IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

LAWRENCE ALEXANDER JR., ELLIS          )
ALLEN, MITCHELL ALSTON, FRANCES R.     )
BANKS, AHMED BLAKE, MICHAEL O.         )
BRODIE, KEVIN E. CHANDLER,             )
CHARLES E. CHERRY, ERNEST              )
CUTHBERTSON, DARRIN DAVIS,             )
STEVEN A. EVANS, WILLIAM GRAVES,       )
MILFORD J. HARRIS II, JONATHAN         )
HEARD, ANTUAN HINSON, STEPHEN L.       )
HUNTER, BRIAN JAMES, DEMETRIUS         )
W. JOHNSON, JOHN O. LEGRANDE,          )
GEORGE M. LITTLE, DARRELL              )
MCDONALD, C.L. MELVIN, STACY A.        )
MORTON JR., WILLIE PARKER, LARRY       )
PATTERSON JR., WILLIAM A. PHIFER,      )
JOSEPH PRYOR, NORMAN RANKIN,           )
WAYNE REDFERN, ALEXANDER RICKETTS,     )
RONALD ROGERS, STEVEN SNIPES,          )
CALVIN STEVENS JR., ERIC STEVENSON     )
JERMEIR JACKSON-STROUD, JULIUS         )
TUNSTALL, ALLEN WALLACE, FRANK         )
YOUNG and MICHAEL WAYLAND WALL,        )
                                       )
            Plaintiffs,                )
                                       )
v.                                     )          1:09-CV-293
                                       )
THE CITY OF GREENSBORO, DAVID          )
WRAY, Former Police Chief of the       )
City of Greensboro, in his             )
individual and official               )
capacities, RANDALL BRADY, Former      )
Deputy Police Chief of the City        )
of Greensboro, in his individual       )
and official capacities, TRUDY         )
WADE, Member of City Council of        )
the City of Greensboro, in her         )
individual and official               )
capacities, and SCOTT SANDERS,         )
in his individual and official         )
capacities.                            )
                                       )
            Defendants.                )

**MEMORANDUM OPINION AND ORDER**

THOMAS D. SCHROEDER, District Judge

## TABLE OF CONTENTS

I.   **BACKGROUND** .............................................. 1

II.  **ANALYSIS** ............................................... 10

    A.   Standard for Rule 12(b)(6) Motions ................. 11

    B.   Federal Claims .................................... 14

        1.   City of Greensboro ........................... 14

            a.   42 U.S.C. §§ 1981 and 1983 (Counts II, V)  14

                i.   Municipal Policy ................... 16
                ii.  Municipal Custom ................... 19
                iii. Proposed SAC ....................... 21

            b.   Conspiracy and 42 U.S.C. § 1981
                (Count III) ........................... 23

            c.   42 U.S.C. § 1985(3) (Count V) ........... 25

        2.   Defendant Wade ............................... 26

            a.   Official Capacity Claims ................. 26

            b.   42 U.S.C. § 1983 (Count V) .............. 27

            c.   42 U.S.C. § 1985(3) (Count V) ........... 30

        3.   GPD Defendants (Wray, Brady, and Sanders) ..... 31

            a.   Official Capacity Claims ................. 32

            b.   42 U.S.C. § 1981 (Count II) .............. 34

                i.   Domino's Pizza, Inc. v. McDonald .... 35

                ii.  The "Plausibility" Standard ......... 39

                    (a). All Plaintiffs ................. 42

                    (1)  Disparate Treatment........42
                    (2)  Hostile Work Environment...46

              (b). Plaintiff Steven A. Evans ...... 49
              (c). Plaintiff Lawrence Alexander Jr.51
              (d). Plaintiff Antuan Hinson ........ 54
              (e). Plaintiff Brian James ......... 55
              (f). Plaintiffs Rankin and Patterson 57

                    (1)  Discussion of Personnel
                         Information .............. 57
                    (2)  Discriminatory
                         Investigation ............ 59

              (g). Plaintiffs Cuthbertson and
                   Rankin ...................... 59

                    (1)  Fake Investigations ....... 59
                    (2)  Undercutting of Plaintiffs'
                         Investigation ............ 60

              (h). Plaintiff Joseph Pryor ......... 61

                    (1)  Improper Administrative
                         Pressure ................. 61
                    (2)  Potential Improper
                         Investigation ............ 64

              (i). Plaintiff William A. Phifer .... 65

              (j). Plaintiff Stephen L. Hunter .... 66

                    (1)  Inappropriate Discipline .. 66
                    (2)  Retaliatory Investigation . 66

              (k). Plaintiff Steven Snipes ........ 68
              (l). "Assistant Chief Stevenson" .... 69
              (m). Summary ....................... 69

     c.  Conspiracy and 42 U.S.C. § 1981
         (Count III) ............................ 70

     d.  42 U.S.C. §§ 1983 and 1985(3) (Count V) .. 72

         i.  42 U.S.C. § 1983 (Count V) ......... 74

              (a). First and Fifth Amendments ..... 76

                              iii

(b). Fourth Amendment .............. 76
(c). Due Process ................... 79
(d). Equal Protection ............. 80
(e). Summary ...................... 82

ii.  42 U.S.C. § 1985(3) (Count V) ....... 82

C.  State Claims ..................................... 84

1.  Breach of Contract (Count I) ................. 85

2.  North Carolina Equal Employment Practices Act
    (Count IV) ................................... 88

3.  Invasion of Privacy (Count VI) ............... 89

    a.  City of Greensboro ...................... 90

    b.  Defendant Wade .......................... 93

    c.  GPD Defendants ......................... 105

4.  Tortious Interference with Prospective Economic
    Advantage (Count VII) ....................... 107

5.  Gross Negligence (Count VIII) ............... 119

    a.  City of Greensboro ..................... 119

    b.  Defendant Wade ......................... 120

    c.  Defendants Wray and Brady .............. 121

6.  Civil Conspiracy (Count IX) ................. 124

D.  Injunctive Relief ("Count IX [sic]") .............. 125

E.  Summary ......................................... 125

III. CONCLUSION ........................................... 126

This matter is before the court on various motions to dismiss filed by Defendants Randall Brady ("Brady") and Scott Sanders ("Sanders") (Doc. 22), David Wray ("Wray") (Doc. 24), the City of Greensboro ("the City") (Doc. 27), and Trudy Wade ("Wade") (Doc. 29). Plaintiffs oppose each motion. Additionally, Plaintiffs have filed a motion to amend the complaint again (Doc. 32), which all Defendants oppose. For the reasons below, the motions are granted in part and denied in part.

I.   **BACKGROUND**

This action was originally commenced in the Superior Court for Guilford County (North Carolina) on January 9, 2009. Plaintiffs filed an amended complaint ("Amended Complaint") dated March 13, 2009 (Doc. 5), and the City removed the case to this court on April 17, 2009.

The Amended Complaint sets forth certain allegations, which are supplemented and expanded on by the proposed Second Amended Complaint ("SAC") (Doc. 32, Ex. 1). Because all allegations in the SAC must be considered to determine whether the proposed amendment would be futile, the court here will summarize all the factual allegations as contained in both complaints. For purposes of the motions to dismiss, the court will view all allegations in the light most favorable to Plaintiffs as the

non-moving parties.  <u>Ibarra v. United States</u>, 120 F.3d 472, 474 (4th Cir. 1997).

Plaintiffs[1] are all African-American/black police officers employed by the Greensboro Police Department ("GPD") when Defendant Wray was promoted to Chief of Police and Defendant Brady to Deputy Chief.  Defendant Sanders was assigned to GPD's Special Investigation Division ("SID"), referred to as the Special Intelligence Section in the SAC.  Wray, Brady and Sanders are white.

After their promotions, Wray and Brady allegedly directed subordinate officers to gather pictures of black GPD officers for line-up books and other visual aids that were sometimes referred to as the "Black Book."  Plaintiffs contend, upon information and belief, that their photographs, likenesses, or names were included in at least one version of the Black Book, which Sanders and other non-black officers showed on numerous occasions to the general public and criminal suspects in an effort to implicate black GPD officers in wrongdoing.

---

[1]  Thirty-nine Plaintiffs are named in the caption of the Amended Complaint; Darryl Stevenson is identified as a Plaintiff in paragraph 25 of both the Amended Complaint and the SAC yet is not listed in the caption of the Amended Complaint or the introductory paragraph of either complaint.  (The caption of the SAC does not list the Plaintiffs.)

Plaintiffs allege that the Black Book was not compiled or used for any legitimate investigatory purpose.[2]

According to Plaintiffs, Defendants Wray, Brady, Sanders, and the City improperly used the SID, which was created to investigate groups like the Ku Klux Klan and street gangs, to investigate black GPD officers, including Plaintiffs, even though the GPD had a Criminal Investigation Division ("CID") whose purpose was to investigate officer misconduct. Wray and Brady instructed Sanders and other non-black SID officers to investigate black GPD officers numerous times without following GPD standards. On several occasions, they allegedly investigated black GPD officers and their families despite no complaints having been made against the officers. When third parties alleged misconduct by GPD officers, moreover, Sanders and the SID unit targeted only the black officers involved. Upon instructions of Wray and Brady, and contrary to GPD policy, black officers were allegedly investigated without any reasonable suspicion of unlawful conduct in order to test the officers' honesty and to entrap them. Plaintiffs claim that the actions of SID officers, under the direction of Wray and Brady,

---

[2] Defendants contend that the Black Book and subsequent investigations were legitimate and stemmed from an allegation that a uniformed GPD officer sexually assaulted a female. (See Doc. 5 ¶ 64; Doc. 32, Ex. 1 ¶ 64; see also id. (City Legal Report) at 65.)

created an atmosphere of fear, distrust, and suspicion and undermined the morale of the GPD.

Plaintiffs allege generally that Wray, Brady, and the City "repeatedly, intentionally, and continuously" failed to promote black GPD officers to positions for which they were qualified and should have been promoted, although no instance of a Plaintiff being denied a promotion is alleged. (Doc. 5 ¶ 82; Doc. 32, Ex. 1 ¶ 106.) Plaintiffs allege that even in cases where black GPD officers were promoted (Plaintiffs identify two such officers), such promotions were made only to suggest the appearance of equal treatment. Plaintiffs also allege generally that black GPD officers were "frequently and typically denied opportunities and benefits afforded to other officers," although Plaintiffs allege only facts relating to (1) a denial of reimbursement of expenses for Plaintiff Steven A. Evans ("Evans") for his attendance at a marksmanship certification program and (2) Wray's designation of white officers, instead of Evans, as marksmanship instructors at local community colleges and/or the Greensboro Police Academy. (Doc. 5 ¶ 85; Doc. 32, Ex. 1 ¶ 109.)

Plaintiffs allege that Wray and the City "on numerous occasions violated the North Carolina Personnel Privacy Act in an effort to embarrass, intimidate, and/or discredit" black GPD officers, citing a June 2005 meeting with the Greensboro Police

Officers Association during which "Wray publicly discussed the details of investigations into allegations of criminal conduct, identifying by name various black officers of the [GPD] in connection with such investigations." (Doc. 5 ¶ 90.) Even after their resignations, Wray and Brady allegedly routinely disclosed personnel information of black GPD officers to a news reporter. (Id.; see Doc. 5-2 ¶ 120; Doc. 34 at 7.) Plaintiffs also allege that Wray, Brady, and others in management positions within the GPD instituted, ratified, or approved of these discriminatory acts and that race "was at least a motivating factor for each of the unlawful employment practices described herein." (Doc. 5 ¶¶ 86, 88.)

On or about November 11, 2005, the City retained Risk Management Associates ("RMA"), a consulting firm, to investigate allegations brought to the City's attention about Wray, Brady, and Sanders. (Doc. 32, Ex. 1 ¶ 96.) RMA interviewed 52 GPD officers and law enforcement officials as part of its review and on December 11, 2005, issued a report ("RMA Report") that allegedly found that "the GPD engaged in a number of illegal and or improper practices" that included "disparate treatment of African-Americans," "the appearance of racial targeting/discrimination," and "failure to follow procedures." (Id. ¶¶ 98-99.)

Plaintiffs allege that at the direction of Wray and Brady, Sanders placed keystroke-monitoring devices on the computers "of numerous Plaintiffs and other African-American officers of the [GPD]" without just cause. (Id. ¶ 101.) Plaintiffs identify only Plaintiff Antuan Hinson ("Hinson"), however, as one whose computer was allegedly monitored for keystrokes to determine a password to allow Sanders to enter his email account and download around one year of his emails. (Id.)

Plaintiffs also allege that "on numerous occasions" Wray disparately disciplined black GPD officers and pressured subordinates to alter findings and evaluations "in order to make such determinations less favorable to African-American officers of the [GPD]." (Id. ¶¶ 92-93.) The SAC alleges as "examples," however, only instances relating to Plaintiffs William A. Phifer ("Phifer") and Stephen L. Hunter ("Hunter"). (Id. ¶¶ 93-94.) The SAC also alleges that Plaintiffs Brian James ("James") and Lawrence Alexander Jr. ("Alexander") were interrogated by Sanders as part of criminal investigations, although the conduct being investigated allegedly did not warrant criminal questioning. (Id. ¶ 95.)

Ultimately, the City accepted the resignations of Wray (sometime in January 2006) and Brady (date not alleged). (See id. ¶ 91.) Thereafter, the City Attorney's office conducted its own review and issued a report ("City Legal Report"). (Id.)

6

Pages two through forty-four are attached to the SAC. (Id. (City Legal Report) at 36-78.) The City Legal Report details the findings of the City Attorney's office as to the circumstances alleged by the Plaintiffs herein and provides additional instances of alleged wrongful conduct directed toward certain GPD officers. Suffice it to say, however, the vast majority of the Plaintiffs are not mentioned in the City Legal Report (those few who are mentioned are addressed more specifically in the court's analysis to follow).

On or about March 4, 2008, in an effort to resolve Plaintiffs' complaints resulting from Defendants' alleged racially motivated actions, the acting Greensboro City Attorney drafted and required Plaintiffs and the City to sign a Stipulation of Confidentiality ("Stipulation"). Plaintiffs and the City agreed that all discussions related to resolving their disputes would be held strictly confidential and would not be disclosed to third parties for any reason. The Stipulation was signed by Plaintiffs, the City Attorney, and the Mayor of Greensboro. On or about October 21, 2008, the City Council held a meeting in closed session to discuss Plaintiffs' claims. No Plaintiff, representative of Plaintiffs, or media outlet was present. As a result of the meeting, the City submitted a written offer to settle Plaintiffs' claims for a specific monetary amount.

Plaintiffs contend that, "in an effort to derail the settlement," Defendant Wade, an elected member of the Greensboro City Council, invited and encouraged a reporter for the Rhino Times, a weekly newspaper with circulation in Greensboro, to submit a "purported" public records request for the settlement information, which the reporter did. (Doc. 5 ¶¶ 100-03.) Plaintiffs claim that Wade provided the reporter Plaintiffs' names (received through Wade's own "purported" public records request) and the monetary amount offered by the City, which was not publicly available but had been revealed to Wade in her capacity as a Greensboro City Council member. (Id. ¶ 102.) According to Plaintiffs, the City Attorney had refused to provide City Council members with Plaintiffs' identities because they had filed a discrimination complaint with the EEOC, which allegedly constituted confidential personnel information under state law, and because such information was protected by the Stipulation. On November 13, 2008, the reporter published an article in the Rhino Times that identified all Plaintiffs by name and the monetary amount of the City's offer.

Following the article's publication, numerous constituents unhappy with the proposed offer contacted Greensboro City Council members. On or about November 18, 2008, the City Council held a scheduled meeting during which members of the public expressed disapproval of the monetary sum offered to

Plaintiffs. Thereafter, the City Council met in closed session without the Mayor and allegedly voted to rescind the offer made to Plaintiffs. The next day, the City Attorney informed Plaintiffs' counsel of the rescission.

Plaintiffs now bring the following claims: (Count I) breach of contract based on the Stipulation (against the City); (Count II) discrimination on the basis of race under 42 U.S.C. § 1981 (against the City, Wray, Brady, and Sanders); (Count III) conspiracy to discriminate on the basis of race under section 1981 (against the City, Wray, Brady, and Sanders); (Count IV) discrimination in employment under the N.C. Equal Employment Practices Act (against all Defendants); (Count V) violations of civil rights under 42 U.S.C. §§ 1983 and 1985(3) (against all Defendants); (Count VI) invasion of privacy (against all Defendants); (Count VII) tortious interference with prospective economic advantage (against Wade); (Count VIII) gross negligence (against the City, Wray, Brady, and Wade); and (Count IX) civil conspiracy (against Wray, Brady, Sanders, and Wade). Plaintiffs seek compensatory and punitive damages as well as injunctive relief ("Count IX [sic]"[3]).[4]

---

[3]  Plaintiffs' civil conspiracy claim and request for injunctive relief are each labeled erroneously as "Count IX" in both complaints.

[4]  In a parallel action filed in this court on December 7, 2009, Plaintiffs bring claims against the City under Title VII of the Civil Rights Act of 1964 (as amended), 42 U.S.C. §§ 2000e et seq. (See Case No. 1:09-CV-934, Docs. 1, 4.)

After all Defendants had filed motions to dismiss (and after four of the five Defendants had filed answers), Plaintiffs moved for leave to file the SAC. (Doc. 32.) Defendants oppose the motion to amend as futile.

## II. ANALYSIS

Plaintiffs acknowledge that they may amend their complaint again "only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). "The court should freely give leave when justice so requires." Id. Leave to amend will be denied only if (1) the amendment would prejudice the opposing party, (2) there is bad faith on the part of the moving party, or (3) the amendment would be futile. Laber v. Harvey, 438 F.3d 404, 426 (4th Cir. 2006) (en banc).

Plaintiffs argue that they are entitled to file the SAC because the new allegations arise out of the same conduct and occurrences set forth in the original pleadings. Plaintiffs claim that the amendment will not prejudice Defendants, since discovery has not yet begun, no Local Rule 16.1(b) meeting of the parties has occurred, no initial disclosures have been made pursuant to Federal Rule of Civil Procedure 26, and no trial date has been set. Finally, Plaintiffs contend that the proposed amendment is neither futile nor made in bad faith.

Defendants oppose the amendment on grounds of futility.[5] They contend that Plaintiffs' Amended Complaint does not survive their motions to dismiss and that the proposed SAC contains nothing that will save it from those same motions. See Perkins v. United States, 55 F.3d 910, 917 (4th Cir. 1995) (noting that "the district court was justified in denying [plaintiff's] motion to amend her complaint because the proposed amendments could not withstand a motion to dismiss").

Because Defendants' motions to dismiss are closely related to their futility arguments, and because the parties have fully briefed the motions to dismiss and Plaintiffs' motion to amend, the court will consider all these motions together as it analyzes each of Plaintiffs' claims.

## A. Standard for Rule 12(b)(6) Motions

A motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6) "challenges the legal sufficiency of a complaint . . . considered with the assumption that the facts alleged are true." Francis v. Giacomelli, 588 F.3d 186, 192

---

[5]   Defendants also oppose the amendment on grounds of bad faith, arguing that Plaintiffs' motion to amend is brought solely "for the purpose of circumventing [Defendants'] dispositive motions." Googerdy v. N.C. Agric. & Technical State Univ., 386 F. Supp. 2d 618, 623 (M.D.N.C. 2005). Because of the court's ultimate ruling that certain of Plaintiffs' claims should be allowed to proceed and that Plaintiffs' amendment is not futile as to those claims, the court rejects Defendants' "bad faith" argument.

(4th Cir. 2009) (citations omitted).[6]  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). This "plausibility standard" requires that the plaintiff "articulate facts . . . that 'show' that the plaintiff has stated a claim entitling him to relief."  Francis, 588 F.3d at 193 (citing Iqbal, 129 S. Ct. at 1949).  Legal conclusions in a complaint are not entitled to the assumption of truth.  Iqbal, 129 S. Ct. at 1949-50.  If the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'show[n]' — 'that the

---

[6]  The City and Wade also seek relief under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(2) in connection with their immunity defenses to certain claims.  Defendants Wray, Brady, and Sanders cite Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) in connection with the official capacity claims against them (without any further discussion of Rule 12(b)(1)), and they point to Local Rule 7.3 as grounds for dismissal without any additional explanation.  Finally, Wray, Brady, and Sanders state that their motions to dismiss are brought under both Federal Rules of Civil Procedure 12(b)(6) and 12(c) (as motions for judgment on the pleadings).  While these Defendants' motions to dismiss (Docs. 22, 24) are docketed after their respective answers (Docs. 21, 23), all four documents carry the same date and each motion to dismiss appears to have been filed together with the respective answer.  Consequently, keeping in mind Plaintiffs' motion for leave to amend their complaint, the court in its discretion treats Defendants' Rule 12(c) motions as Rule 12(b)(6) motions.  See Kutsmeda v. Trust One Mortg. Corp., No. 3:05-CV-518 (JRS), 2005 WL 3357347, at *2 (E.D. Va. Dec. 9, 2005) ("When a court cannot definitively deem the pleadings closed, it is within the court's discretion to treat a Rule 12(c) motion . . . as a Rule 12(b)(6) motion to dismiss.").

pleader is entitled to relief.'" Id. at 1950 (alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)).

Employment discrimination claims carry no heightened pleading standard, see Twombly, 550 U.S. at 569-70, nor must an employment discrimination complaint contain specific facts establishing a prima facie case, Swierkiewicz v. Sorema N.A., 534 U.S. 506, 510-11, 515 (2002). Yet the Fourth Circuit has not interpreted Swierkiewicz as removing the burden of a plaintiff to plead facts sufficient to state all the elements of his claim. Bass v. E.I. DuPont de Nemours & Co., 324 F.3d 761, 764-65 (4th Cir. 2003) (holding that the plaintiff failed to allege facts sufficient to support all the elements of her hostile work environment claim); see also Jordan v. Alt. Res. Corp., 458 F.3d 332, 346-47 (4th Cir. 2006) (affirming the dismissal of a 42 U.S.C. § 1981 discrimination claim because the complaint did not allege facts supporting the assertion that race was a motivating factor in the plaintiff's termination). As is seen below, the court's task is made more difficult by the Amended Complaint's (and SAC's) inclusion of forty apparent Plaintiffs under circumstances where most factual allegations, where they have any specificity, are related only generally or (as in most cases) not at all to any particular Plaintiff.

**B.  Federal Claims**

Plaintiffs' Amended Complaint and SAC both contain three counts under federal law: (1) discrimination on the basis of race under 42 U.S.C. § 1981 (Count II); (2) conspiracy to discriminate on the basis of race under section 1981 (Count III); and (3) violations of civil rights under 42 U.S.C. §§ 1983 and 1985(3) (Count V), which can be analyzed as two separate claims.  The claims against each Defendant will be considered in turn: (a) Defendant City of Greensboro; (b) Defendant Wade; and (c) Defendants Wray, Brady, and Sanders (collectively "GPD Defendants"), who all present the same arguments.

**1.  City of Greensboro**

**a.  42 U.S.C. §§ 1981 and 1983 (Counts II, V)**

Although Plaintiffs do not mention section 1983 in their section 1981 claim, "when suit is brought against a state actor, § 1983 is the 'exclusive federal remedy for violation of the rights guaranteed in § 1981.'"  Dennis v. Cnty. of Fairfax, 55 F.3d 151, 156 (4th Cir. 1995) (quoting Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 733 (1989)).  Because the requirements of section 1983 must therefore be satisfied for a section 1981 claim to prevail, id., Plaintiffs' section 1981 and 1983 claims will be considered together.

Both claims rest entirely upon the allegedly wrongful actions of Wray, Brady, Sanders, Wade, and unnamed non-black GPD

employees.[7]  However, a municipality cannot be held liable under section 1983 on a *respondeat superior* theory.  <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658, 691-92 (1978).  Rather, "[t]o state a cause of action against a municipality, a section 1983 plaintiff must plead (1) the existence of an official policy or custom; (2) that the policy or custom is fairly attributable to the municipality; and (3) that the policy or custom proximately caused the deprivation of a constitutional right."  <u>Pettiford v. City of Greensboro</u>, 556 F. Supp. 2d 512, 530 (M.D.N.C. 2008) (citing <u>Jordan ex rel. Jordan v. Jackson</u>, 15 F.3d 333, 338 (4th Cir. 1994)).  Municipal policy can be found in (1) written ordinances and regulations, (2) affirmative decisions of policymaking officials, or (3) omissions by policymaking officials "that manifest deliberate indifference to the rights of citizens."  <u>Carter v. Morris</u>, 164 F.3d 215, 218 (4th Cir. 1999).  A municipal custom may arise "if a practice is so 'persistent and widespread' and 'so permanent and well settled as to constitute a "custom or usage" with the force of law.'"  <u>Id.</u> (quoting <u>Monell</u>, 436 U.S. at 691).

Plaintiffs raise two arguments in favor of the existence of a municipal policy or custom: (1) that Wray, Brady, and Sanders

---

[7] More specifically, the section 1981 claim is based on the actions of Wray, Brady, Sanders, and unnamed non-black GPD employees.  The section 1983 claim is based on the actions of all these persons, plus Wade.

had final policymaking authority in connection with the actions allegedly taken against Plaintiffs (see Doc. 5, ¶ 70; Doc. 5-2, ¶¶ 135, 144); and (2) that a municipal custom arose from a "persistent and widespread" practice.

### i. Municipal Policy

Plaintiffs allege that Wray, Brady, and Sanders had "actual or *de facto* final policy-making authority in connection with the adverse personnel actions described" in the Amended Complaint. (Doc. 5-2, ¶ 144; see also id. ¶ 135.) However, in Greensboro Professional Fire Fighters Ass'n, Local 3157 v. City of Greensboro, 64 F.3d 962 (4th Cir. 1995), the Fourth Circuit held that under the Greensboro City Ordinance "*only* the City Manager and the City Council possess the authority to fashion policy with regard to employer-employee relations in all city departments." Id. at 965. The court further held that although the Greensboro Fire Chief had final decisionmaking authority to appoint captains and to establish procedures for those appointments, he did not have "policymaking" authority.[8] Id. at 965-66. Rather, the Fire Chief's powers were "always subject to the parameters established by the City." Id. The court cautioned against confusing "the authority to make final *policy*

---

[8] The question whether an individual possesses final policymaking authority is a matter of state law. See Crowley v. Prince George's Cnty., Md., 890 F.2d 683, 685 (4th Cir. 1989) (citing City of St. Louis v. Praprotnik, 485 U.S. 112, 124 (1988) (plurality opinion)).

with the authority to make final implementing *decisions*."  <u>Id.</u>
at 966; <u>see also</u> <u>Robinson v. Balog</u>, 160 F.3d 183, 190 (4th Cir.
1998) ("The fact that [the director of the Baltimore Department
of Public Works] had the power to choose whom to hire, promote,
discharge, and transfer within the department he directed simply
cannot establish that he had the broader authority to craft
municipal policy.").

The Amended Complaint alleges facts showing that Wray,
Brady, and Sanders had power to make many (perhaps most)
decisions about the operation of the GPD and the SID.  But it
contains no factual allegations supporting a reasonable
inference that this power rose to the level of municipal
"policymaking."  Instead, it contains only the bare assertion
(repeated for emphasis) that Wray, Brady, and Sanders had "final
policy-making authority."  For example, Plaintiffs allege that
Sanders was "in effect delegated with policy-making authority
[by Wray and Brady] with respect to investigations of black
officers."  (Doc. 5 ¶ 70.)  Plaintiffs allege no facts to
suggest why the holding in <u>Fire Fighters Ass'n</u> should not apply
in this case.  Importantly, there is no allegation that the
Greensboro City Council or City Manager delegated final
policymaking authority over employer-employee relations to Wray,
Brady, or Sanders.

Plaintiffs seek to distinguish Fire Fighters Ass'n on the ground that it was decided on summary judgment, noting the court's statement that "[t]here is no evidence in the record that the City Council or the City Manager had delegated any of its policymaking authority with regard to employer-employee relations to the Fire Chief." 64 F.3d at 965. Plaintiffs argue that "[a]t the pleading stage, obviously, a plaintiff need not come forward with 'evidence' of anything." (Doc. 45 at 5.)

While it is true that Plaintiffs need not establish a prima facie case at this stage, Iqbal and Twombly require more than claims from which mere possibility can be inferred; they require facts showing plausibility. Plaintiffs have not met this standard. See Yadin Co. v. City of Peoria, No. CV-06-1317-PHX-PGR, 2008 WL 906730, at *5 (D. Ariz. Mar. 25, 2008) (dismissing section 1983 claim for lack of factual allegations supporting plaintiff's assertion that a city official had final policymaking authority or had been delegated such authority); Lyttle v. Killackey, 528 F. Supp. 2d 818, 828-29 (N.D. Ill. 2007) (finding complaint defective for failure to plead facts supporting claim that final policymaking authority was delegated to police officers), reconsidered on other counts, 546 F. Supp. 2d 583 (N.D. Ill. 2008).

In fact, Plaintiffs' pleadings and briefs demonstrate that the GPD Defendants did not have final policymaking authority.

For example, Plaintiffs provide an excerpt from the Greensboro City Charter that provides in part: "The chief of police, acting under the city manager, shall have supervision and control of the police force and shall enforce discipline therein." Greensboro, N.C., Charter § 4.31. If an official's acts are subject to review or supervision by a municipal policymaker, that official does not have final policymaking authority. See Riddick v. Sch. Bd., 238 F.3d 518, 523-24 (4th Cir. 2000).

### ii. Municipal Custom

Plaintiffs plead that the allegedly wrongful actions of Wray, Brady, Sanders, and Wade were "pursuant to municipal policy or custom." (See, e.g., Doc. 5-2 ¶¶ 148, 156.) Yet Plaintiffs focus primarily upon the "policy" and "policymakers" argument in their briefs, raising the "custom" argument only indirectly (see Doc. 35 at 13-15) or very briefly (see Doc. 45 at 7-8). To the extent they raise this argument, it is unsupported by the facts alleged in their Amended Complaint.

To establish municipal liability for a widespread, unconstitutional custom or practice among the City's police force, Plaintiffs must show (1) that the City had "'actual or constructive knowledge' of the custom and usage by its responsible policymakers," and (2) that there was a failure by those policymakers, "'as a matter of specific intent or deliberate indifference,' to correct or terminate the improper

19

custom and usage." Randall v. Prince George's Cnty., Md., 302
F.3d 188, 210 (4th Cir. 2002) (quoting Spell v. McDaniel, 824
F.2d 1380, 1391 (4th Cir. 1987)).

Plaintiffs have failed to allege facts showing that the
City Manager, the City Council, or any other responsible
policymaker had actual or constructive knowledge of the
allegedly wrongful acts of the other Defendants and that these
policymakers deliberately failed to correct these wrongs.
Plaintiffs' Amended Complaint alleges that in January 2006 the
City Manager publicly condemned the GPD Defendants' actions and
accepted Wray's resignation as Chief of Police. (See Doc. 5
¶¶ 51-54, 56-57, 59-62.) At that time, he also announced that
after reviewing one of the line-up books, he had confronted Wray
about it in the summer of 2005, that Wray had denied knowledge
of it, and that Wray had ordered Brady to hide it. (Id. ¶ 59.)
The only other factual allegations involving municipal
policymakers concern the Stipulation, signed when the City was
attempting to negotiate a settlement with Plaintiffs. This
hardly shows "deliberate indifference" by the City. Finally,
Plaintiffs do not even attempt to argue that the allegedly
wrongful action of Wade — an isolated incident of releasing
information pursuant to a public records request — constituted a
"custom" under the Randall standard.

Plaintiffs have failed to allege facts showing a municipal policy or custom. Consequently, their section 1981 and section 1983 claims against the City, as stated in the Amended Complaint, must be dismissed.[9]

### iii. Proposed SAC

The new allegations of Plaintiffs' proposed SAC fail to alter this holding.

The SAC alleges that Brady was "a person empowered by Defendant Greensboro to establish the Greensboro Police Department's official policies and customs with regard to employment practices . . . and to conduct of investigations . . . in the absence of the Chief of Police." (Doc. 32, Ex. 1 ¶ 71.) It also alleges that Brady was "empowered by Defendant Greensboro to establish . . . official policies and customs with regard to the activities and functions of SID." (Id. ¶ 72.) If this is an attempt to establish that Brady is a "policymaker," it is no less conclusory and lacking in factual support than Plaintiffs' original bald assertions that the GPD Defendants were "policymakers."

Plaintiffs further allege that "Brady reported all substantive activities of SID directly to Defendant Wray" (id.

---

[9] Because Plaintiffs have not alleged facts showing a municipal policy or custom, it is unnecessary to address the City's arguments that Plaintiffs failed to allege sufficient facts to state a claim for discrimination based on race or violation of civil rights and that Plaintiffs' section 1983 claim is barred, at least in part, by the applicable statute of limitations.

¶ 73) and that Sanders "answered only to Defendants Brady and Wray" rather than to the SID sergeant (id. ¶ 74). The same paragraph alleges that Brady, authorized by Wray, instructed Sanders to report directly to Brady and Wray "in contravention of established policy." (Id.) These allegations do not cure the deficiencies in the Amended Complaint and, insofar as Plaintiffs claim that Brady and Sanders were final policymakers, undercut that claim.

The SAC also details the investigation conducted by the City Attorney's office after Wray and Brady resigned (id. ¶¶ 91-95) and the City's hiring of RMA in November 2005 to investigate allegations of wrongdoing by the GPD Defendants (id. ¶¶ 96-99). Plaintiffs attach nearly the entirety of the City Legal Report by the City Attorney's office. None of this new material provides any factual support for the existence of a municipal policy or custom. To the contrary, the existence of these reports, which resulted from investigations initiated by the City, undercuts Plaintiffs' argument that the City was "deliberately indifferent" to the alleged misconduct. The City Legal Report, which the SAC incorporates by reference, states that the City began an investigation once three African-American GPD officers raised concerns about Wray, Brady, and Sanders to the City Manager in early August 2005. (Id. (City Legal Report) at 37, 75.) The Report details that during the approximately

three months following notice to the City in August 2005, the City's investigation involved interviews of a ranking member of the State Bureau of Investigation, the U.S. Attorney for the Middle District of North Carolina, and over fifty GPD officers and related law enforcement personnel, as well as the retention of RMA for its independent analysis. (Id. at 37-38, 45-47, 75.)

Therefore, because Plaintiffs' section 1981 and 1983 claims against the City would not survive the City's motion to dismiss even if Plaintiffs were permitted to file the SAC, the court finds that Plaintiffs' proposed amendment would be futile.

### b.   Conspiracy and 42 U.S.C. § 1981 (Count III)

The exact nature of Plaintiffs' section 1981 conspiracy claim against the City is unclear, and Plaintiffs do not address it in their briefing.  In any event, Plaintiffs' claim fails.

To the extent Plaintiffs allege a conspiracy that violates section 1981, the claim fails because Plaintiffs have not alleged facts showing a municipal policy or custom, as discussed above.  To the extent Plaintiffs seek to allege some sort of state law conspiracy to violate section 1981, they have provided no legal support for or explanation of such a theory.  Even if they could do so, the claim would still fail for the following reasons.  First, under North Carolina law a municipality generally may not be a party to a conspiracy.  Houpe v. City of Statesville, 128 N.C. App. 334, 352, 497 S.E.2d 82, 93-94 (1998)

("[A] municipal corporation, which is limited by law to the purposes and objects of its creation . . . cannot in its sovereign or municipal capacity be a party to a conspiracy." (quoting Charlton v. City of Hialeah, 188 F.2d 421, 422 (5th Cir. 1951))); see also Franklin v. Yancey Cnty., Civil No. 1:09cv199, 2010 WL 317804, at *5 (W.D.N.C. Jan. 19, 2010) (citing Houpe). Plaintiffs' Amended Complaint does not allege that the asserted conspiracy falls outside this general rule. See Houpe, 128 N.C. App. at 352, 497 S.E.2d at 94. Second, a municipality generally cannot conspire with itself under the intracorporate conspiracy (or intracorporate immunity) doctrine. "[S]ince at least two persons must be present to form a conspiracy, a corporation cannot conspire with itself . . . . An allegation that a corporation is conspiring with its agents, officers or employees is tantamount to accusing a corporation of conspiring with itself." State ex rel. Cooper v. Ridgeway Brands Mfg., LLC, 184 N.C. App. 613, 625, 646 S.E.2d 790, 799 (2007) (citation omitted), aff'd in part and rev'd in part on other grounds, 362 N.C. 431, 666 S.E.2d 107 (2008). The doctrine is equally applicable to municipalities. See Iglesias v. Wolford, 539 F. Supp. 2d 831, 835-36 (E.D.N.C. 2008). Merely suing the agents, officers, or employees in their individual capacities does not change this result. Cooper, 184 N.C. App. at 625, 646 S.E.2d at 799. Thus, Plaintiffs' conspiracy claim

will be dismissed. The court finds nothing in the SAC that would save this claim, so the proposed amendment would be futile.

### c. 42 U.S.C. § 1985(3) (Count V)

Plaintiffs' final federal claim against the City is conspiracy to violate civil rights under section 1985(3). The City argues that this claim is barred by the intracorporate conspiracy doctrine. The Fourth Circuit has clearly held that the doctrine applies to federal civil-rights actions. See Buschi v. Kirven, 775 F.2d 1240, 1251-53 (4th Cir. 1985). Plaintiffs have not responded to this argument.

Plaintiffs' Amended Complaint alleges that "[a]ll of the activities referred to in the Complaint were performed by, or at the direction of the Defendants Wray and Brady, individually, together, and as part of a conspiracy involving them, Defendant Sanders, and other non-black [GPD] employees . . . and *while said Defendants were employed by the Defendant Greensboro*." (Doc. 5 ¶ 89 (emphasis added).) Also, Wade's alleged actions were taken while she was "an elected member of the Greensboro City Council." (Id. ¶ 102.) For the reasons noted above, because under the intracorporate conspiracy doctrine the City could not have conspired with the other Defendants, this claim will be dismissed. See Buschi, 775 F.2d at 1251-53; Iglesias, 539 F. Supp. 2d at 835-36, 838. The court finds nothing in the

SAC that would save this claim, so the proposed amendment would be futile.

## 2. Defendant Wade

Plaintiffs bring only two federal claims against Wade: (1) violation of civil rights under 42 U.S.C. § 1983 (Count V), and (2) conspiracy to violate civil rights under 42 U.S.C. § 1985(3) (Count V). Wade is sued in both her official and individual capacities.

### a. Official Capacity Claims

Wade argues that Plaintiffs' claims against her in her official capacity are merely another way of pleading those claims against the City, and she contends that they should be dismissed as unnecessary and redundant.[10] See Kentucky v. Graham, 473 U.S. 159, 165 (1985) ("Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" (quoting Monell, 436 U.S. at 690 n.55)); Love-Lane v. Martin, 355 F.3d 766, 783 (4th Cir. 2004) ("The district court correctly held that the § 1983 claim against [defendant] in his official capacity as Superintendent is essentially a claim against the Board and thus should be dismissed as duplicative.").

Plaintiffs concede this point but argue that there is an exception to the extent injunctive relief is sought against the

---

[10] On this issue, Wade adopts the arguments made by Brady and Sanders. (Doc. 26 at 7-8.)

defendant.  See Hafer v. Melo, 502 U.S. 21, 27 (1991) ("[A] state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because official-capacity actions for prospective relief are not treated as actions against the State." (alteration in original) (quoting Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 n.10 (1989)) (internal quotation marks omitted)).  Plaintiffs point out that they seek to enjoin all Defendants from "engaging in further disclosure of plaintiffs' confidential and protected personnel information," among other things.  (Doc. 5-2 ¶¶ 182-85.)

Wade replies that Plaintiffs' request for injunctive relief will not save their section 1983 claim, because they have failed to state a claim for relief under section 1983.[11]  This requires the court to proceed to the substance of Plaintiffs' claims.

### b.  42 U.S.C. § 1983 (Count V)

Plaintiffs' section 1983 claims against Wade in her official and individual capacities are based on the same conduct and can be analyzed together.

---

[11]  Wade apparently assumes that Plaintiffs seek injunctive relief against her on the basis of their section 1983 claim but not their section 1985(3) claim.  While this is a reasonable inference from the wording of Plaintiffs' Amended Complaint (see Doc. 5-2 ¶¶ 182-85), neither the Amended Complaint nor any of Plaintiffs' other filings clarifies this point.  To the extent that Plaintiffs also seek injunctive relief by way of section 1985(3), Wade's argument above applies here as well.

To state a claim under section 1983, Plaintiffs must allege (1) that Wade "deprived [them] of a right secured by the Constitution and laws of the United States," and (2) that the deprivation was performed under color of state law. Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009). The Amended Complaint alleges generally that Plaintiffs "were deprived of their rights to equal protection of all the laws and to due process of law and of their right to their property." (Doc. 5-2 ¶ 157.) Plaintiffs also allege that all Defendants deprived them of "rights, privileges, or immunities secured by the United States Constitution or by Federal law and guaranteed by the First, Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States." (Id. ¶ 156.)

Plaintiffs' specific allegations against Wade are that she ascertained Plaintiffs' identities and the amount of the City's settlement offer to them, that she encouraged a reporter to request this information through a public records request, that the reporter did so, that she revealed the information pursuant to the request and the reporter published it, that she did so to derail the settlement negotiations between Plaintiffs and the City, and that this information was released in violation of state confidentiality laws and/or the Stipulation. Wade argues that these alleged facts do not establish any federal

constitutional violation[12] and that a section 1983 claim cannot be based on a state constitutional violation. Plaintiffs do not respond to this argument but allege only that Wade acted with an improper motive, "inten[ding] to cause Plaintiffs to suffer injury that would likely chill persons of ordinary firmness from continuing to engage in Constitutionally protected activity, including the pursuit of redress in the EEOC proceeding." (Doc. 36 at 15.)

The court finds that Plaintiffs have failed to allege facts rising to the level of a federal constitutional or statutory violation. Plaintiffs allege multiple times that their identities and the City's settlement offer were protected from disclosure by state law and/or the Stipulation. (See Doc. 5 ¶¶ 104, 106; Doc. 5-2 ¶ 121; Doc. 36 at 12, 14-15.) But section 1983 requires factual allegations plausibly showing the deprivation of "a right secured by the Constitution and laws of the United States." Philips, 572 F.3d at 180. It is unclear how Plaintiffs' factual allegations against Wade show a deprivation of any federal constitutional or statutory right. To the extent Plaintiffs rely on an alleged breach of the Stipulation or state law, such grounds do not support a federal claim here. See Stewart v. Hunt, 598 F. Supp. 1342, 1353

---

[12] Wade mentions only Plaintiffs' due process and equal protection claims by name.

(E.D.N.C. 1984) ("§ 1983 imposes liability solely for violations of rights protected by the Constitution and federal law, not for violations arising simply out of state tort and contract law principles. . . . [W]hile some conduct may . . . violate state law, it may not rise to the dimensions of constitutional injury.")  Therefore, Plaintiffs' section 1983 claim against Wade in her official and individual capacities will be dismissed.

The proposed SAC contains no new allegations involving Wade, and Plaintiffs' briefs in support of the amendment do not even mention Wade.  Therefore, the court finds that the proposed amendment would be futile as to this claim.

### c.    42 U.S.C. § 1985(3) (Count V)

Wade contends that Plaintiffs have failed to allege facts showing that she was involved in a conspiracy cognizable under section 1985(3).  Plaintiffs do not respond to Wade's arguments or provide any explanation for or justification of their section 1985(3) claim.

In order to prove a conspiracy in violation of 42 U.S.C. § 1985(3), a plaintiff must show, among other things, that "some racial, or perhaps otherwise class-based, invidiously discriminatory animus [lay] behind the conspirators' action." Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 267-68 (1993) (alteration in original) (quoting Griffin v.

<u>Breckenridge</u>, 403 U.S. 88, 102 (1971)). Here, Plaintiffs' Amended Complaint provides absolutely no factual basis for an inference that Wade's actions were part of a conspiracy motivated by racial or class-based invidiously discriminatory animus. Therefore, because Plaintiffs have failed to allege facts sufficient to render their section 1985(3) claim plausible, the claim will be dismissed against Wade in her official and individual capacities.[13] The court finds nothing in the SAC that would save this claim, so the proposed amendment would be futile.[14]

### 3. GPD Defendants (Wray, Brady, and Sanders)

Plaintiffs bring the same claims against the GPD Defendants as against the City: (1) discrimination on the basis of race under 42 U.S.C. § 1981 (Count II); (2) conspiracy to discriminate on the basis of race under § 1981 (Count III); and (3) violations of civil rights under 42 U.S.C. §§ 1983 and 1985(3) (Count V). The GPD Defendants are sued in both their official and individual capacities. Because these three Defendants allegedly acted in concert with one another and

---

[13] Although Wade does not mention the intracorporate conspiracy doctrine in her briefs, this conspiracy claim would fail under that doctrine as well, for the reasons discussed earlier in connection with Plaintiffs' conspiracy claims against the City.

[14] Since Plaintiffs have failed to allege facts showing a plausible claim under section 1983 or section 1985(3), it is unnecessary to address Wade's qualified immunity argument.

generally make the same arguments, the claims against them will be considered together.

### a.  Official Capacity Claims

Like Wade, the GPD Defendants argue that the official capacity claims against them should be dismissed as redundant and duplicative of the claims against the City.  And as in Wade's case, Plaintiffs respond that the claims must go forward because Plaintiffs have requested injunctive relief.  Brady and Sanders contend that injunctive relief against them in their official capacities is impossible since Brady is no longer employed by the GPD (see Doc. 5-2 ¶ 120) and Sanders has been permanently reassigned out of the SID.  (Doc. 41 at 6.)  Wray points out that he is no longer the Chief of Police, as Plaintiffs' Amended Complaint recognizes (see Doc. 5 ¶ 61; Doc. 5-2 ¶ 120).  Plaintiffs offer no response to these arguments.

The court finds that the official capacity claims are indeed duplicative of those against the City (which are dismissed for the reasons noted).  In addition, Plaintiffs have not alleged any ongoing discrimination or civil rights violations or alleged facts indicating that such harms may recur.  To the contrary, Plaintiffs' Amended Complaint admits that Wray and Brady are no longer employed by the GPD.[15]  (See

---

[15]  Although Sanders is apparently still employed by the GPD, Plaintiffs' SAC alleges that Sanders was placed on "an extended administrative leave," only returning to duty in early 2009.  (Doc.

Doc. 5 ¶ 61; Doc. 5-2 ¶ 120.)  See Spencer v. Gen. Electric Co.,
703 F. Supp. 466, 469 (E.D. Va. 1989) ("Before granting
injunctive relief, the court must . . . conclude that a
'cognizable danger of recurrent violation' exists." (quoting
United States v. Hunter, 459 F.2d 205, 219 (4th Cir. 1972))),
aff'd, 894 F.2d 651 (4th Cir. 1990), abrogated on other grounds
by Farrar v. Hobby, 506 U.S. 103 (1992); cf. Brown v. Lieutenant
Governor's Office on Aging, 697 F. Supp. 2d 632, 634, 639-40
(D.S.C. 2010) (adopting magistrate judge's recommendation that
"the claims for injunctive relief . . . against [individual
defendant] in her official capacity [are] moot because [she] is
no longer employed by the employer").[16]  Therefore, the official
capacity claims against the GPD Defendants will be dismissed.
Nothing in the SAC would change this result, so the proposed
amendment would be futile.

     The court turns now to Plaintiffs' individual capacity
claims.[17]

---

32, Ex. 1 ¶ 101.)  Moreover, Plaintiffs do not challenge Sanders'
contention that he has been permanently reassigned out of the SID.

[16]  For purposes of this issue, the exact dates that Wray and Brady
left the GPD are irrelevant.  What matters is Plaintiffs' failure to
allege ongoing harm or danger of future harm, demonstrated in part by
the Amended Complaint's clear admission that Wray and Brady are not
currently employed by the GPD.

[17]  The GPD Defendants have not raised qualified immunity as a defense
to any of the federal claims against them.  Because qualified immunity
is an affirmative defense that must be raised by the defendant, see
Henry v. Purnell, 501 F.3d 374, 377 & n.2 (4th Cir. 2007), the court

## b.    42 U.S.C. § 1981 (Count II)

The GPD Defendants raise two principal arguments against Plaintiffs' section 1981 claim.[18]   First, they contend that because Plaintiffs did not have a direct contractual relationship with the GPD Defendants, this claim must fail as a matter of law under Domino's Pizza, Inc. v. McDonald, 546 U.S. 470 (2006).   Second, they argue that Plaintiffs' allegations do not satisfy the "plausibility" standard of Iqbal.[19]

---

will proceed to the substance of Plaintiffs' individual capacity claims against the GPD Defendants.

[18]   Section 1981 provides in relevant part:

> All persons . . . shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a).   "Make and enforce contracts" includes "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."   Id. § 1981(b).

[19]   The GPD Defendants also argue that individual supervisors are only liable under section 1981 if they intentionally cause the employer to violate the statute, citing Tillman v. Wheaton-Haven Recreation Ass'n, 517 F.2d 1141, 1146 (4th Cir. 1975), Jackson v. Blue Dolphin Communications of North Carolina, LLC, 359 F. Supp. 2d 442, 453-54 (W.D.N.C. 2004), and Carson v. Giant Food, Inc., 187 F. Supp. 2d 462, 483 (D. Md. 2002), aff'd sub nom. Skipper v. Giant Food Inc., 68 F. App'x 393 (4th Cir. 2003) (unpublished per curiam opinion).   The GPD Defendants misapply these cases, however.   The opinions stand for the proposition that "individual liability under § 1981 attaches only where the individual himself participates in the discrimination." Jackson, 359 F. Supp. 2d at 454 (citing Behnia v. Shapiro, 961 F. Supp. 1234, 1237 (N.D. Ill. 1997)).   Here, each of the GDP Defendants is alleged to have directly participated in discriminatory actions. Cf. Carson, 187 F. Supp. 2d at 483-84 (granting summary judgment for

### i.    Domino's Pizza, Inc. v. McDonald

According to the GPD Defendants, Plaintiffs' section 1981 claim is based upon alleged discrimination in employment, and Plaintiffs' at-will employment contracts[20] were with the City, not with the GPD Defendants.  The GPD Defendants argue that Plaintiffs may not bring a section 1981 claim against Defendants in their individual capacities without alleging a contractual relationship between Plaintiffs and the individual Defendants.

As Plaintiffs point out, this court has addressed and rejected this very argument in Phillips v. Mabe, 367 F. Supp. 2d 861 (M.D.N.C. 2005):

> [I]n the instant case, Plaintiff is a party to the contract between himself and the Sheriff's Department. . . . That Plaintiff does not have a contract with Defendant Mabe, the superintendent, and Defendant Whitt, the former Sheriff, is not important, because tortious interference by Defendants of Plaintiff's ability to contract with the Sheriff's Department satisfies the contract requirement of § 1981.

Id. at 869 (emphasis omitted) (citation omitted).  Phillips concluded that "the Defendants' argument as to the necessity of a contract between Plaintiff and Defendants is not valid."  Id. at 870.  Phillips also noted that in Spriggs v. Diamond Auto Glass, 165 F.3d 1015 (4th Cir. 1999), a plaintiff was permitted

---

individual defendants on section 1981 claim because of lack of evidence that any individual defendant "directed, participated in or even approved of intentional discrimination").

[20]  At-will employment relationships may "serve as predicate contracts for § 1981 claims." Spriggs v. Diamond Auto Glass, 165 F.3d 1015, 1018-19 (4th Cir. 1999).

to sue his former employer, the employer's president, and the plaintiff's former supervisor under section 1981 even though the plaintiff did not have a contract with the latter two parties. Phillips, 367 F. Supp. 2d at 869 (citing Spriggs, 165 F.3d at 1020). Here, Plaintiffs allege that each of them had an employment contract with the GPD and that the GPD Defendants interfered with those employment contracts, thereby violating section 1981.

The GPD Defendants respond that Domino's Pizza, Inc. v. McDonald, 546 U.S. 470 (2006), changed all this. In Domino's, McDonald, a black man who was the sole shareholder and president of JWM Investments, Inc. ("JWM"), brought a section 1981 action against Domino's, alleging that JWM and Domino's had entered into several contracts, that Domino's had breached those contracts because of racial animus toward McDonald, and that the breach had harmed McDonald personally. Id. at 472-73. The Supreme Court held that McDonald had failed to state a claim, because "a plaintiff cannot state a claim under § 1981 unless he has (or would have) rights under the existing (or proposed) contract that he wishes 'to make and enforce.'" Id. at 479-80. The Court stated that "[s]ection 1981 plaintiffs must identify injuries flowing from a racially motivated breach of their own contractual relationship, not of someone else's." Id. at 480. McDonald was not a party to and had no rights under the

contracts between JWM and Domino's and thus had no standing to raise a claim.

According to the GPD Defendants, <u>Domino's</u> requires a contractual relationship between the plaintiff and the defendant in a section 1981 action.  The Court required no such thing.  Rather, it expressly required only that the plaintiff allege a contractual relationship "under which the plaintiff has rights" (declining even "to exclude the possibility that a third-party intended beneficiary of a contract may have rights under § 1981").  <u>Id.</u> at 476 & n.3.  Here, Plaintiffs have rights under their at-will contracts for employment with the City.

The GPD Defendants' only support for their position is <u>Peters v. Molloy College of Rockville Centre</u>, No. 07-CV-2553 (DRH)(ETB), 2008 WL 2704920 (E.D.N.Y. July 8, 2008).  In <u>Peters</u>, a former nursing student sued Molloy College, one professor, and two associate deans under section 1981, among other bases.  <u>Id.</u> at *1.  The court stated that the plaintiff "*may* state a Section 1981 claim by alleging that Defendants breached a contract with her and the breach was motivated by racial prejudice."  <u>Id.</u> at *6 (emphasis added).  Then the court cited <u>Domino's</u> for the proposition that a section 1981 claim must identify "an impaired contractual relationship under which the plaintiff has rights." <u>Id.</u> (quoting <u>Domino's</u>, 546 U.S. at 476) (internal quotation marks omitted).  Without further analysis or explanation, the

court concluded that to the extent the professor and deans "move to dismiss Plaintiff's Section 1981 claims against the individual defendants on the ground that Plaintiff does not allege that she had a contractual relationship with the individual defendants, the Court grants this motion." Id. at *7. No other court has cited this opinion for this proposition.

No Fourth Circuit opinion has directly addressed this issue since Domino's, but of the Fourth Circuit opinions that both cite Domino's and address a section 1981 claim based on a contractual relationship, one allowed the claim to go forward against a nonparty to the contract. See Emory Utils., Inc. v. Time Warner Cable, Inc., No. 7:09-CV-169-BO, 2010 WL 2402888, at *2 (E.D.N.C. June 11, 2010). Three others rejected claims against nonparties to the contracts at the summary judgment stage, but on other grounds (the argument advanced by the GPD Defendants was not mentioned). See Orgain v. City of Salisbury, Md., 305 F. App'x 90, 104-05 (4th Cir. 2008) (unpublished per curiam opinion); Proa v. NRT Mid Atl., Inc., 618 F. Supp. 2d 447, 460-72 (D. Md. 2009), aff'd, Nos. 09-1727, 09-1816, 09-1969, 2010 WL 4137533 (4th Cir. Oct. 18, 2010) (unpublished per curiam opinion); Orgain v. City of Salisbury, 521 F. Supp. 2d 465, 481-83, 498 (D. Md. 2007), aff'd in part, 305 F. App'x 90

(4th Cir. 2008)(unpublished per curiam opinion).[21]  Consequently,
the GPD Defendants' interpretation of Domino's finds no support
in any Fourth Circuit case law, and the court declines to adopt
it now.

### ii.  The "Plausibility" Standard

The GPD Defendants argue alternatively that Plaintiffs have
failed to plead facts plausibly showing that they may be
entitled to relief under section 1981.  Addressing this argument
will require a careful examination of each of Plaintiffs'
allegations.

Plaintiffs' "shotgun" complaint presents an array of
generalized grievances and vague allegations.  In Plaintiffs'
own words, it alleges "discriminatory investigations, targeting
of Plaintiffs, disparate disciplinary practices, hostile work
environment, failures to promote, and violations of the North
Carolina Personnel Privacy Act."  (Doc. 34 at 4.)
Notwithstanding, each Plaintiff individually must allege facts
plausibly showing that he or she is entitled to relief.  Because
of this, many of Plaintiffs' more general allegations are
clearly inadequate.  For example, Plaintiffs allege that Sanders

---

[21] Three other opinions dealt with situations in which no nonparty was
involved.  Worldwide Network Servs., LLC v. Dyncorp Int'l, LLC, 365 F.
App'x 432 (4th Cir. 2010) (unpublished opinion), cert. denied, 131 S.
Ct. 224 (2010); Qayyum v. U.S. Airways, Inc., Civil Action No. 3:08-
0996, 2008 WL 4879401 (S.D.W. Va. Nov. 12, 2008); Johnson v. Dillard's
Inc., Civil Action No. 3:03-3445-MBS, 2007 WL 2792232 (D.S.C. Sept.
24, 2007).

"made numerous investigations of black officers" without following proper standards. (Doc. 5 ¶ 72.) Plaintiffs provide no other details about this allegation, so it is unknown which of the Plaintiffs were investigated or even whether any Plaintiffs were investigated at all. Similarly, Plaintiffs allege that Wray and Brady repeatedly "failed to promote black officers . . . to positions for which such officers were qualified." (Id. ¶ 82.) Again, the Amended Complaint does not indicate whether any individual Plaintiffs were among these officers, nor does it allege any specific instances in which a Plaintiff was qualified for and denied a particular promotion.

Even where the Amended Complaint names specific victims of the alleged discrimination, they are not always Plaintiffs. For example, the Amended Complaint alleges that Wray excluded two black Assistant Chiefs, Tim Bellamy and Annie Stevenson, from "the decision-making process." (Id. ¶ 83.) Neither is a Plaintiff, however. Allegations like these do not show that any individual Plaintiff is entitled to relief.

To bring a section 1981 discrimination claim, each Plaintiff must allege that he or she is a member of a racial minority, that Defendants' discriminatory actions against that Plaintiff were because of his or her race, and that the discrimination was intentional. Jordan, 458 F.3d at 345 (citing Mian v. Donaldson, Lufkin & Jenrette Sec. Corp., 7 F.3d 1085,

40

1087 (2d Cir. 1993) (per curiam)). Each Plaintiff must also allege facts plausibly supporting these allegations. <u>See Francis</u>, 588 F.3d at 193, 195-96; <u>Jordan</u>, 458 F.3d at 346-47; <u>see also Iqbal</u>, 129 S. Ct. at 1949-50.

Fourth Circuit case law demonstrates that the framework of analysis for a section 1981 employment discrimination claim is generally the same as for a Title VII employment discrimination claim,[22] and courts typically apply the same theoretical categories, such as disparate treatment, retaliation, or hostile work environment. <u>See, e.g.,</u> <u>Gairola v. Va. Dep't of Gen. Servs.</u>, 753 F.2d 1281, 1285 (4th Cir. 1985) ("Under Title VII and either § 1981 or § 1983, the elements of the required prima facie case are the same."); <u>see also, e.g.,</u> <u>Patterson v. McLean Credit Union</u>, 491 U.S. 164, 186 (1989) (holding, "in the context of disparate treatment," that the "scheme of proof" designed for Title VII claims "should apply to claims of racial discrimination under § 1981"), <u>superseded by statute on other grounds</u>, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071; <u>Bryant v. Aiken Reg'l Med. Ctrs. Inc.</u>, 333 F.3d 536,

---

[22] Two key differences between the statutes are that (1) disparate impact is not available as a theory under section 1981, <u>see</u> <u>Gen. Bldg. Contractors Ass'n v. Pennsylvania</u>, 458 U.S. 375, 382-91 (1982), and (2) unlike Title VII, section 1981 is not restricted to claims against unions, employment agencies, and employers with fifteen or more employees, <u>see</u> <u>Aleman v. Chugach Support Servs., Inc.</u>, 485 F.3d 206, 210-13 (4th Cir. 2007). Other distinctions, including Title VII's administrative exhaustion requirements and Title VII's applicability to discrimination based on factors other than race, <u>see</u> <u>id.</u> at 212-13, are not pertinent to this discussion.

543 (4th Cir. 2003) (applying the same requirements to retaliation claims under section 1981 and Title VII); Spriggs v. Diamond Auto Glass, 242 F.3d 179, 184 (4th Cir. 2001) ("The elements [of a hostile work environment claim] are the same under either § 1981 or Title VII."). Consequently, the court will examine each of Plaintiffs' specific factual allegations and determine under which, if any, of these theories Plaintiffs have pleaded a section 1981 claim.

### (a). All Plaintiffs

Plaintiffs allege that Wray and Brady "directed subordinate officers to gather pictures of black officers of the Greensboro Police Department for the use of line-up books or other visuals [sic] aids . . . for the purpose of framing, embarrassing, and wrongfully investigating and charging black officers." (Doc. 5 ¶ 48.) Plaintiffs allege that upon information and belief, their "photographs, likenesses, and/or names were included in at least one version of the [l]ine-[u]p Books." (Id. ¶ 49.) Sanders and other non-black officers allegedly "presented the [l]ine-[u]p Books to members of the general public, including known convicted criminals and criminal suspects," to elicit false allegations against black GPD officers. (Id. ¶ 50; see id. ¶¶ 48, 56.)

*(1) Disparate Treatment:* Although Plaintiffs allege that non-black officers did not receive this treatment (id. ¶¶ 66,

87), these allegations do not successfully state a claim for disparate treatment under section 1981. The elements of a prima facie section 1981 disparate treatment claim in the employment setting are the same as those for a Title VII claim. See Gairola, 753 F.2d at 1285. Plaintiffs must establish that (1) they are members of a protected class, (2) they suffered an adverse employment action, (3) they were performing in a manner that satisfied their employer's legitimate job expectations, and (4) the adverse employment action occurred "under circumstances which give rise to an inference of unlawful discrimination." Jenkins v. Trs. of Sandhills Cmty. Coll., 259 F. Supp. 2d 432, 443 (M.D.N.C. 2003) (quoting EEOC v. Sears Roebuck & Co., 243 F.3d 846, 851 n.2 (4th Cir. 2001)), aff'd, 80 F. App'x 819 (4th Cir. 2003) (unpublished per curiam opinion); see Holland v. Wash. Homes, Inc., 487 F.3d 208, 214 (4th Cir. 2007); Julsaint v. Corning, Inc., 178 F. Supp. 2d 610, 615-16 (M.D.N.C. 2001).

While Plaintiffs need not allege facts that constitute a prima facie case, see Jordan, 458 F.3d at 346, they must still "allege facts sufficient to state all the elements of [their] claim," id. (emphasis omitted) (quoting Bass, 324 F.3d at 765). A key element that Plaintiffs must allege is that they each suffered an "adverse employment action." See Harman v. Unisys Corp., 356 F. App'x 638, 641 (4th Cir. 2009) (unpublished per curiam opinion) (citing Page v. Bolger, 645 F.2d 227, 233 (4th

Cir. 1981) (en banc)); <u>Fletcher v. Philip Morris USA Inc.</u>, No. 3:09-CV-284 (HEH), 2009 WL 2067807, at *5-*6 (E.D. Va. July 14, 2009) (analyzing whether a section 1981 plaintiff sufficiently alleged an adverse employment action); <u>cf.</u> <u>Hoffman v. Balt. Police Dep't</u>, 379 F. Supp. 2d 778, 792 (D. Md. 2005) ("It is well settled that to state a cause of action for disparate treatment under Title VII . . . the plaintiff must allege that he suffered an 'adverse employment action.'").

An "adverse employment action" is "a discriminatory act that 'adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment.'" <u>Holland</u>, 487 F.3d at 219 (alteration in original) (quoting <u>James v. Booz-Allen & Hamilton, Inc.</u>, 368 F.3d 371, 375 (4th Cir. 2004)). While "[c]onduct short of ultimate employment decisions can constitute adverse employment action," <u>James</u>, 368 F.3d at 375-76 (quoting <u>Von Gunten v. Maryland</u>, 243 F.3d 858, 865 (4th Cir. 2001), <u>abrogated on other grounds by</u> <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53 (2006)) (internal quotation marks omitted), the "typical requirements for a showing of an 'adverse employment action'" are "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion," <u>Boone v. Goldin</u>, 178 F.3d 253, 255 (4th Cir. 1999). For example, the Fourth Circuit has held that a reassignment only constitutes an "adverse employment

action" if the reassignment has a "significant detrimental effect" on the plaintiff. Id. at 256. "[E]ven if the new job . . . cause[s] some modest stress not present in the old position," reassignment to a new position "commensurate with one's salary level" is not an "adverse employment action" unless there is a "decrease in compensation, job title, level of responsibility, or opportunity for promotion." Id. at 256-57. As another example, "a poor performance evaluation 'is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment.'" James, 368 F.3d at 377 (quoting Spears v. Mo. Dep't of Corr. & Human Res., 210 F.3d 850, 854 (8th Cir. 2000)). "An evaluation merely causing a loss of prestige or status is not actionable." Id.

Here, Plaintiffs have not alleged facts showing any concrete harm resulting from the creation of the line-up books, let alone any harm involving the "terms, conditions, or benefits" of their employment. It is unclear from Plaintiffs' allegations whether all of the claimed line-up books and photographs were shown to criminals and suspected criminals. If only some were, it is not clear which Plaintiffs' photographs were shown, nor is it clear how each individual Plaintiff was affected by all this. The most serious allegation is that the line-up books "resulted in the exposure of black officers . . .

who were working undercover" (Doc. 5 ¶ 50), but Plaintiffs do not allege any additional facts showing how this entitles any individual Plaintiff to relief. The only alleged harm applicable to each Plaintiff is the creation of the line-up books itself, and this does not satisfy the definition of an actionable "adverse employment action."

The new allegations in the SAC do not alter this result. The SAC adds an allegation that Wray and Brady authorized the creation of a digital photograph array of all black GPD officers, and that Sanders placed this array on his employer-issued laptop computer and showed it to criminals or suspected criminals to elicit false allegations against black GPD officers. (Doc. 32, Ex. 1 ¶ 49.) As before, it is unclear which Plaintiffs' photographs were shown and more importantly how each Plaintiff was harmed or even affected.[23] These allegations fail to satisfy the "adverse employment action" requirement.

*(2) Hostile Work Environment:* To state a hostile work environment claim under section 1981, Plaintiffs must allege harassment that was (1) unwelcome, (2) based on race, and (3) "sufficiently severe or pervasive to alter the conditions of

---

[23] The City Legal Report attached to the SAC indicates that the photograph of Plaintiff Larry Patterson Jr. ("Patterson") was shown to "witnesses," but no further details are provided. (See Doc. 32, Ex. 1 (City Legal Report) at 65.)

employment and create an abusive atmosphere." Spriggs, 242 F.3d at 183-84; see Bass, 324 F.3d at 765.[24]  Plaintiffs have alleged that the creation and use of the line-up books were unwelcome (see Doc. 5-2 ¶ 127) and based on race (see Doc. 5 ¶¶ 66, 87). The issue is whether Plaintiffs plausibly allege harassment "sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere."

In making this determination, the court must examine the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Spriggs, 242 F.3d at 184 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)).  The conduct must create an "objectively hostile or abusive" work environment, and the victim must "perceive the environment to be abusive."  Id.

In Spriggs, the Fourth Circuit held that a reasonable jury could find a hostile work environment existed where the plaintiff was exposed on a daily basis to "incessant racial slurs, insults, and epithets" by his supervisor, some directed

_____

[24]  A fourth requirement is that Plaintiffs must show a basis for imposing liability on Defendants.  Spriggs, 242 F.3d at 184.  This is generally an issue where a plaintiff seeks to impose liability on an employer for harassment by a supervisor.  See id. at 186.  Here, however, Plaintiffs allege that Wray, Brady, and Sanders were each personally involved in the creation and use of the line-up books and photo array.  (See Doc. 5 ¶¶ 48, 50; Doc. 32, Ex. 1 ¶ 49.)

at the plaintiff himself, others directed at other African-Americans. Id. at 182, 184-86. Here, Plaintiffs' photographs (and perhaps other personal information) were allegedly placed into line-up books, and at least some of these photographs were allegedly shown to criminal defendants, criminal suspects, and the general public for the purpose of developing criminal charges against one or more black GPD officers. (See Doc. 5 ¶¶ 48, 50, 56, 63, 66.) If these allegations are true, the existence and use of the line-up books may have put each Plaintiff at risk of false criminal accusations, targeting by criminals, or other harm. At this pleading stage, it is reasonable to infer that Plaintiffs were aware of these actions, since there were "rumors" about the line-up books within the GPD at some point in 2005. (See id. ¶ 55.) The rumors were prevalent enough that Wray later claimed to have been "gravely concerned by this rumor." (Id.)

The court finds that Plaintiffs' Amended Complaint alleges facts plausibly stating section 1981 claims against the GPD Defendants to the extent Plaintiffs allege a racially hostile work environment. Therefore, the court denies the GPD Defendants' motions to dismiss as to Plaintiffs' hostile work environment claims under section 1981. Because the SAC contains all the allegations contained in the Amended Complaint, Plaintiffs' proposed amendment is not futile as to these claims

and their motion to amend is therefore granted to this extent. Whether the GPD Defendants' actions were, and were perceived to be, sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere as to each Plaintiff will be subject to discovery and further proof.

The court will now consider allegations involving individual Plaintiffs to determine whether any Plaintiff may proceed under an additional theory. To the extent these allegations contribute to any Plaintiff's hostile work environment claim, of course, they may go forward under that theory.

### (b). Plaintiff Steven A. Evans

Evans alleges that although he was the only black GPD officer certified by the North Carolina Justice Academy ("NCJA") as a marksmanship instructor, Wray appointed white officers, not Evans, as instructors at local community colleges and/or the Greensboro Police Academy. (Id. ¶ 85.) Had Evans obtained one of these appointments, he would have been compensated for his instruction. (Id.)

Evans has plausibly alleged an "adverse employment action" for purposes of a disparate treatment claim, because he was allegedly denied a significant work opportunity for which he would have received compensation. Moreover, Evans has alleged that he was qualified for the instructing appointments.

Although the qualifications of the white officers who received the appointments are unclear, it is a reasonable inference at this stage that Evans has alleged his qualifications to be at least equal to those of the white officers. Furthermore, Evans has alleged that when he was invited by the NCJA to receive his certification at a multi-day program, the GPD first denied him the opportunity to attend and later permitted him to attend but refused to provide lodging expenses and sufficient ammunition. (Id.) Evans alleges that all previous GPD officers invited to the program had been given lodging expenses and sufficient ammunition (id.), and because Evans was the only black GPD officer certified by the NCJA, it is a reasonable inference that all previous GPD officers invited to the program were non-black.

The court finds that all these allegations in the Amended Complaint, taken together, plausibly give rise to an inference that Evans may have been denied the instructing appointments on the basis of his race. Cf. Bryant, 333 F.3d at 544-45 (stating that at trial a disparate treatment plaintiff, in a failure-to-promote context, generally must present evidence that (1) he is a member of a protected group, (2) he applied for the position in question, (3) he was qualified for the position, and (4) he was rejected under circumstances giving rise to an inference of unlawful discrimination). Therefore, the court denies the GPD Defendants' motions to dismiss as to Evans' disparate treatment

claim under section 1981. Because the SAC contains all the allegations contained in the Amended Complaint, Evans' proposed amendment is not futile as to this claim and his motion to amend is therefore granted to this extent.

### (c). Plaintiff Lawrence Alexander Jr.

Alexander is not mentioned in the Amended Complaint, but allegations concerning him are raised in the SAC and the attached City Legal Report. According to the City Legal Report, Alexander gave criminal background and license tag information to an unauthorized civilian. (Doc. 32, Ex. 1 (City Legal Report) at 58.) For these infractions, he was investigated criminally by SID and cleared, and then an administrative investigation took place. (Id. at 58, 64, 74.) Alexander challenges his criminal interrogation by Sanders and SID, alleging that his offenses did not warrant criminal questioning and "the investigations 'were administrative, and should not have been undertaken by Detective Sanders.'" (Doc. 32, Ex. 1 ¶ 95 (quoting id. (City Legal Report) at 74).) Alexander received a Bureau Level reprimand, which affects an officer for three years. (Id. (City Legal Report) at 58.) The City Legal Report states that this level of discipline was higher than that recommended by Alexander's sergeant and captain. (Id. at 64.) Susan Farkas ("Farkas"), a white, non-sworn employee, gave license tag information to an unauthorized civilian as well, but

she was not investigated by SID and she received only a First Level reprimand, two grades lower than Alexander's reprimand. (Id. at 58.)  This lower level was negotiated to prevent Farkas from losing her Department of Criminal Information certification for one year.  (Id.)

The requirements for a claim of racial discrimination in the discipline of employees are (1) that the plaintiff is a member of a protected class, (2) that the prohibited conduct in which he engaged was "comparable in seriousness to misconduct of employees outside the protected class," and (3) that "the disciplinary measures enforced against him were more severe than those enforced against those other employees."[25]  Cook v. CSX Transp. Corp., 988 F.2d 507, 511 (4th Cir. 1993) (Title VII case); see Booth v. Maryland, 327 F.3d 377, 383 (4th Cir. 2003) (citing Cook in the section 1981 context); Robins v. Moore, No. 4:05-CV-104, 2006 WL 1520573, at *4 (E.D. Va. May 31, 2006) (applying this framework in the Rule 12(b)(6) context); Herbig v. Int'l Bus. Machs. Corp., 796 F. Supp. 865, 866 (D. Md. 1992) ("[T]he *sine qua non* of a disparate discipline claim in this Circuit [is an allegation that] others, not within [plaintiff's] protected group[], who engaged in comparable prohibited conduct, were more favorably treated (less severely disciplined) than was

_____

[25]  These requirements are simply a variation on the usual disparate treatment elements.  See Moore v. City of Charlotte, N.C., 754 F.2d 1100, 1105-06 (4th Cir. 1985).

[plaintiff].”), aff'd, 998 F.2d 1009 (4th Cir. 1993) (per curiam) (unpublished table decision).

Here, Alexander has clearly alleged that he is a member of a protected class and that less severe disciplinary measures were taken against an employee outside that class. It is somewhat less clear whether Alexander's conduct was "comparable in seriousness" to Farkas' conduct. While Alexander disclosed both criminal background and license tag information, Farkas disclosed only license tag information (although she had also done so once before), and unlike Alexander, Farkas was a non-sworn employee. (Doc. 32, Ex. 1 (City Legal Report) at 58.) However, the Fourth Circuit has stated that "precise equivalence in culpability between employees is not the ultimate question: . . . an allegation that other employees involved in acts against [the employer] of comparable seriousness [were treated less severely] is adequate to plead an inferential case." Moore v. City of Charlotte, N.C., 754 F.2d 1100, 1107 (4th Cir. 1985) (first alteration in original) (emphasis omitted) (quoting McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 283 n.11 (1976)) (internal quotation marks omitted). At this pleading stage, "constru[ing] the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff," Ibarra, 120 F.3d at 474, the court finds that Alexander has plausibly stated a claim for disparate discipline against the GPD

Defendants under section 1981 in the SAC. Therefore, Alexander's proposed amendment is not futile as to this claim, and the court grants his motion to amend to this extent.[26] Consequently, the court denies as moot the GPD Defendants' motions to dismiss the Amended Complaint as to this claim.

### (d). Plaintiff Antuan Hinson

Hinson is not mentioned in the Amended Complaint, but the SAC alleges that Sanders (at the direction of Wray and Brady) secretly placed keystroke-monitoring devices on the computers of several black GPD officers, including Hinson, without justification, that Sanders monitored Hinson's keystrokes to determine his password, and that he used that password to enter Hinson's email account and download one year of Hinson's emails. (Doc. 32, Ex. 1 ¶ 101.) Sanders allegedly admitted to these actions in early 2009. (Id.) Hinson alleges that these actions violated GPD policies and that no keystroke-monitoring devices have been used on any non-black officer's computer. (Id. ¶¶ 102-03.)

The court finds that Hinson has not stated a claim for disparate treatment in the SAC, because he has not alleged any "adverse employment action" — the GPD Defendants took no action

---

[26]  This conclusion is supported by Wray's statement that "[b]ased on these allegations, David Wray does not dispute that Plaintiff Alexander has stated a claim." (Doc. 39 at 17 n.7.) Moreover, Wray pleads in the alternative that "Plaintiffs' Motion for Leave to Amend should be denied as to all but Plaintiff Alexander as to his claim under section 1981." (Id. at 18.)

affecting the "terms, conditions, or benefits" of Hinson's employment.  Cf. Skipper v. Giant Food, Inc., 187 F. Supp. 2d 490, 492-94 (D. Md. 2002) (holding that the employer's surveillance of plaintiff at work, followed by an announcement of his productivity over a company loudspeaker, was not an "adverse employment action" for purposes of a disparate treatment or disparate discipline claim under section 1981, since these actions did not lead to any discipline or any change in the terms, conditions, or benefits of plaintiff's employment), aff'd, 68 F. App'x 393 (4th Cir. 2003) (unpublished per curiam opinion).  Moreover, violation of GPD policies, without more, does not provide grounds for a section 1981 claim.

### (e). Plaintiff Brian James

James is not mentioned in the Amended Complaint, but according to the City Legal Report attached to the SAC, James was monitored and then criminally interrogated by SID officers after allegedly associating with known offenders, although this is only a policy violation, not a crime.  (Doc. 32, Ex. 1 (City Legal Report) at 55.)  Like Alexander, James alleges that his criminal interrogation by Sanders and SID was discriminatory, claiming that (a) his offense did not warrant criminal questioning and (b) "the investigations 'were administrative, and should not have been undertaken by Detective Sanders.'" (Doc. 32, Ex. 1 ¶ 95 (quoting id. (City Legal Report) at 74).)

When James asked for an administrative inquiry or investigation to clear his name, his superiors did not honor this request. (Id. (City Legal Report) at 55.) After Officer Domitrivits, a white officer, allegedly associated with a known offender, she was given counseling and was instructed not to commit this violation again, but no investigation took place. (Id.)

James has not alleged that any disciplinary measures were taken against him, nor has he alleged any adverse effect upon the terms, conditions, or benefits of his employment. See Dawson v. Rumsfeld, No. 1:05-CV-1270 (JCC), 2006 WL 325867, at *6 (E.D. Va. Feb. 8, 2006) (inferring from Fourth Circuit case law that "the mere decision to initiate an investigation is not an adverse employment action"); Hoffman, 379 F. Supp. 2d at 792 (stating, in response to a "disparate investigation" claim, that "[t]he few courts that have considered whether an investigation, *by itself*, can constitute an adverse employment action have answered that question in the negative"); see also Locklear v. Person Cnty. Bd. of Educ., No. 1:05CV00255, 2006 WL 1743460, at *7 (M.D.N.C. June 22, 2006) ("[A] suspension with pay during an investigation into a complaint about a doctored answer sheet cannot constitute an adverse employment action.").[27] Moreover,

---

[27] An investigation may be a sufficient adverse action in the context of a retaliation claim. See Hetzel v. Cnty. Of Prince William, 89 F.3d 169, 171-72 (4th Cir. 1996); cf. Williams v. Hansen, 326 F.3d 569, 585 n.1 (4th Cir. 2003) (King, J., dissenting) (citing Hetzel in the context of an equal protection claim). However, the definition of

James has not alleged that any concrete investigative findings were made against him from which he wishes his name to be cleared or that he received any reprimand — he has alleged only the investigation itself. Cf. James, 368 F.3d at 377 ("[A performance] evaluation merely causing a loss of prestige or status is not actionable."); Skipper, 187 F. Supp. 2d at 493-94, 494 n.4 (citing Keenan v. Am. Cast Iron Pipe Co., 707 F.2d 1274, 1277 (11th Cir. 1983)) (holding that a written warning alone is not an "adverse employment action," but indicating that a reprimand that cannot be expunged from the employee's file and that might affect the employee's ability to secure promotions and credit may be an "adverse employment action"). Consequently, James has not stated a claim in the SAC under a disparate treatment or disparate discipline theory.

### (f). Plaintiffs Rankin and Patterson

The Amended Complaint briefly mentions Plaintiff Norman Rankin ("Rankin"), and the SAC provides more allegations concerning Rankin as well as similar allegations involving Patterson:

*(1) Discussion of Personnel Information:* The Amended Complaint alleges generally that in a June 2005 meeting with the Greensboro Police Officers Association, Wray "publicly discussed

---

"adverse action" in the retaliation context is broader than the definition of "adverse employment action" in the disparate treatment context. See White, 548 U.S. at 67.

the details of investigations into allegations of criminal conduct, identifying by name various black officers of the Greensboro Police Department in connection with such investigations." (Doc. 5 ¶ 90.) This was allegedly "private personnel information" that should not have been disclosed. (Id.) Plaintiffs do not allege what information was revealed or which Plaintiffs were affected, other than that Wray pointed at Rankin and stated, "We looked at you too, but cleared you," or words to that effect. (Id.) This allegation does not state a claim for disparate treatment, because Rankin does not allege that he suffered any "adverse employment action." Cf. Skipper, 187 F. Supp. 2d at 493-94 (holding that disclosure of plaintiff's job performance via a company loudspeaker was not an "adverse employment action").

The City Legal Report attached to the SAC expands on this allegation slightly, stating that at the June 2005 meeting, Wray "improperly and maliciously discussed confidential personnel matters" involving Rankin, Patterson, and two black officers who are not Plaintiffs in this case. (Doc. 32, Ex. 1 (City Legal Report) at 46.) Wray's actions allegedly violated North Carolina law. (Id.) Again, Rankin and Patterson do not allege what information was revealed by Wray or how they were affected. The court finds that these allegations do not satisfy the "adverse employment action" requirement.

*(2) Discriminatory Investigation:* According to the City Legal Report, Rankin and Patterson were criminally investigated by SID for alleged connections to known offenders "in order to clear them of violating the Department's directives against associating with known offenders." (Id. at 56.) Both officers were cleared. (Id.) Officer T.V. Moore, a white officer, was not investigated for allegedly more significant connections to known offenders. Instead, he was consulted by his supervisor about how he wanted the incident handled. (Id.) Like James, Rankin and Patterson have not alleged that any disciplinary measures were taken against them, nor have they alleged any adverse effect upon the terms, conditions, or benefits of their employment. The investigation itself, standing alone, does not constitute an "adverse employment action." See Dawson, 2006 WL 325867, at *6; Hoffman, 379 F. Supp. 2d at 792. These allegations do not state a claim for disparate treatment or disparate discipline.

### (g). Plaintiffs Cuthbertson and Rankin

The Amended Complaint briefly mentions Plaintiff Ernest Cuthbertson ("Cuthbertson"), and the City Legal Report attached to the SAC provides additional, related allegations concerning Cuthbertson and Rankin:

*(1) Fake Investigations:* Cuthbertson, an officer within the SID, alleges in the Amended Complaint that he was repeatedly

assigned to investigate fabricated criminal activity so that in his absence the other SID officers could investigate black GPD officers. (Doc. 5 ¶ 84.) This does not state a claim for disparate treatment, because even assuming that similarly situated non-black officers received different treatment, Cuthbertson has not alleged any "adverse employment action." See generally Boone, 178 F.3d at 256 (holding that even reassignment to a less appealing position is not an "adverse employment action" unless it has "some significant detrimental effect" on the plaintiff).

*(2) Undercutting of Plaintiffs' Investigation:* According to the City Legal Report, both Cuthbertson and Rankin, another officer within the SID, were assigned the investigation of Officer Steven Snipes for possible association with prostitutes. (Doc. 32, Ex. 1 (City Legal Report) at 60.) Sanders requested that a white officer (Sloan) continue to be involved in this investigation, expressing doubt that Rankin and Cuthbertson were competent. (Id.) Sanders told Sloan, who had initiated the investigation, not to share all the information he knew with Rankin or Cuthbertson and not to let them meet with a crucial informant. (Id.) Sanders said that he wanted Rankin to fail so that Wray would assign this investigation "back to us." (Id. at 60-61.) Like Cuthbertson's previous allegation, these

allegations fail to satisfy the "adverse employment action"
requirement and do not state a disparate treatment claim.

### (h). Plaintiff Joseph Pryor

*(1) Improper Administrative Pressure:* No specific factual
allegations concerning Plaintiff Joseph Pryor ("Pryor") are
provided in either complaint. However, the City Legal Report,
attached to the SAC and incorporated by reference into it,
alleges that Pryor was criminally and then administratively
investigated for an improper arrest and use of force.[28] (Id. at
54.) After these investigations were closed and Pryor was
administratively disciplined, Wray allegedly brought improper
pressure on Captain Tony Phifer ("Captain Phifer")[29] to increase
the discipline imposed on Pryor. Captain Phifer acquiesced to
Wray's request. (Id.)

Pryor has not alleged facts plausibly showing that his
increased discipline was because of his race. See Coleman v.
Md. Court of Appeals, 626 F.3d 187, 191 (4th Cir. 2010)
(dismissing a disparate treatment claim where "the complaint
fail[ed] to establish a plausible basis for believing . . . that
race was the true basis for [plaintiff's] termination"); Jordan,
458 F.3d at 346-47 (dismissing a section 1981 claim where the

---

[28]  The court assumes that the "Officer Pryor" discussed in the City
Legal Report is the same as Plaintiff Joseph Pryor.

[29]  It is unclear whether Captain Tony Phifer is the same person as
Plaintiff William A. Phifer.

court could not "discern [from plaintiff's alleged facts] any way that [plaintiff's] race factored into his termination"). The SAC and City Legal Report contain no examples, black or non-black, of a similarly situated GPD officer (i.e., one disciplined for the unwarranted use of force), let alone one who received different treatment. Cf. Herbig, 796 F. Supp. at 866 ("[T]he *sine qua non* of a disparate discipline claim in this Circuit [is an allegation that] others, not within [plaintiff's] protected group[], who engaged in comparable prohibited conduct, were more favorably treated (less severely disciplined) than was [plaintiff].").

The SAC states that "[a]ll of the examples in the City Legal Report of such coercion by Defendant Wray leading to increased discipline or less favorable evaluations were targeted upon black officers" (Doc. 32, Ex. 1 ¶ 93), and the City Legal Report does list three instances of "improper administrative pressure" involving black GPD officers (see id. (City Legal Report) at 53-54). However, the Report also alleges pressure brought by Wray upon Assistant Chief Tim Bellamy to lower the evaluation of a fourth officer, Captain Anita Holder ("Holder"), whose race is not alleged. (Id. at 54.) Moreover, Plaintiffs acknowledge that the instances discussed in the City Legal Report are merely "examples." Thus, Pryor's claim would require the court to infer, without any factual basis, that Holder is

also black, that the "examples" provided in the City Legal Report were the only instances of such disciplinary treatment (or that if other instances occurred, none affected white officers), that therefore only black officers received such treatment, and that this indicates Wray's actions toward Pryor individually were motivated by Pryor's race. The court does not find this to be a reasonable chain of inferences from the facts provided in the City Legal Report. Cf. Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999) (noting that at the Rule 12(b)(6) stage, the court must "draw[] all *reasonable* factual inferences . . . in the plaintiff's favor" (emphasis added)).

Moreover, although the SAC states that "the only example in the City Legal Report of improper administrative pressure by Defendants to *decrease* disciplinary action involved a white employee" (Doc. 32, Ex. 1 ¶ 93), the employee described (Corporal Cheryl Cundiff ("Cundiff")) was charged with a very different offense than Pryor (untruthfulness rather than unwarranted use of force), and the City Legal Report itself states that Cundiff's husband "was a close friend of Chief Wray and Deputy Chief Brady" and speculates that this "may account for the favorable treatment she received during this investigation," (id. (City Legal Report) at 49-50). Cf. Morris-Belcher v. Hous. Auth. of the City of Winston-Salem, No. 1:04-

CV-255, 2005 WL 1423592, at *7 (M.D.N.C. June 17, 2005) (stating that "the law is clear that giving preferential treatment to friends or social acquaintances does not violate Title VII"). Although the SAC alleges that "Plaintiffs' race was at least a motivating factor for each of the unlawful employment practices described herein" (Doc. 32, Ex. 1 ¶ 112), such a conclusory statement is insufficient to state a section 1981 claim, see Jordan, 458 F.3d at 346-47. Moreover, as noted above, violation of GPD disciplinary policies, standing alone, does not provide grounds for a section 1981 claim. The court finds that these allegations by Pryor do not independently support a section 1981 disparate treatment or disparate discipline claim.[30]

*(2) Potential Improper Investigation:* The City Legal Report also alleges that in violation of GPD directives, a criminal investigation of Pryor was ordered after he had already been investigated criminally and then administratively. After Captain Phifer met with Wray and protested this action, the investigation was canceled. (Doc. 32, Ex. 1 (City Legal Report) at 61.) Suffice it to say that Pryor is not entitled to relief under a disparate treatment or disparate discipline theory for an investigation that almost happened.

_____

[30] If the "Officer Stacey Morten" mentioned in the City Legal Report is the same as Plaintiff Stacy A. Morton Jr. ("Morton"), then Morton makes a similar allegation of improper pressure from Wray. (See Doc. 32, Ex. 1 (City Legal Report) at 53-54.) This allegation fails to state a disparate treatment or disparate discipline claim for the same reasons as Pryor's allegation.

### (i). Plaintiff William A. Phifer

Phifer is not mentioned in the Amended Complaint. The proposed SAC alleges that Wray brought improper pressure on a supervisor of Phifer that resulted in an increased level of discipline for him. (Doc. 32, Ex. 1 ¶ 93.) This allegation would fail to state a disparate treatment or disparate discipline claim for the same reason as Pryor's improper-pressure allegation: Phifer has not alleged facts plausibly showing that his increased discipline was because of his race — moreover, Phifer has alleged no factual details at all about this claim.

However, it appears that Plaintiffs have misstated this allegation, since the SAC cites to the passage in the City Legal Report describing how pressure was brought *upon Captain Tony Phifer* to increase the disciplinary measures taken *against Pryor* for Pryor's unwarranted use of force. (Id. (City Legal Report) at 54.) It is unclear whether Captain Tony Phifer is the same person as Plaintiff William A. Phifer. If so, Plaintiff Phifer has no disparate treatment or disparate discipline claim for the pressure brought upon him to increase another officer's disciplinary level, because Phifer himself did not receive any discipline and did not suffer any "adverse employment action." Furthermore, Phifer has alleged no facts plausibly showing that the pressure placed upon him was because of *Phifer's* race.

### (j). Plaintiff Stephen L. Hunter

*(1) Inappropriate Discipline:* Hunter is not mentioned in the Amended Complaint. In the SAC, Hunter alleges that he was falsely accused of damaging a patrol car that he shared with several other officers and was "given documented discipline." (Doc. 32, Ex. 1 ¶ 94.) After Hunter threatened to file a grievance with the City Manager, the memorandum documenting his violation and recommended discipline was rescinded. (Id.; id. (City Legal Report) at 71.) Presumably the rescission of the memorandum shows that Hunter never should have been charged in the first place. However, because Hunter ultimately received no discipline and suffered no "adverse employment action," these allegations do not state a claim for disparate treatment or disparate discipline.

*(2) Retaliatory Investigation:* The SAC also alleges that shortly after Hunter threatened to file his grievance, Plaintiff Charles E. Cherry ("Cherry") was instructed to investigate Hunter's off-duty time reporting to establish evidence of possible fraud. (Doc. 32, Ex. 1 ¶ 94.) After a preliminary inquiry, Cherry ended the investigation, finding insufficient grounds for continuing. (Id. (City Legal Report) at 58-59.) Meanwhile, Cherry learned of facts supporting an allegation of improper off-duty time reporting by Officer Heinrich, a white officer, and Cherry reported these facts to his superior.

However, no investigation into Heinrich's actions ever took place. (Id. at 59.) Because no disciplinary measures were taken against Hunter and he suffered no "adverse employment action," see Dawson, 2006 WL 325867, at *6 ("[T]he mere decision to initiate an investigation is not an adverse employment action."), his allegations do not state a claim for disparate discipline or for disparate treatment generally.

Unlike any of the other Plaintiffs, however, Hunter appears to imply that the actions taken against him constituted retaliation.[31] To state a section 1981 claim under a retaliation theory, a plaintiff must allege that (1) he engaged in a "protected activity," (2) the employer acted adversely against him, and (3) the adverse action was taken because of the protected activity. Bryant, 333 F.3d at 543; see Coleman, 626 F.3d at 190-91 (applying these elements in the Rule 12(b)(6) context). See generally CBOCS West, Inc. v. Humphries, 553 U.S. 442, 457 (2008) (confirming that section 1981 encompasses employment-related retaliation claims). The "adverse action" required in the retaliation context is different from the "adverse employment action" required in the disparate treatment context. See White, 548 U.S. at 67. A retaliation plaintiff

---

[31] It is unclear whether any other Plaintiff attempts to pursue a retaliation claim under section 1981 against the GPD Defendants. To the extent any Plaintiff does so, the court is unable to find any factual allegations plausibly supporting such a claim.

must show that "a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from'" engaging in the protected activity. Id. at 68 (quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006)) (internal quotation marks omitted).

It is unnecessary to determine whether Hunter's threat to file a grievance was "protected activity," because the action allegedly taken against him in retaliation was not "adverse action" under White. The only action taken against Hunter was a preliminary inquiry that ended very quickly. Hunter has not alleged that he was affected by this preliminary inquiry at all; indeed, he does not even allege that he was questioned during this inquiry. Therefore, Hunter has failed to show a "materially adverse" action against him.

### (k). Plaintiff Steven Snipes

Plaintiff Steven Snipes ("Snipes") is not mentioned in the Amended Complaint. The City Legal Report attached to the SAC states that Snipes' name "keeps appearing and being linked to prostitutions and illicit parties." (Doc. 32, Ex. 1 (City Legal Report) at 65.) At one point, SID began an investigation into Snipes. (Id.) The City Legal Report states that no support has ever been found for any link between Snipes and prostitutes. (Id.) As noted above, an investigation, without more, is not an

"adverse employment action" and does not support a disparate treatment or disparate discipline claim.

### (l). "Assistant Chief Stevenson"

The City Legal Report states that Wray held informal meetings of his command staff after hours at a local restaurant, but that "Assistant Chief Stevenson" and two other black officers were not invited to these meetings until "Assistant Chief Stevenson" questioned their exclusion. (Id. at 59.) After this, Wray invited them to the meetings, but they apparently never attended. (Id.) It is unclear whether these allegations refer to Plaintiff Eric Stevenson, Plaintiff Darryl Stevenson,[32] or Assistant Chief Annie Stevenson, who is not a Plaintiff in this action. While Assistant Chief Annie Stevenson seems the most likely candidate (see Doc. 5 ¶ 83), Wray interprets these allegations as referring to one of the Plaintiffs (see Doc. 39 at 18). Regardless, no discipline or "adverse employment action" is alleged, so these allegations do not support a disparate discipline or disparate treatment claim.

### (m). Summary

The court has carefully reviewed the Amended Complaint, the proposed SAC, and the attached City Legal Report. None of Plaintiffs' other allegations states facts showing that any individual Plaintiff is entitled to relief. Therefore, the

---

[32] See supra note 1 on Darryl Stevenson's status as a Plaintiff.

court holds as follows: The GPD Defendants' motions to dismiss the Amended Complaint are denied on the merits as to each Plaintiff's hostile work environment claim under section 1981 and Evans' disparate treatment claim under section 1981 against the GPD Defendants in their individual capacities. The motions to dismiss are denied as moot as to Alexander's disparate discipline claim against the GPD Defendants in their individual capacities, insofar as Plaintiffs' motion to amend is granted as to all these claims. In all other respects, Plaintiffs' section 1981 claims are dismissed and Plaintiffs' proposed amendment is denied as being futile.

### c. Conspiracy and 42 U.S.C. § 1981 (Count III)

As noted above, the nature of Plaintiffs' "conspiracy to discriminate on the basis of race" claim is unclear, and unfortunately, none of the parties addresses the substance of this claim in any briefing. The Amended Complaint alleges that the GPD Defendants' actions "in conspiring to violate the Plaintiffs' employment rights were in violation of federal and state law, including 42 U.S.C. § 1981." (Doc. 5-2 ¶ 147.)

If Plaintiffs are alleging a state law conspiracy *to violate* section 1981, they have provided no legal support for or explanation of such a theory. If Plaintiffs are alleging a conspiracy *in violation of* section 1981 (which seems more likely), this claim is redundant and unnecessary. Section 1981

forbids discrimination on the basis of race — it does not forbid conspiracy to discriminate absent concrete acts of discrimination.  See Baseball at Trotwood, LLC v. Dayton Prof'l Baseball Club, No. C-3-98-260, 2003 WL 25566103, at *52 (S.D. Ohio Sept. 2, 2003) ("To begin with, § 1981 does not by its definition create a conspiracy cause of action. . . . Moreover . . . if [Defendants'] alleged acts constitute a violation of § 1981 in and of themselves, then that is enough to state a cause of action thereunder, regardless of any finding of a conspiracy."), aff'd, 204 F. App'x 528 (6th Cir. 2006) (unpublished opinion).  Therefore, to the extent the GPD Defendants' alleged conspiracy resulted in discrimination on the basis of race, this discrimination itself violates section 1981 and the conspiracy claim adds nothing.  To the extent the alleged conspiracy did not result in acts of discrimination, there is no violation of section 1981.  Insofar as Plaintiffs are alleging a conspiracy to deprive them of "the equal protection of the laws, or of equal privileges and immunities under the laws," this is properly an allegation under 42 U.S.C. § 1985(3) and will be considered in connection with that claim.

Therefore, Plaintiffs' conspiracy claim against the GPD Defendants is dismissed.  Plaintiffs' proposed SAC adds nothing to change this result, so the motion to amend is denied as being futile as to this claim.

#### d.    42 U.S.C. §§ 1983 and 1985(3) (Count V)

The GPD Defendants argue that Plaintiffs' claims under section 1983 and section 1985(3) are barred by the applicable statute of limitations which, in this case, is three years. Nat'l Adver. Co. v. City of Raleigh, 947 F.2d 1158, 1161-62 (4th Cir. 1991) (section 1983); McHam v. N.C. Mut. Life Ins. Co., No. 1:05-CV-1168, 2007 WL 1695914, at *2 (M.D.N.C. June 11, 2007) (section 1985), aff'd, 250 F. App'x 545 (4th Cir. 2007) (unpublished per curiam opinion).

Plaintiffs' original Complaint against Wray and Brady was filed on January 9, 2009. (Doc. 3 at 11.) According to the GPD Defendants, Brady retired from the GPD on December 1, 2005. (Doc. 26 at 18.) Wray was relieved of all authority over personnel issues on December 20, 2005, was locked out of his office on January 6, 2006, and resigned as Chief of Police on January 9, 2006. (Id.) Plaintiffs' Amended Complaint, which added Sanders as a Defendant, was filed on March 13, 2009. (Doc. 5-2 at 10.) The GPD Defendants assert that Sanders was permanently reassigned out of the SID on January 30, 2006. (Doc. 26 at 19.) The GPD Defendants argue that these dates show they could not have taken any actions against Plaintiffs within the three-year limitations periods applicable to each Defendant.

Plaintiffs argue that a Rule 12(b)(6) dismissal on limitations grounds is inappropriate unless it appears on the

face of the complaint that the limitations period has run. Because the dates Wray, Brady, and Sanders resigned or were reassigned are not included in the Amended Complaint, Plaintiffs contend that these dates cannot be considered in connection with the GPD Defendants' motions to dismiss. The GPD Defendants respond that these dates are matters of public record, of which the court may take judicial notice. <u>Philips</u>, 572 F.3d at 180. Unfortunately, the GPD Defendants do not provide any evidence of where these dates can be found in the public record. Plaintiffs do not respond to this argument, do not challenge the assertion that the dates are matters of public record, and do not challenge the truth of the dates themselves.

"[A] motion to dismiss filed under [Rule 12(b)(6)], which tests the sufficiency of the complaint, generally cannot reach the merits of an affirmative defense, such as the defense that the plaintiff's claim is time-barred." <u>Goodman v. Praxair, Inc.</u>, 494 F.3d 458, 464 (4th Cir. 2007) (en banc). However, a statute of limitations defense may be reached on such a motion "if all facts necessary to the . . . defense 'clearly appear[] on the face of the complaint.'" <u>Id.</u> (alteration in original) (emphasis omitted) (quoting <u>Richmond, Fredericksburg & Potomac R.R. Co. v. Forst</u>, 4 F.3d 244, 250 (4th Cir. 1993)).

While the dates alleged by the GPD Defendants may be correct, they do not clearly appear on the face of the

complaint.  The Amended Complaint refers to "the termination of Defendants Wray and Brady" (Doc. 5-2 ¶ 120) and indicates that Wray, at least, resigned by sometime in January 2006 (see Doc. 5 ¶ 61), but no other dates are provided.  Moreover, the Amended Complaint does not allege any facts concerning Sanders' reassignment or indicate when his alleged investigations of black officers ceased.  Accordingly, the facts necessary to the GPD Defendants' statute of limitations defense do not "clearly appear on the face of the complaint."  The court must therefore proceed to the substance of Plaintiffs' section 1983 and section 1985(3) claims.[33]

### i.  42 U.S.C. § 1983 (Count V)

To state a claim under section 1983, Plaintiffs must allege (1) that the GPD Defendants "deprived [them] of a right secured by the Constitution and laws of the United States," and (2) that the deprivation was performed under color of state law. Philips, 572 F.3d at 180.  The GPD Defendants do not contest the second prong above.  Therefore, the court must determine only whether Plaintiffs have alleged the first prong — deprivation of a federal right.

Plaintiffs allege that they "had a right under the Due Process and Equal Protection Clauses of the . . . Federal

---

[33]  Insofar as the GPD Defendants use this same argument to support their futility argument, it fails in that context for the same reason: the necessary dates do not "clearly appear on the face of" the SAC.

Constitution[] not to be deprived of their constitutionally protected interest in their property" (Doc. 5-2 ¶ 154) and that because of the GPD Defendants' conduct, Plaintiffs "were deprived of their rights to equal protection of all the laws and to due process of law and of their right to their property" (id. ¶ 157). Plaintiffs also allege in conclusory fashion that "Defendants deprived Plaintiffs of rights, privileges, or immunities secured by the United States Constitution or by Federal law and guaranteed by the First, Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States."[34] (Id. ¶ 156.) The GPD Defendants respond that Plaintiffs' allegations "cannot meet the plausibility standard for a motion to dismiss" and incorporate their arguments against Plaintiffs' section 1981 claim (Doc. 26 at 17), which focused on the general vagueness and lack of factual detail of Plaintiffs' allegations (see, e.g., id. at 14-17).

Evaluating Plaintiffs' section 1983 claim is rendered difficult by Plaintiffs' failure to explain or clarify this claim. Plaintiffs have not indicated how the GPD Defendants allegedly violated each of the constitutional rights mentioned above, nor have they explained which factual allegations

---

[34] Plaintiffs also allege equal protection and due process violations under the North Carolina Constitution as part of their section 1983 claim. (See Doc. 5-2 ¶ 154.) However, section 1983 does not provide a remedy for state constitutional violations. See Golden State Transit Corp. v. City of L.A., 493 U.S. 103, 105 (1989).

constitute violations of which rights. Therefore, the court must examine Plaintiffs' allegations and determine which, if any, plausibly allege a deprivation of any of the rights mentioned above. For this purpose, the court will consider only the allegations discussed earlier in connection with Plaintiffs' section 1981 claim, because only these allegations contain the factual specificity necessary to state any claim.

### (a). First and Fifth Amendments

The court is unable to find any alleged facts in either the Amended Complaint or the SAC plausibly implicating First Amendment or Fifth Amendment rights, and Plaintiffs have provided no guidance in this search. Therefore, to the extent Plaintiffs attempt to bring a section 1983 claim based on violations of these two amendments, that claim is dismissed and Plaintiffs' proposed amendment is denied as being futile.

### (b). Fourth Amendment

The only allegation that potentially raises Fourth Amendment issues[35] is found in the proposed SAC: Sanders' secret placement of a keystroke-monitoring device on Hinson's computer and his use of the device to obtain Hinson's email password and to download one year of Hinson's emails. (Doc. 32, Ex. 1

---

[35] The Fourth Amendment "[was] made applicable to the states through the Fourteenth Amendment." Altman v. City of High Point, N.C., 330 F.3d 194, 200 (4th Cir. 2003).

¶ 101.) These actions, authorized by Wray and Brady (id.),
allegedly violated GPD policies (id. ¶ 102).

In City of Ontario, Cal. v. Quon, 130 S. Ct. 2619 (2010),
the Supreme Court assumed without deciding that a city police
officer had a "reasonable expectation of privacy" in text
messages sent and received on a pager owned by the city and
issued to the officer. Id. at 2630. The Court held that even
assuming the officer had a "reasonable expectation of privacy,"
the police department's search of the officer's text messages
was reasonable under the circumstances and thus did not violate
the Fourth Amendment, id. at 2632-33, so the Court declined to
issue a "broad holding concerning employees' privacy
expectations vis-à-vis employer-provided technological
equipment," id. at 2630. A leading Fourth Circuit opinion,
United States v. Simons, 206 F.3d 392 (4th Cir. 2000), held that
a government employee "did not have a legitimate expectation of
privacy with regard to the record or fruits of his Internet use"
because of his employer's clearly stated policy that the
employer would "audit, inspect, and/or monitor" all employee
Internet use, including all email messages. Id. at 398. See
generally O'Connor v. Ortega, 480 U.S. 709, 718 (1987)
(plurality opinion) ("Given the great variety of work
environments in the public sector, the question whether an
employee has a reasonable expectation of privacy must be

77

addressed on a case-by-case basis."); <u>Rehberg v. Paulk</u>, 611 F.3d 828, 844 (11th Cir. 2010) ("The Supreme Court's more-recent precedent shows a marked lack of clarity in what privacy expectations as to content of electronic communications are reasonable.").

Here, it is unclear whether the GPD Defendants' actions were reasonable, because the context of and reasons for Sanders' downloading of Hinson's email messages are not alleged by Hinson. Moreover, Hinson has not alleged any GPD policy indicating that employees have no expectation of privacy in their email messages. To the contrary, he alleges a GPD policy against searches of officers' email accounts without a showing of probable cause. (Doc. 32, Ex. 1 ¶ 104.) Considering the facts alleged and drawing all reasonable factual inferences in Hinson's favor, the court finds at this stage that Hinson's proposed allegations plausibly state a Fourth Amendment claim under section 1983 and thus are not futile. Therefore, Plaintiffs' motion to amend is granted as to Hinson's Fourth Amendment claim against the GPD Defendants in their individual capacities, and the GPD Defendants' motions to dismiss the Amended Complaint are denied as moot to this extent. Any Fourth Amendment claim by any other Plaintiff is dismissed, and Plaintiffs' proposed amendment is denied as futile as to such claims.

### (c). Due Process

"[T]he first inquiry in every due process challenge [under the Fourteenth Amendment] is whether the plaintiff has been deprived of a protected interest in property or liberty." Andrew v. Clark, 561 F.3d 261, 269 (4th Cir. 2009) (quoting Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 59 (1999)) (internal quotation marks omitted); see also Iota Xi Chapter of Sigma Chi Fraternity v. Patterson, 566 F.3d 138, 145-46 (4th Cir. 2009) (procedural due process); A Helping Hand, LLC v. Balt. Cnty., Md., 515 F.3d 356, 368 (4th Cir. 2008) (substantive due process). Plaintiffs claim that the GPD Defendants deprived them of their "constitutionally protected interest in their property." (Doc. 5-2 ¶ 154; see id. ¶ 157.) However, Plaintiffs provide no indication of what "property interests" were allegedly violated.

"[T]o have a property interest in a benefit, a person must have a 'legitimate claim of entitlement to it.' . . . A mere 'abstract need or desire for it' or 'a unilateral expectation of it' is insufficient." Tri-Cnty. Paving, Inc. v. Ashe Cnty., 281 F.3d 430, 436 (4th Cir. 2002) (quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972)). A public employee in an at-will position does not even have a protected property interest in continued public employment, absent rules and understandings entitling him to termination "for cause."

Andrew, 561 F.3d at 269-70.  Moreover, an injury to a person's good name, honor, or reputation is not a deprivation of a cognizable property interest without additional tangible injury, such as loss of employment.  Iota Xi, 566 F.3d at 147-48.

Keeping these principles in mind, the court has examined Plaintiffs' specific factual allegations in both the Amended Complaint and the SAC and is unable to locate any alleged facts plausibly supporting the deprivation of a protected "property interest" of any of the Plaintiffs by the GPD Defendants. Plaintiffs provide no guidance on this point.  Therefore, Plaintiffs' Fourteenth Amendment Due Process claim under section 1983 is dismissed, and Plaintiffs' proposed amendment is denied as being futile.

### (d). Equal Protection

To state a claim for violation of the Equal Protection Clause of the Fourteenth Amendment based on race, each Plaintiff must allege "that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001); see Fisher v. Md. Dep't of Pub. Safety & Corr. Servs., No. JFM 10-CV-0206, 2010 WL 2732334, at *5 (D. Md. July 8, 2010) (applying this standard in the Rule 12(b)(6) context);

see also <u>Eberhart v. Gettys</u>, 215 F. Supp. 2d 666, 675 (M.D.N.C. 2002) (applying this standard in the summary judgment context).

Here, the Amended Complaint alleges that Plaintiffs' "photographs, likenesses, and/or names were included in at least one version of the [l]ine-[u]p Books" that were shown to criminals or suspected criminals. (Doc. 5 ¶¶ 49-50.) Plaintiffs allege that non-black officers did not receive this treatment (<u>Id.</u> ¶¶ 66, 87), and at this stage the court may reasonably infer that Plaintiffs and these non-black officers were similarly situated. <u>See</u> <u>Williams v. Hansen</u>, 326 F.3d 569, 576 (4th Cir. 2003) ("[F]or most purposes officers in a police department must be regarded as similarly situated regardless of their race."). Moreover, this sharp difference in treatment between black and non-black officers supports an inference of intentional discrimination. Therefore, construing all allegations in the light most favorable to Plaintiffs, the court holds that Plaintiffs' Equal Protection claim under section 1983 may proceed.[36] Having reached this holding, the court need not

---

[36] This determination is buttressed by case law demonstrating that allegations of a hostile work environment can support a section 1983 Equal Protection claim. <u>See</u> <u>Hoffman</u>, 379 F. Supp. 2d at 790-91 (requiring the same elements "[t]o state a hostile work environment claim under Title VII or § 1983"); <u>see also</u> <u>Bryant v. Jones</u>, 575 F.3d 1281, 1296 (11th Cir. 2009) (requiring the same elements "[t]o establish a hostile work environment claim under the Equal Protection Clause and 42 U.S.C. § 1981"), <u>cert. denied</u>, 130 S. Ct. 1536 (2010); <u>cf.</u> <u>Beardsley v. Webb</u>, 30 F.3d 524, 529 (4th Cir. 1994) (holding that "intentional sexual harassment of employees by persons acting under color of state law violates the [Equal Protection Clause of the]

analyze Plaintiffs' other allegations, all of which may go forward to the extent they support this Equal Protection claim. The GPD Defendants' motions to dismiss the Amended Complaint are denied as to this claim, and because the SAC includes all the allegations contained in the Amended Complaint, Plaintiffs' motion to amend is not futile as to this claim and is therefore granted to this extent.

### (e). Summary

Having carefully reviewed Plaintiffs' allegations, the court holds that the GPD Defendants' motions to dismiss the Amended Complaint are denied on the merits as to each Plaintiff's Equal Protection claim under section 1983 against the GPD Defendants in their individual capacities and denied as moot as to Hinson's Fourth Amendment claim against them in their individual capacities. Plaintiffs' motion to amend is granted as to these claims. In all other respects, Plaintiffs' section 1983 claims are dismissed, and their motion to amend is denied as futile.

### ii. 42 U.S.C. § 1985(3) (Count V)

Plaintiffs claim that the GPD Defendants, together with the City of Greensboro, violated section 1985(3) by "engag[ing] in a

---

Fourteenth Amendment and is actionable under § 1983," and applying the Title VII hostile work environment standard). As the court held earlier, Plaintiffs' allegations involving the line-up books permit their hostile work environment claim to proceed at this stage.

conspiracy, the purpose of which was to deprive Plaintiffs and other black officers of the Greensboro Police Department . . . of the equal protection of federal and State law or of equal privileges and immunities under Federal and State law." (Doc. 5-2 ¶ 159; see also Doc. 5 ¶ 89; Doc. 5-2 ¶¶ 117, 121-22.) The court has already held that the intracorporate conspiracy doctrine applies to this claim. This doctrine bars claims based on an alleged conspiracy among a corporation and its officers, employees, and agents. See Buschi, 775 F.2d at 1251-53 (applying the doctrine to a section 1985(3) claim); Turner v. Randolph Cnty., N.C., 912 F. Supp. 182, 186-87 (M.D.N.C. 1995) (same). The doctrine is applicable to municipalities, see Iglesias, 539 F. Supp. 2d at 835-36, and merely suing the officers, employees, or agents in their individual capacities does not change the result, Buschi, 775 F.2d at 1252.

Plaintiffs allege that "[a]ll of the activities referred to in the Complaint were performed by, or at the direction of the Defendants Wray and Brady, individually, together, and as part of a conspiracy involving them, Defendant Sanders, and other non-black [GPD] employees . . . and *while said Defendants were employed by the Defendant Greensboro.*"[37] (Doc. 5 ¶ 89 (emphasis

---

[37] Plaintiffs do allege one set of actions taken by Wray and Brady *after* their employment with the City ended. On multiple occasions, Wray and Brady allegedly disclosed to a news reporter protected personnel information about black GPD officers in violation of state law. (Doc. 5 ¶ 90.) They also allegedly gave this reporter

added).)  Consequently, under the intracorporate conspiracy
doctrine, the GPD Defendants could not have conspired among
themselves or with the City.[38]  Therefore, Plaintiffs' section
1985(3) claim is dismissed.  Nothing in the SAC would change
this result, so the proposed amendment is denied as futile.

## C.   State Claims

The court will now consider Plaintiffs' state law claims,
exercising supplemental jurisdiction over them pursuant to 28
U.S.C. § 1367(a).  Those claims are: (1) breach of contract
based on the Stipulation against the City (Count I);
(2) discrimination in employment under the N.C. Equal Employment
Practices Act against all Defendants (Count IV); (3) invasion of
privacy against all Defendants (Count VI); (4) tortious
interference with prospective economic advantage against Wade

---

materially false or misleading facts about black GPD officers in order
to turn public sentiment against these officers.  (Doc. 5-2 ¶ 120.)
Like most of Plaintiffs' allegations, however, these are too vague to
support any claim, including a conspiracy claim, because it is unknown
which, if any, Plaintiffs were affected by these alleged actions.

[38]  Plaintiffs appear to allege that Defendant Wade also participated
in this conspiracy.  (See Doc. 5-2 ¶¶ 117, 121-22, 159.)  If the
intracorporate conspiracy doctrine did not apply to her, it would fail
as to the GPD Defendants as well.  However, because Wade's alleged
actions were taken while she was "an elected member of the Greensboro
City Council" (Doc. 5 ¶ 102), she could not have conspired with the
GPD Defendants or the City.  Cf. Saleh v. Va. State Univ., No. 3:97-
CV-460 R, 1999 WL 34798179, at *20 (E.D. Va. Feb. 25, 1999) ("[I]f the
[doctrine does not apply] even to a single conspirator, the immunity
fails entirely because there then will be two actors, a legally
sufficient number to comprise a conspiracy."), aff'd sub nom. Saleh v.
Upadhyay, 11 F. App'x 241 (4th Cir. 2001) (unpublished per curiam
opinion).

(Count VII); (5) gross negligence against the City, Wray, Brady, and Wade (Count VIII);[39] and (6) civil conspiracy against Wray, Brady, Sanders, and Wade (Count IX).

### 1. Breach of Contract (Count I)

Plaintiffs' first state law claim alleges breach of contract against the City. Plaintiffs allege that Wade's disclosure of their names and the amount of the City's settlement offer constituted a breach by the City of the Stipulation between Plaintiffs and the City. In response, the City seizes upon Plaintiffs' statement that "Defendants' public disclosure of confidential and protected personnel information was malicious, undertaken in bad faith and for discriminatory reasons, and so exceeded their authority as to amount to a waiver of any possible immunity afforded to State employees or officials." (Doc. 5-2 ¶ 124, cited in Doc. 28 at 16.) The City argues that according to this statement, Wade's actions exceeded the scope of her authority as a City Council member and therefore the City cannot be liable for breach of contract based upon Wade's actions.

The City points to Merritt, Flebotte, Wilson, Webb & Caruso, PLLC v. Hemmings, 196 N.C. App. 600, 676 S.E.2d 79

---

[39] It is not clear from Plaintiffs' Amended Complaint that the gross negligence claim is brought against Sanders. (See Doc. 5-2, ¶¶ 174-77.) Brady and Sanders interpret the claim as not including Sanders (Doc. 26 at 2), and Plaintiffs do not challenge this interpretation. (This issue is not clarified in the SAC.)

(2009), <u>review denied</u>, 363 N.C. 655, 686 S.E.2d 518 (2009), for the proposition that a "principal is not liable when the agent is about his own business, or is acting beyond the scope and range of his employment." <u>Id.</u> at 607, 676 S.E.2d at 85 (quoting <u>Snow v. DeButts</u>, 212 N.C. 120, 123, 193 S.E. 224, 227 (1937)). In <u>Merritt</u>, former associates at a law firm alleged that the law firm breached a "non-disparagement" clause in a settlement agreement between the firm and the former associates. <u>Id.</u> at 606-07, 676 S.E.2d at 84-85. They pointed to remarks made by the law firm's office administrator during an informal conversation with a third party at a bar late one night. <u>Id.</u> at 606-07, 676 S.E.2d at 85. The law firm submitted affidavits detailing the scope of the office administrator's authority and showing that his statements were outside of that scope. <u>Id.</u> at 607, 676 S.E.2d at 85. The former associates offered no evidence in response, and the court granted summary judgment for the law firm on this claim. <u>Id.</u> at 608, 676 S.E.2d at 85-86.

<u>Merritt</u> is distinguishable from the present situation. Here, the City has filed a Rule 12(b)(6) motion to dismiss, not a motion for summary judgment, so there is no evidence of the scope of Wade's authority as a City Council member. That scope is not clear from the Amended Complaint, but the court finds that the facts alleged by Plaintiffs, construed in the light most favorable to them, plausibly support a reasonable inference

that Wade acted within the scope of her authority. Her alleged actions consist of attendance at a closed session of the City Council "in her capacity as an elected member" (Doc. 5 ¶ 102), the making of a formal public records request (id. ¶¶ 102-03), the receipt of a formal public records request from a news reporter (id. ¶ 101), a response to that request (id. ¶ 102), and an earlier communication with the news reporter (id. ¶ 101). None of Wade's alleged actions is comparable to the Merritt office administrator's casual remarks at night in a bar.

The City rests its entire argument upon Plaintiffs' statement that "Defendants' public disclosure of confidential and protected personnel information . . . so exceeded their authority as to amount to a waiver of any possible immunity." (Doc. 5-2 ¶ 124.) However, this statement is conclusory, conflicts with other assertions by the Plaintiffs indicating agreement between Wade and the City (see, e.g., id. ¶¶ 117, 121-22), and was likely inserted in an effort to preempt immunity defenses by other Defendants. Furthermore, Plaintiffs are entitled to plead in the alternative, regardless of consistency, see Fed. R. Civ. P. 8(d)(3), so the statement above does not prevent Plaintiffs from alleging that Wade acted within the scope of her authority for purposes of this claim. Therefore, the court will not dismiss Plaintiffs' breach of contract claim on the basis of this statement alone, and this claim may proceed

against the City.[40]  The City's motion to dismiss the Amended

Complaint is denied as to this claim, and because the SAC

contains all the allegations contained in the Amended Complaint,

Plaintiffs' motion to amend is not futile as to this claim and

is therefore granted to this extent.

### 2.   North Carolina Equal Employment Practices Act (Count IV)

Plaintiffs allege that all Defendants' conduct "constituted

discrimination in employment in violation of the State's

Constitution and its public policy, as set forth in North

Carolina Equal Employment Practices Act, [N.C. Gen. Stat.

§§ 143-422.1 et seq.]."  (Doc. 5-2 ¶ 151.)  North Carolina's

Equal Employment Practices Act ("NCEEPA") consists of (1) a

statement of North Carolina's public policy against

discrimination in employment, N.C. Gen. Stat. § 143-422.2, and

(2) a grant of authority to the Human Relations Commission of

the North Carolina Department of Administration to receive and

investigate charges of discrimination, id. § 143-422.3.

Defendants point out that there is no private cause of action

under the NCEEPA, Smith v. First Union Nat'l Bank, 202 F.3d 234,

---

[40]  The City also argues briefly that Plaintiffs' names and the amount
of the settlement offer were "not the type of information covered by
the terms of the Stipulation" and were "not information that was
received by the City during the mediation of . . . Plaintiffs'
claims."  (Doc. 28 at 17.)  Therefore, the City contends, "this
information was not protected from disclosure by the Stipulation."
(Id.)  However, the City does not provide any further explanation of
or support for this assertion.  Therefore, the court will not dismiss
Plaintiffs' claim on this ground.

247 (4th Cir. 2000), although the statute does apply "to common law wrongful discharge claims or in connection with other specific statutory remedies," McLean v. Patten Cmtys., Inc., 332 F.3d 714, 720 (4th Cir. 2003) (quoting Smith, 202 F.3d at 247). Because Plaintiffs have not brought a wrongful discharge claim or cited any other specific statutory remedy, Defendants argue that this claim should be dismissed.  Plaintiffs do not respond to this argument, nor do they provide any explanation of or justification for this claim (or the associated appeal to the North Carolina Constitution[41]).  Therefore, this claim will be dismissed as to all Defendants.  Nothing in the SAC would change this result, so Plaintiffs' proposed amendment would be futile.

### 3.    Invasion of Privacy (Count VI)

Plaintiffs allege that through illegal investigations of Plaintiffs and publication of confidential information about Plaintiffs, all Defendants have committed the tort of invasion of privacy by intrusion into seclusion.  (Doc. 5-2 ¶¶ 164-67.) Each Defendant raises different arguments against this claim, so the court will consider each Defendant in turn.

---

[41]  Plaintiffs make one mention elsewhere of "Plaintiffs' claims under the North Carolina Constitution" (Doc. 38 at 1), but they provide no indication anywhere of what those claims are.

### a.  City of Greensboro

The City argues that governmental immunity shields it from
Plaintiffs' invasion of privacy claim.[42]  "Governmental immunity
shields municipalities and the officers or employees thereof
sued in their official capacities from suits based on torts
committed while performing a governmental function."  Houpe, 128
N.C. App. at 340, 497 S.E.2d at 87.  "[G]enerally speaking, the
distinction [between governmental and proprietary acts] is this:
If the undertaking of the municipality is one in which only a
governmental agency could engage, it is governmental in nature.
It is proprietary and 'private' when any corporation,
individual, or group of individuals could do the same thing."
Wilkerson v. Norfolk S. Ry. Co., 151 N.C. App. 332, 339, 566
S.E.2d 104, 109 (2002) (quoting Britt v. City of Wilmington, 236
N.C. 446, 451, 73 S.E.2d 289, 293 (1952)).  "In order to
overcome a defense of governmental immunity, the complaint must
specifically allege a waiver of governmental immunity. . . .
Absent such an allegation, the complaint fails to state a cause

---

[42]  "North Carolina law is unsettled regarding whether a motion to
dismiss based on [governmental] immunity presents a question of
subject matter jurisdiction or personal jurisdiction."  Pettiford, 556
F. Supp. 2d at 524 n.8.   This court has treated such motions as
motions to dismiss for lack of subject matter jurisdiction under
Federal Rule of Civil Procedure 12(b)(1).   See RPR & Assocs. v.
O'Brien/Atkins Assocs., P.A., 921 F. Supp. 1457, 1460 (M.D.N.C. 1995),
aff'd, 103 F.3d 120 (4th Cir. 1996) (per curiam) (unpublished table
decision).  However, "the distinction appears to have no impact on the
method of review."  Pettiford, 556 F. Supp. 2d at 524 n.8.  Here, the
City has filed alternative motions to dismiss under Federal Rules of
Civil Procedure 12(b)(1) and 12(b)(2).

of action." <u>Paquette v. Cnty. of Durham</u>, 155 N.C. App. 415, 418, 573 S.E.2d 715, 717 (2002) (citation omitted).

The City argues that the allegations in the Amended Complaint relate to the performance of governmental, not proprietary, functions. In particular, the City notes that most of Plaintiffs' allegations relate to "the operation of a police department and law enforcement" (Doc. 28 at 9), which is recognized as a governmental function. <u>See, e.g.</u>, <u>Houpe</u>, 128 N.C. App. at 340-41, 497 S.E.2d at 87 ("This Court has previously held that the provision of police services . . . and the training and supervision of police officers . . . constituted governmental functions. We believe the actions of a city and its officials in investigating and disciplining a city police officer accused of criminal activity are likewise encompassed within the rubric of 'governmental functions.'" (citations omitted)). The City contends that to the extent Wray, Brady, Sanders, and Wade acted within the scope of their authority as police officers and/or City Council members, they were limited to governmental functions and thus the City is not liable for their actions because of governmental immunity; to the extent these other Defendants acted outside the scope of their authority, there can be no *respondeat superior* liability against their employer, the City. Finally, the City argues that

Plaintiffs have nowhere alleged a waiver of governmental immunity by the City.

Plaintiffs do not respond to any of these arguments, other than to point to a recent opinion, Craig ex rel. Craig v. New Hanover Cnty. Bd. of Educ., 363 N.C. 334, 678 S.E.2d 351 (2009). (See Doc. 38 at 1.) In Craig, a plaintiff sued a county school board, bringing three claims directly under the North Carolina Constitution as well as a common law negligence claim based on the same facts. 363 N.C. at 335, 678 S.E.2d at 352. The state court of appeals held that sovereign immunity defeated the negligence claim and that because the negligence claim was an "adequate" remedy at state law, the direct constitutional claims were barred. Id. at 335-36, 678 S.E.2d at 353. The North Carolina Supreme Court reversed, holding that because the negligence claim was barred by sovereign immunity, it was not an "adequate" remedy, so the plaintiff's direct constitutional claims could proceed. Id. at 342, 678 S.E.2d at 356-57. Here, Plaintiffs have not brought any direct state constitutional claims based on the same facts as their invasion of privacy claim (or their other tort claims, such as gross negligence), so Craig is not applicable.

The court finds that the alleged actions of Wray, Brady, Sanders, and Wade were taken in connection with governmental, not proprietary, functions. In the case of Wray, Brady, and

Sanders, those governmental functions included "the provision of police services," "the training and supervision of police officers," and "investigating and disciplining . . . city police officer[s]." Houpe, 128 N.C. App. at 340-41, 497 S.E.2d at 87 (finding these functions to be "governmental"). In the case of Wade, those functions included responding to a public records request. See Chatfield v. Wilmington Hous. Fin. & Dev., Inc., 166 N.C. App. 703, 708, 603 S.E.2d 837, 840 (2004) ("Our Public Record Laws are only applicable to government agencies."). Therefore, the court holds that governmental immunity bars Plaintiffs' invasion of privacy claim against the City, and this claim will be dismissed. Nothing in the SAC would change this result, so Plaintiffs' proposed amendment is denied as being futile.

### b.    Defendant Wade

Wade argues that the invasion of privacy claim against her in her official capacity is barred by governmental immunity. See Beck v. City of Durham, 154 N.C. App. 221, 229, 573 S.E.2d 183, 190 (2002) ("[T]he doctrine of governmental immunity also bars actions against public officials sued in their official capacity." (citation omitted) (internal quotation marks omitted)). Wade adopts all the arguments for governmental immunity made by the City, and Plaintiffs do not respond at all, other than to point to the Craig opinion, which is not

applicable for the reasons given above.  Therefore, the court holds that governmental immunity bars Plaintiffs' invasion of privacy claim against Wade in her official capacity, and this claim will be dismissed.  Plaintiffs' proposed amendment would be futile and is therefore denied.

Wade argues that public official immunity bars Plaintiffs' invasion of privacy claim against her in her individual capacity.  "A public official may only be held personally liable when [her] tortious conduct falls within one of the immunity exceptions: 1) the conduct is malicious; 2) the conduct is corrupt; or 3) the conduct is outside the scope of official authority."  Mabrey v. Smith, 144 N.C. App. 119, 122, 548 S.E.2d 183, 186 (2001).  Wade contends that this immunity applies to her and that Plaintiffs have not alleged facts plausibly supporting any of the listed exceptions.  Plaintiffs do not respond to or even acknowledge Wade's arguments on public official immunity.  Despite Plaintiffs' failure to respond, the court will proceed to the substance of this claim, because "[p]ublic official immunity is not a defense to intentional torts."  Mandsager v. Univ. of N.C. at Greensboro, 269 F. Supp. 2d 662, 681 (M.D.N.C. 2003); see Beck, 154 N.C. App. at 230, 573 S.E.2d at 190.  Invasion of privacy by intrusion into seclusion is an intentional tort.  See Toomer v. Garrett, 155 N.C. App. 462, 479, 574 S.E.2d 76, 90 (2002).

The tort of invasion of privacy by intrusion into seclusion was first recognized in North Carolina in <u>Miller v. Brooks</u>, 123 N.C. App. 20, 27, 472 S.E.2d 350, 354 (1996), which defined the tort as follows: "[O]ne who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person." <u>Id.</u> at 26, 472 S.E.2d at 354 (citations omitted). Plaintiffs point to <u>Toomer</u>, in which the North Carolina Court of Appeals held that the plaintiff stated a claim for intrusion into seclusion where he alleged that the defendants intentionally allowed unauthorized persons to go through the plaintiff's state personnel records and disseminate the contents through the media and the Internet. 155 N.C. App. at 467, 480, 574 S.E.2d at 82, 90. Among this information was the plaintiff's home address, Social Security number, personnel history, medical history, testing data, credit history, and financial information, as well as the names and addresses of his family members. <u>Id.</u> at 467, 574 S.E.2d at 82-83. <u>Toomer</u> stated that "[t]he unauthorized examination of the contents of one's personnel file, especially where it includes sensitive information such as medical diagnoses and financial information, like the unauthorized opening and perusal of one's

mail, would be highly offensive to a reasonable person."  Id. at 480, 574 S.E.2d at 90.

Plaintiffs contend that the information disclosed by Wade constituted part of their "personnel files" and that therefore her actions were analogous to the Toomer defendants' actions. They point to N.C. Gen. Stat. § 160A-168(a), which states that "[n]otwithstanding [state and local statutes] concerning access to public records, personnel files of employees [and] former employees . . . maintained by a city are subject to inspection and may be disclosed only" under certain limited circumstances not present in this case.  For purposes of this provision:

> [A]n employee's personnel file consists of any information in any form gathered by the city with respect to that employee and, by way of illustration but not limitation, relating to his application, selection or nonselection, performance, promotions, demotions, transfers, suspension and other disciplinary actions, evaluation forms, leave, salary, and termination of employment.

Id.  Plaintiffs also point to News Reporter Co. v. Columbus County, 184 N.C. App. 512, 646 S.E.2d 390 (2007), which held that information in an employee's "personnel file" (1) must be "with respect to" the employee and (2) must "relate to" his employment with the relevant governmental body.  Id. at 517-18, 646 S.E.2d at 394 (construing the parallel statute for county employees).  Plaintiffs note the statement in News Reporter Co. that "[w]hether a document is part of a 'personnel file,' within

96

the meaning of [the relevant statute], depends upon the nature of the document and not upon where the document has been filed." Id. at 516, 646 S.E.2d at 393. Plaintiffs then claim that under the above principles, it is "straightforward" that any document "indicating that plaintiffs had filed EEOC charges against Greensboro" was part of Plaintiffs' protected "personnel files." (Doc. 36 at 12.) In addition, Plaintiffs rely upon N.C. Gen. Stat. § 143-318.11, which lists the permitted purposes for "closed sessions" of public bodies in North Carolina. The first listed purpose is "[t]o prevent the disclosure of information that is privileged or confidential pursuant to the law of this State or of the United States, or not considered a public record within the meaning of [North Carolina's public records statutes]." Id. § 143-318.11(a)(1). Plaintiffs have alleged that Wade learned the amount of the City's settlement offer by participating in a closed session of the Greensboro City Council (Doc. 5 ¶ 102), and they contend that the settlement offer was therefore "privileged" or "confidential" information under the above statute.

Wade responds with a number of arguments. First, she contends that the information she allegedly disclosed — Plaintiffs' identities and the amount of the settlement offer — was not part of Plaintiffs' "personnel files," because it did not "relat[e] to" any Plaintiff's "application, selection or

nonselection, performance, promotions, demotions, transfers, suspension and other disciplinary actions, evaluation forms, leave, salary, [or] termination of employment." N.C. Gen. Stat. § 160A-168(a). Second, she argues that even if the disclosed information was part of Plaintiffs' "personnel files," it fell within the list of exceptions in section 160A-168(b), under which the names of all city employees and all forms of compensation paid to them are matters of public record. See id. § 160A-168(b) to (b1).[43] Third, Wade argues that even if the disclosed information was not a matter of public record when she allegedly disclosed it, it would have become a matter of public record as soon as a settlement agreement was reached between Plaintiffs and the City. See id. § 143-318.11(a)(3) ("If [a] public body [such as a city council] has approved or considered a settlement . . . in closed session, the terms of that settlement shall be reported to the public body and entered into its minutes as soon as possible within a reasonable time after the settlement is concluded."). Wade contends that this distinguishes the situation in Toomer from Plaintiffs' allegations, because the personnel records disclosed in Toomer were "inherently personal and private" in a way that Plaintiffs'

---

[43] N.C. Gen. Stat. § 160A-168(b) was recently amended, reorganized, and split into three subsections: (b), (b1), and (b2). See North Carolina Government Ethics and Campaign Reform Act of 2010, S.L. 2010-169, § 18(f) (July 10, 2010). These changes do not affect the issues in this case.

identities and the amount of the settlement offer were not. (Doc. 30 at 12-13.) Fourth, Wade points out that "prevent[ing] the disclosure of information that is privileged or confidential" is not the only permitted purpose for a closed session under N.C. Gen. Stat. § 143-318.11. Rather, she argues, the purpose of the Greensboro City Council's closed session was "[t]o consult with an attorney employed or retained by the public body in order to preserve the attorney-client privilege between the attorney and the public body" and to "consider and give instructions to [the] attorney concerning the handling or settlement of a claim." Id. § 143-318.11(a)(3). Wade contends that the closed session statute therefore does not render all matters discussed in a closed session "privileged" or "confidential." Finally, Wade argues that an invasion of privacy claim requires an allegation of a "physical, intentional intrusion into [Plaintiffs'] confidential personnel files" (Doc. 30 at 20; see id. at 12-13), and she cites Broughton v. McClatchy Newspapers, Inc., 161 N.C. App. 20, 588 S.E.2d 20 (2003), which states that an intrusion into seclusion claim generally requires "a physical or sensory intrusion or an unauthorized prying into confidential personal records." Id. at 29, 588 S.E.2d at 27.

Even assuming for the moment that Plaintiffs' arguments are correct, the court finds that Plaintiffs have not stated a claim

for invasion of privacy by intrusion into seclusion.  This court has stated that "the essential elements of the intrusion tort are *the manner in which the intrusion is made* and the level of offensiveness of the conduct."  Sabrowski v. Albani-Bayeux, Inc., No. 1:02-CV-728, 2003 WL 23018827, at *11 (M.D.N.C. Dec. 19, 2003) (emphasis added) (quoting defendants' motion to dismiss) (internal quotation marks omitted), aff'd, 124 F. App'x 159 (4th Cir. 2005) (unpublished per curiam opinion).  In Sabrowski, the plaintiff alleged, among other claims, that she provided the plant manager at her place of employment with a note from her mental health therapist indicating that she needed some time off work.  Id. at *1.  The plant manager allegedly made phone calls to several third parties, including the plaintiff's sister, former husband, and coworkers, in which he asked questions about the plaintiff's mental health and passed on the medical information contained in the therapist's note.  Id. at *1, *12.  This court held that "even [the plant manager's] wrongful dissemination of Plaintiff's confidential information would not be recognized as the tort of intrusion [in North Carolina]."  Id. at *12.  This court explained that "the tort of intrusion protects one against wrongful *intrusions* into his or her private affairs," and it distinguished this tort from two related invasion of privacy torts — (1) public disclosure of private facts and (2) publicity which places the plaintiff in a

false light in the public eye — neither of which has been recognized by North Carolina. Id. at *10, *12; see Hall v. Post, 323 N.C. 259, 269-70, 372 S.E.2d 711, 717 (1988) (refusing to recognize the tort of public disclosure of private facts); Renwick v. News & Observer Publ'g Co., 310 N.C. 312, 326, 312 S.E.2d 405, 413 (1984) (refusing to recognize the tort of false-light invasion of privacy). In Sabrowksi, there was no allegation that the plant manager had improperly accessed the plaintiff's personal medical records; rather, the plaintiff gave the plant manager a doctor's note, which he was authorized to receive. See 2003 WL 23018827, at *12. The plant manager's improper dissemination of this properly received information did not constitute intrusion into seclusion. Id.

This holding is consistent with language in other state and federal opinions. The tort of intrusion into seclusion "does not depend upon any publicity given a plaintiff or his affairs but generally consists of an intentional physical or sensory interference with, or prying into, a person's solitude or seclusion or his private affairs." Burgess v. Busby, 142 N.C. App. 393, 405, 544 S.E.2d 4, 11 (2001) (quoting Hall v. Post, 85 N.C. App. 610, 615, 355 S.E.2d 819, 823 (1987), rev'd on other grounds, 323 N.C. 259, 372 S.E.2d 711 (1988)). "The kinds of intrusions that have been recognized under this tort include 'physically invading a person's home or other private place,

101

eavesdropping by wiretapping or microphones, peering through windows, persistent telephoning, unauthorized prying into a bank account, and opening personal mail of another." Toomer, 155 N.C. App. at 479-80, 574 S.E.2d at 90 (quoting Hall, 85 N.C. App. at 615, 355 S.E.2d at 823). In Bradley v. Ramsey, 329 F. Supp. 2d 617 (W.D.N.C. 2004), the court dismissed the plaintiff's intrusion claims against most of the defendants, because "Plaintiff's complaint focuses more on the . . . Defendants' disclosure of embarrassing information about him than it does on their prying into his affairs to obtain that information." Id. at 628; see also French v. United States ex rel. Dep't of Human Health and Human Serv., 55 F. Supp. 2d 379, 382-83 (W.D.N.C. 1999) (dismissing the plaintiff's intrusion claim "to the extent [it rested] on the public dissemination of her medical records," but finding that the plaintiff stated an intrusion claim by alleging that an employee of the defendant hospital "wrongfully and intentionally obtained her medical records"); cf. Anderson v. Farr Assocs., Inc., No. 2:97-CV-238, 1997 WL 896407, at *4 (M.D.N.C. Dec. 12, 1997) (finding that the plaintiff stated an intrusion claim by alleging that his employer "forced him to participate in group sessions and evaluations which resulted in his disclosure of deeply personal information"). Even in Toomer, upon which Plaintiffs rely heavily, the court focused its intrusion discussion on the

"unauthorized examination of the contents of [the plaintiff's] personnel file" by the defendants and others, rather than on the later public disclosure of those contents.  See 155 N.C. App. at 480, 574 S.E.2d at 90; see also Sabrowski, 2003 WL 23018827, at *12 (distinguishing Toomer on this basis).

Here, Plaintiffs have not alleged that Wade improperly ascertained the amount of the City's settlement offer.  To the contrary, they allege that the amount was "revealed to Defendant Wade in her capacity as an elected member of the Greensboro City Council participating in a Closed Session of the Greensboro City Council."  (Doc. 5 ¶ 102.)  Because Wade properly received this information, her disclosure of it did not constitute intrusion into seclusion, so Plaintiffs cannot rely upon this disclosure for their invasion of privacy claim.

As for Plaintiffs' identities, Plaintiffs allege that Wade received these through a "*purported* public records request" (id. (emphasis added)), "notwithstanding the fact that the Greensboro City Attorney had advised Ms. Wade and other Greensboro City Council members he would not provide Council members with the Plaintiffs' identities" because their status as EEOC claimants was allegedly confidential information under state law and/or the Stipulation (id. ¶ 104).  Plaintiffs appear to claim that Wade obtained their names without proper authorization and did so with the intention of relaying the names to another

unauthorized individual through a "purported public records request." (Id. ¶ 101; see id. ¶¶ 103-04, 106.)

It is unnecessary at this point to analyze the substance of this claim, because even if Plaintiffs have successfully alleged an intrusion, they must also allege facts plausibly showing that the intrusion "would be highly offensive to a reasonable person," Miller, 123 N.C. App. at 26, 472 S.E.2d at 354, and the court finds that they have not satisfied this prong. Intrusions that have been found to be "highly offensive to a reasonable person" include the installation of a hidden video camera in the plaintiff's bedroom and the unauthorized interception and perusal of his mail, see id.; forced participation in group sessions resulting in the plaintiff's disclosure of deeply personal information, see Anderson, 1997 WL 896407, at *4; the intentional, wrongful acquisition and use of the plaintiff's medical records, see French, 55 F. Supp. 2d at 383; the unauthorized acquisition of a confidential state file indicating the plaintiff's alternative sexual lifestyle, see Bradley, 329 F. Supp. 2d at 622, 628; and the unauthorized examination of a personnel file containing "sensitive information" such as the plaintiff's Social Security number, medical history, credit history, and financial information, see Toomer, 155 N.C. App. at 467, 480, 574 S.E.2d at 82-83, 90.

Here, Plaintiffs allege that Wade discovered their involvement in settlement negotiations with the City and relayed their names to another recipient. The court finds that even if Wade's actions were unauthorized and improper, this allegation does not plausibly rise to the level of an intrusion "highly offensive to a reasonable person," because, as Wade notes, this information would have become a matter of public record as soon as a settlement agreement was reached. See N.C. Gen. Stat. § 143-318.11(a)(3); cf. Moore v. Beaufort Cnty., N.C., 936 F.2d 159, 163 (4th Cir. 1991) ("Under North Carolina law, public bodies can give instructions to their attorneys to settle litigation, so long as the settlement terms are later entered into the minutes in open session." (citing an earlier version of section 143-318.11)).

Therefore, the court holds that Plaintiffs have not plausibly stated a claim for invasion of privacy by intrusion into seclusion against Wade in her individual capacity, and this claim will be dismissed. Plaintiffs' proposed amendment would be futile and is denied.

### c. GPD Defendants

The GPD Defendants argue that the invasion of privacy claim against them in their official capacities should be dismissed as duplicative of the claim against the City. For the reasons given earlier in connection with the GPD Defendants' identical

argument against Plaintiffs' federal official capacity claims, the invasion of privacy claim against the GPD Defendants in their official capacities will be dismissed. Plaintiffs' proposed amendment would also be futile and is denied as to this claim.

The GPD Defendants contend that Plaintiffs' invasion of privacy claim against them in their individual capacities is barred by the applicable statute of limitations as to most of Plaintiffs' allegations and that the remaining allegations fail to state a claim. In North Carolina, the statute of limitations applicable to invasion of privacy is three years. Losing v. Food Lion, L.L.C., 185 N.C. App. 278, 284, 648 S.E.2d 261, 265 (2007) (citing N.C. Gen. Stat. § 1-52(5)). The GPD Defendants make the same statute of limitations arguments here that they made against Plaintiffs' section 1983 and 1985(3) claims, and Plaintiffs offer the same response. For the reasons provided earlier, the court cannot find that the facts necessary to the GPD Defendants' statute of limitations defense "clearly appear on the face of the complaint," so the court must proceed to the substance of this claim.

After a careful review of Plaintiffs' pleadings, the court finds only one set of factual allegations plausibly stating an intrusion into seclusion claim against the GPD Defendants: Hinson's allegations in the SAC that Sanders secretly placed a

keystroke-monitoring device on Hinson's computer, used it to obtain Hinson's email password, and then downloaded one year of Hinson's emails. (Doc. 32, Ex. 1 ¶ 101.) <u>Toomer</u> stated that "the unauthorized opening and perusal of one's mail . . . would be highly offensive to a reasonable person." 155 N.C. App. at 480, 574 S.E.2d at 90. With this statement in mind, and construing all factual allegations in the light most favorable to Hinson, the court holds that Hinson's proposed allegations plausibly state a claim for invasion of privacy against the GPD Defendants in their individual capacities and thus are not futile. Therefore, Plaintiffs' motion to amend is granted as to this claim, and the GPD Defendants' motions to dismiss the Amended Complaint are denied as moot to this extent. The invasion of privacy claims of all other Plaintiffs will be dismissed, and Plaintiffs' motion to amend is denied as futile as to these claims.

### 4. Tortious Interference with Prospective Economic Advantage (Count VII)

Plaintiffs allege that Wade tortiously interfered with their prospective settlement with the City, depriving them of the opportunity to accept the City's settlement offer. Wade argues that governmental immunity bars this claim against her in her official capacity and that public official immunity bars it against her in her individual capacity.

As to governmental immunity, Wade makes the same arguments she offered against Plaintiffs' invasion of privacy claim, and Plaintiffs provide no new counterarguments.  Therefore, for the reasons provided in the discussion of that claim, the court holds that Plaintiffs' tortious interference claim against Wade in her official capacity is barred by governmental immunity, and this claim will be dismissed.  Plaintiffs' proposed amendment would be futile and is denied.

As to public official immunity, Wade makes the same arguments she offered against Plaintiff's invasion of privacy claim, and Plaintiffs once again fail to provide any specific response to these arguments.  Because "[p]ublic official immunity is not a defense to intentional torts," Mandsager, 269 F. Supp. 2d at 681, and tortious interference with prospective economic advantage is an intentional tort, see Beck, 154 N.C. App. at 230, 573 S.E.2d at 190, the court will proceed to the substance of the claim.

The North Carolina Supreme Court has defined this tort as follows:

> [T]o interfere with a man's business, trade or
> occupation by maliciously inducing a person not to
> enter into a contract with a third person, which he
> would have entered into but for the interference, is
> actionable if damage proximately ensues, when this
> interference is done not in the legitimate exercise of
> the interfering person's rights, but with a malicious
> design to injure the third person or gain some
> advantage at his expense.

Spartan Equip. Co. v. Air Placement Equip. Co., 263 N.C. 549, 559, 140 S.E.2d 3, 11 (1965); see Dalton v. Camp, 353 N.C. 647, 654, 548 S.E.2d 704, 709 (2001) (quoting the definition from Spartan Equip. Co.).  This court has stated that "[i]n order to prevail, the plaintiff must demonstrate a 'lack of justification for inducing a third party to refrain from entering into a contract with [the plaintiff] which contract would have ensued but for the interference."  Carter v. Duke Univ. Med. Ctr., No. 95-CV-042, 1995 WL 17208544, at *3 (M.D.N.C. Oct. 3, 1995) (emphasis omitted) (quoting Cameron v. New Hanover Mem'l Hosp., Inc., 58 N.C. App. 414, 440, 293 S.E.2d 901, 917 (1982)).

Wade argues that Plaintiffs have not alleged facts supporting several elements of this tort: (1) that the settlement agreement would have ensued but for Wade's alleged interference, (2) that Plaintiffs suffered damages as a result of Wade's alleged interference, and (3) that Wade acted "without justification."  As to Wade's first and second arguments, the court disagrees.  Construing all allegations and reasonable inferences derived therefrom in the light most favorable to Plaintiffs, the Amended Complaint alleges that the City submitted a written settlement offer to Plaintiffs (Doc. 5 ¶ 99), that Wade's disclosures and the subsequent publication of the information she provided led directly to protests by

Greensboro citizens against the prospective settlement (see id. ¶¶ 106-09, 111), that these protests led directly to the City Council's decision to withdraw the offer (see id. ¶¶ 111-14), that Plaintiffs were considering the City's offer when it was withdrawn (id. ¶ 110), and that Plaintiffs would have accepted the offer had it not been withdrawn (see id. ¶ 110; Doc. 5-2 ¶ 172). Thus, Plaintiffs have sufficiently alleged that the settlement agreement would have ensued but for Wade's alleged interference and that Wade's actions caused Plaintiffs to suffer damages, namely, the loss of the opportunity to receive $750,000 from the City in settlement of their claims. (See Doc. 5-2 ¶ 172.)

Wade's third argument requires more analysis. A claim for tortious interference with prospective economic advantage requires an allegation that the defendant interfered "without justification." DaimlerChrysler Corp. v. Kirkhart, 148 N.C. App. 572, 585, 561 S.E.2d 276, 286 (2002); see Carter, 1995 WL 17208544, at *3; Beck, 154 N.C. App. at 232, 573 S.E.2d at 191. The North Carolina Supreme Court has held that "[i]n the context of interference . . . by an insider, . . . the element that the defendant acted without justification is potentially vitiated by the defendant's corporate position." Embree Const. Grp., Inc. v. Rafcor, Inc., 330 N.C. 487, 498, 411 S.E.2d 916, 924 (1992) (discussing tortious interference with contract); see Beck, 154

N.C. App. at 232, 573 S.E.2d at 191 (noting that tortious interference with contract and tortious interference with prospective economic advantage both include as an element the same requirement that the interference be "without justification"). Corporate officers and directors, for example, have a qualified privilege to interfere between the corporation and a third party, because such acts "are presumed to have been done in the interest of the corporation." Embree, 330 N.C. at 498, 411 S.E.2d at 924 (quoting Wilson v. McClenny, 262 N.C. 121, 133, 136 S.E.2d 569, 578 (1964)). Wade argues that as a member of City Council empowered to vote for or against the prospective settlement, she was an "insider" to the settlement negotiations between Plaintiffs and the City and thus protected by this privilege. Moreover, she argues that Plaintiffs have failed to plead facts plausibly showing that her alleged actions were not justified in the context of her "insider" status.

Plaintiffs appear to make two arguments in response. First, they hint that this qualified privilege may not be available to City Council members. (See Doc. 36 at 10 ("Even assuming *arguendo* that such a privilege even exists for members of a City Council . . . .").) But Plaintiffs do not pursue this idea any further or explain why the "insider" principles presented above would not apply to a City Council member. Therefore, to the extent Plaintiffs present this argument, it is

rejected.  See Varner v. Bryan, 113 N.C. App. 697, 701-02, 440 S.E.2d 295, 298-99 (1994) (affirming the trial court's summary judgment order for defendant town council members, which was "based in part on [the trial court's] conclusion that defendants were not outsiders" to plaintiff town manager's employment contract with the town); cf. MCI Constructors, Inc. v. Hazen & Sawyer, P.C., 405 F. Supp. 2d 621, 624, 630 (M.D.N.C. 2005) (holding that an engineering and consulting firm hired by the City of Greensboro to oversee a construction project was an "insider" to the related construction contract between the City and a third party).

Plaintiffs' second argument is that the issue of qualified privilege should not be decided on a motion to dismiss, because it raises questions of fact and because "it is unreasonable to require the [Plaintiffs] to negate in [their] pleadings facts that more properly support a defense."  (Doc. 36 at 11 (quoting Embree, 330 N.C. at 499, 411 S.E.2d at 925).)  Plaintiffs are correct up to a point.  "[T]he proper place in the pleadings for allegations of qualified privilege is in defendant's answer . . . . [I]nsofar as questions regarding the scope of defendants' privilege are evoked by the allegation that defendants acted 'without justification,' plaintiff's complaint need not address such questions in order to withstand a motion to dismiss for failure to state a claim."  Embree, 330 N.C. at 500, 411 S.E.2d

at 925. "[U]nless Defendants' actions appear justified on the face of Plaintiff's Complaint, Defendants' contentions in this regard are a matter to be decided after resolution of the facts at issue in this dispute." Elina Adoption Servs., Inc. v. Carolina Adoption Servs., Inc., No. 1:07-CV-169, 2008 WL 4005738, at *8 (M.D.N.C. Aug. 25, 2008).

Nevertheless, lack of justification is still an element of a tortious interference claim, and Plaintiffs must allege facts plausibly supporting it. See, e.g., Carter, 1995 WL 17208544, at *3; Embree, 330 N.C. at 500, 411 S.E.2d at 926; Beck, 154 N.C. App. at 232, 573 S.E.2d at 191; DaimlerChrysler, 148 N.C. App. at 585, 561 S.E.2d at 286. One way that Plaintiffs may do this, where the complaint shows that the defendant is an "insider" (see Doc. 5 ¶¶ 99, 102), is to allege that Wade acted for her own personal interest or benefit. See Embree, 330 N.C. at 499, 411 S.E.2d at 924-25; cf. Joiner v. Revco Disc. Drug Ctrs., Inc., 467 F. Supp. 2d 508, 516 (W.D.N.C. 2006) (requiring, at a later procedural stage, a showing that the defendant "acted maliciously by interfering . . . with the intent to injure [the plaintiff] or gain some advantage at her expense"); Wilson, 262 N.C. at 133, 136 S.E.2d at 578 ("As either directors or stockholders, [defendants] were privileged purposely to cause the corporation not to renew plaintiff's contract as president . . . if they acted in good faith to

113

protect the interests of the corporation."); <u>Lenzer v. Flaherty</u>, 106 N.C. App. 496, 513, 418 S.E.2d 276, 286 (1992) (noting that "wrongful purpose" would "defeat a non-outsider's qualified privilege to interfere"). <u>But see</u> <u>Varner</u>, 113 N.C. App. at 702, 440 S.E.2d at 299 (holding that even if plaintiff town manager was terminated by defendant town council members "for personal or political reasons," the termination was "not legally malicious" unless it was a "wrongful act" or "in excess of defendants' authority").

Here, Plaintiffs have not even asserted that Wade acted for her own personal benefit, let alone alleged facts supporting this. They have stated in conclusory fashion that Wade's actions were "malicious and designed to injure the Plaintiffs" (Doc. 5-2 ¶ 170), that her actions were "undertaken in bad faith and for discriminatory reasons" (<u>id.</u> ¶ 124), and that they were "not related to any legitimate government objective" (<u>id.</u> ¶ 125). However, Plaintiffs have alleged no facts plausibly supporting these conclusions. <u>See</u> <u>Jordan</u>, 458 F.3d at 346 (reaffirming "the burden of a plaintiff to allege facts sufficient to state all the elements of her claim" (emphasis omitted) (quoting <u>Bass</u>, 324 F.3d at 765)). None of the factual allegations in the Amended Complaint indicates that Wade acted to gain some advantage at Plaintiffs' expense or that she acted

outside the scope of her role as a City Council member who was free to oppose any prospective City settlement.

Another approach to pleading lack of justification against an "insider" is to allege that Wade's *methods* were improper. See Embree, 330 N.C. at 498, 411 S.E.2d at 924; cf. Varner, 113 N.C. App. at 701-02, 440 S.E.2d at 298 (requiring, at the summary judgment stage, a showing of "legal malice" (but not "actual malice") and defining "legal malice" to include any act that is "wrongful" or "exceeds [the 'insider' defendant's] legal right or authority"). Plaintiffs claim that Wade disclosed information that should not have been disclosed under state confidentiality laws and/or the Stipulation, and apparently they claim that the way in which she did this was improper (see Doc. 5 ¶¶ 101-02 (alleging the "purported public records request[s]" made and received by Wade).) Only the former claim merits discussion, because if the disclosed information was not confidential but was a matter of public record, there likely would be nothing improper about Wade's provision of this information to another party by any method. Therefore, the court must analyze whether Plaintiffs have alleged facts supporting their claim that the information in question was confidential. The arguments made by Plaintiffs and Wade on this point were detailed in the earlier discussion of invasion of privacy, and the parties make the same arguments here.

As discussed earlier, "personnel files" of city employees may not be disclosed except under limited circumstances and are exempted from state and local public records statutes. See N.C. Gen. Stat. § 160A-168(a). An employee's "personnel file" contains "any information in any form gathered by the city with respect to that employee and . . . relating to" his employment with the city. Id.; see News Reporter Co., 184 N.C. App. at 517-18, 646 S.E.2d at 394 (discussing the parallel statute for county employees). Wade's alleged disclosure of Plaintiffs' names in and of itself did not violate section 160A-168, because the names of all city employees are matters of public record. See N.C. Gen. Stat. § 160A-168(b). Whether the amount of the City's settlement offer was part of Plaintiffs' "personnel files" need not be decided now, because a fair inference from the Amended Complaint is that Wade revealed Plaintiffs' participation in employment-related settlement negotiations with the City and information concerning their status as EEOC claimants. (See Doc. 5 ¶¶ 100, 103-04; Doc. 5-2 ¶¶ 121-23, 171.) The exact nature and scope of Wade's disclosures are not clear from the Amended Complaint; however, the court finds that Plaintiffs have plausibly alleged disclosure of information "with respect to" each Plaintiff and "relating to" each Plaintiff's "performance," "promotions," "disciplinary actions," "evaluation forms," or other aspects of employment with the

City.  See N.C. Gen. Stat. § 160A-168(a); cf. News Reporter Co., 184 N.C. App. at 513, 517-18, 646 S.E.2d at 392, 394-95 (holding that a letter from a county emergency-services director to the county board of commissioners (1) discussing in part his experience working with the county's medical director and (2) recommending a new medical director was part of the writer's "personnel file" to the extent of the first discussion but not as to the second).

Wade offers four exhibits relating to the alleged records requests and her alleged communications with the news reporter (Doc. 30, Exs. A-D), and she argues that the court should consider these in support of her motion to dismiss, contending that they are "integral to and specifically relied upon in the Amended Complaint."  (Doc. 30 at 4 n.2.)  Plaintiffs dispute this contention.

"[W]hen a defendant attaches a document to its motion to dismiss, 'a court may consider it in determining whether to dismiss the complaint [if] it was integral to and explicitly relied on in the complaint and [if] the plaintiffs do not challenge its authenticity.'"  Am. Chiropractic Ass'n v. Trigon Healthcare, Inc., 367 F.3d 212, 234 (4th Cir. 2004) (second and third alterations in original) (emphasis added) (quoting Phillips v. LCI Int'l, Inc., 190 F.3d 609, 618 (4th Cir. 1999)).  However, "this principle does not apply to any and all documents

117

that might be referenced in a complaint; . . . it requires that the referenced document be central or integral to the claim in the sense that its very existence, and not the mere information it contains, gives rise to the legal rights asserted." Walker v. S.W.I.F.T. SCRL, 517 F. Supp. 2d 801, 806 (E.D. Va. 2007) (providing as one example of an "integral" document a magazine article referred to in a complaint in a libel action based on statements in that article); accord Fisher, 2010 WL 2732334, at *2.

Wade's attached documents are not "integral to" and "explicitly relied on" in the Amended Complaint in this sense. Furthermore, Plaintiffs call the authenticity of Wade's exhibits into question. (See Doc. 36 at 8-9.) Therefore, the court declines to consider these exhibits in support of Wade's motion to dismiss. To the extent Wade submits the exhibits in support of a qualified privilege defense, this is an affirmative defense "to be decided by a resolution of the factual issues presumptively involved" where Wade's right to the privilege "does not affirmatively appear on the face of the complaint." Embree, 330 N.C. at 499-500, 411 S.E.2d at 925 (quoting Freed v. Manchester Serv., Inc., 165 Cal. App. 2d 186, 190, 331 P.2d 689, 691 (1958)).

The court finds that the Amended Complaint plausibly alleges that Wade may have acted without justification and

therefore plausibly states a claim for tortious interference against Wade in her individual capacity. Wade's motion to dismiss the Amended Complaint is denied as to this claim, and because the SAC contains all the allegations contained in the Amended Complaint, Plaintiffs' motion to amend is not futile as to this claim and is therefore granted to this extent. A final determination on Plaintiffs' tortious interference claim, especially as to Wade's potential qualified privilege defense, must await further factual development.

### 5.    Gross Negligence (Count VIII)

Plaintiffs bring their gross negligence claim against the City, Wray, Brady, and Wade. They allege that "Defendants had a duty, pursuant to [the Stipulation and applicable state law], not to disclose Plaintiff's confidential and protected personnel information," that Defendants "publicly disclosed [this information] without authority or justification," and that these disclosures were "undertaken willfully, wantonly and with reckless disregard for the Plaintiffs' rights." (Doc. 5-2 ¶¶ 175-77.) Once again, the court will examine each Defendant's arguments in turn.

### a.    City of Greensboro

The City argues that governmental immunity bars Plaintiffs' gross negligence claim against it. The City makes the same arguments offered against the invasion of privacy claim, and

Plaintiffs provide no new counterarguments. Therefore, the court holds that governmental immunity bars this claim, and it will be dismissed. Plaintiffs' proposed amendment would be futile and is denied.

### b. Defendant Wade

Wade argues that governmental immunity bars this claim against her in her official capacity and that public official immunity bars it against her in her individual capacity. As to governmental immunity, Wade makes the same arguments that she offered against Plaintiffs' invasion of privacy and tortious interference claims, and Plaintiffs provide no new counterarguments. Therefore, for the reasons provided in the discussions of those claims, the court holds that Plaintiffs' gross negligence claim against Wade in her official capacity is barred by governmental immunity, and this claim will be dismissed. Plaintiffs' proposed amendment is denied as futile.

As to public official immunity, Wade makes the same arguments that she offered against Plaintiff's invasion of privacy and tortious interference claims. "A public official may only be held personally liable when [her] tortious conduct falls within one of the immunity exceptions: 1) the conduct is malicious;[44] 2) the conduct is corrupt; or 3) the conduct is

_____

[44] In this context, "[a] defendant acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or

outside the scope of official authority." <u>Mabrey</u>, 144 N.C. App. at 122, 548 S.E.2d at 186. "[A] conclusory allegation that a public official acted willfully and wantonly should not be sufficient, by itself, to withstand a Rule 12(b)(6) motion to dismiss [based on public official immunity]. The facts alleged in the complaint must support such a conclusion." <u>Meyer v. Walls</u>, 347 N.C. 97, 114, 489 S.E.2d 880, 890 (1997).

Wade acknowledges Plaintiffs' conclusory assertion that her actions were "malicious, undertaken in bad faith and for discriminatory reasons, and so [in excess of her] authority as to amount to a waiver of any possible immunity." (Doc. 5-2 ¶ 124.) Wade contends, however, that Plaintiffs allege no facts plausibly supporting this statement. Plaintiffs do not respond to or even acknowledge Wade's arguments on public official immunity. Therefore, the court holds that Plaintiffs' gross negligence claim against Wade in her individual capacity is barred by public official immunity, and this claim will be dismissed. Plaintiffs' proposed amendment would be futile and is denied.

### c. Defendants Wray and Brady

Wray and Brady argue that the gross negligence claim against them in their official capacities should be dismissed as

---

injurious to another." <u>Grad v. Kaasa</u>, 312 N.C. 310, 313, 321 S.E.2d 888, 890 (1984).

duplicative of the claim against the City.  The court agrees
once again, for the reasons given earlier in the discussion of
Plaintiffs' federal official capacity claims against the GPD
Defendants.  Therefore, the gross negligence claim against Wray
and Brady in their official capacities will be dismissed, and
Plaintiffs' proposed amendment is denied as futile.

    Wray and Brady argue that the gross negligence claim
against them in their individual capacities should be dismissed
for failure to satisfy the three-year statute of limitations
applicable to that claim.  See N.C. Gen. Stat. § 1-52(5).
Again, for the reasons provided earlier, the court cannot find
that the facts necessary to this affirmative statute of
limitations defense "clearly appear on the face of the
complaint," so the court must proceed to the substance of the
claim.

    Plaintiffs base their gross negligence claim against Wray
and Brady on alleged disclosures of protected personnel
information (see Doc. 5-2 ¶¶ 175-77), and they point again to
Toomer, which held that the "willful" and "wanton" public
disclosure of the plaintiff's personnel files by the Secretary
of the North Carolina Department of Transportation, if proven,
constituted gross negligence.  155 N.C. App. at 482-83, 574
S.E.2d at 92.  "Gross negligence has been defined as wanton
conduct done with conscious or reckless disregard for the rights

and safety of others." Id. at 482, 574 S.E.2d at 92 (citation omitted) (internal quotation marks omitted).

Having considered Plaintiffs' pleadings, the court is unable to locate any factual allegations in either complaint plausibly stating a gross negligence claim based on the disclosure of protected information. For example, Plaintiffs allege that Wray and Brady routinely disclosed unspecified protected personnel information about unidentified black officers to a news reporter. (Doc. 5 ¶ 90.) Such vague allegations do not plausibly show that any individual Plaintiff is entitled to relief. Rankin and Patterson allege that in June 2005, Wray "improperly and maliciously discussed confidential personnel matters" involving Rankin, Patterson, and two black officers who are not Plaintiffs. (Doc. 32, Ex. 1 (City Legal Report) at 46.) However, Rankin and Patterson do not allege what information was revealed by Wray, other than that Wray pointed at Rankin and stated, "We looked at you too, but cleared you," or words to that effect. (Doc. 5 ¶ 90.) Moreover, Rankin and Patterson do not allege how this incident had any effect upon them. Cf. Toomer, 155 N.C. App. at 482, 574 S.E.2d at 92 ("Aside from allegations of wanton conduct, a claim for gross negligence requires that plaintiff plead facts on each of the elements of negligence, including duty, causation, proximate cause, and damages." (emphasis added)). Therefore, Plaintiffs'

gross negligence claim against Wray and Brady in their
individual capacities will be dismissed. Plaintiffs' proposed
amendment is denied as being futile.

### 6. Civil Conspiracy (Count IX)

Plaintiffs allege generally that the GPD Defendants, Wade,
"and other co-conspirators agreed among themselves to accomplish
unlawful acts, or to accomplish unlawful acts in a lawful way, .
. . result[ing] in injury to the Plaintiffs," and that they
"acted in concert to injure Plaintiffs." (Doc. 5-2 ¶¶ 179-80.)
As explained earlier, the intracorporate conspiracy doctrine
bars any conspiracy claim based on an alleged conspiracy among
the City's employees, officers, and agents, such as Wray, Brady,
Sanders, and Wade. See Cooper, 184 N.C. App. at 625, 646 S.E.2d
at 799; see also Buschi, 775 F.2d at 1251-53. Plaintiffs do not
provide any explanation of or justification for any of their
conspiracy claims, including this one, nor do they allege the
identities of the anonymous "co-conspirators" or explain how
they might affect the analysis.[45] Therefore, Plaintiffs' civil
conspiracy claim will be dismissed. Plaintiffs' proposed
amendment is denied as being futile.

---

[45] Elsewhere, Plaintiffs allege a conspiracy involving Wray, Brady,
Sanders, "and other non-black [GPD] employees . . . while said
Defendants were employed by the [City]." (Doc. 5 ¶ 89.) To the
extent those "other non-black [GPD] employees" are the "other co-
conspirators" mentioned here, the intracorporate conspiracy doctrine
would apply to them as well, because they were employed by the City.

### D.    Injunctive Relief ("Count IX [sic]")

In a separate count, Plaintiffs' Amended Complaint alleges generally that Plaintiffs are entitled to preliminary and permanent injunctive relief. (Doc. 5-2 ¶¶ 183-85.) Plaintiffs do not explain or justify this request in their briefs. Insofar as the request rests on claims that have been dismissed, it lacks merit. In all other respects, there is no factual basis for such relief, because Wray and Brady are no longer employed by the GPD and Plaintiffs have not alleged any ongoing harm by any Defendant or alleged facts indicating that any past harm may recur. Therefore, Plaintiffs' request for injunctive relief ("Count IX [sic]") will be dismissed. Because Plaintiffs' proposed amendment would be futile as to this request, their motion to amend is denied.

### E.    Summary

The net effect of the court's various rulings is that Plaintiffs may file their proposed SAC as to, and may proceed on, the following claims: (1) Plaintiffs' breach of contract claim against the City (Count I); (2) Plaintiffs' hostile work environment claim under section 1981 against the GPD Defendants in their individual capacities (Count II in part); (3) Evans' disparate treatment claim under section 1981 against the GPD Defendants in their individual capacities (Count II in part); (4) Alexander's disparate discipline claim under section 1981

against the GPD Defendants in their individual capacities (Count II in part); (5) Plaintiffs' Equal Protection claim under section 1983 against the GPD Defendants in their individual capacities (Count V in part); (6) Hinson's Fourth Amendment claim under section 1983 against the GPD Defendants in their individual capacities (Count V in part); (7) Hinson's invasion of privacy claim against the GPD Defendants in their individual capacities (Count VI in part); and (8) Plaintiffs' tortious interference claim against Wade in her individual capacity (Count VII in part).

## III. CONCLUSION

For the reasons set forth above, IT IS THEREFORE ORDERED as follows:

(1) Defendant City of Greensboro's Motion to Dismiss (Doc. 27) is GRANTED IN PART AND DENIED IN PART. The motion is DENIED as to Plaintiffs' breach of contract claim (Count I); it is GRANTED as to all other claims against the City (Counts II, III, IV, V, VI, VIII, "IX [sic]" (Injunction)), which are DISMISSED WITH PREJUDICE.[46]

(2) Defendant Trudy Wade's Motion to Dismiss (Doc. 29) is GRANTED IN PART AND DENIED IN PART. The motion is DENIED as to Plaintiffs' claim for tortious interference with prospective

---

[46] Because the court found that no claim under Count IX (Civil Conspiracy) was asserted against the City, no dismissal of this Count is necessary.

economic advantage against Wade in her individual capacity (Count VII in part); it is GRANTED as to all other claims against Wade (Counts IV, V, VI, VII in part, VIII, IX (Civil Conspiracy), "IX [sic]" (Injunction)), which are DISMISSED WITH PREJUDICE.

(3) Defendant David Wray's Motion to Dismiss (Doc. 24) is GRANTED IN PART AND DENIED IN PART. The motion is DENIED as to: (a) Plaintiffs' hostile work environment claim under 42 U.S.C. § 1981 against Wray in his individual capacity (Count II in part); (b) Plaintiff Steven A. Evans' disparate treatment claim under 42 U.S.C. § 1981 against Wray in his individual capacity (Count II in part); and (c) Plaintiffs' Equal Protection claim under 42 U.S.C. § 1983 against Wray in his individual capacity (Count V in part). The motion is DENIED AS MOOT as to: (a) Plaintiff Lawrence Alexander Jr.'s disparate discipline claim under 42 U.S.C. § 1981 against Wray in his individual capacity (Count II in part); (b) Plaintiff Antuan Hinson's Fourth Amendment claim under 42 U.S.C. § 1983 against Wray in his individual capacity (Count V in part); and (c) Plaintiff Antuan Hinson's invasion of privacy claim against Wray in his individual capacity (Count VI in part), insofar as the proposed SAC may be filed as to these claims. The motion is GRANTED as to all other claims against Wray (Counts II in part, III, IV, V

in part, VI in part, VIII, IX (Civil Conspiracy), "IX [sic]" (Injunction)), which are DISMISSED WITH PREJUDICE.

(4) Defendants Randall Brady and Scott Sanders' Motion to Dismiss (Doc. 22) is GRANTED IN PART AND DENIED IN PART. The motion is DENIED as to: (a) Plaintiffs' hostile work environment claim under 42 U.S.C. § 1981 against Brady and Sanders in their individual capacities (Count II in part); (b) Plaintiff Steven A. Evans' disparate treatment claim under 42 U.S.C. § 1981 against Brady and Sanders in their individual capacities (Count II in part); and (c) Plaintiffs' Equal Protection claim under 42 U.S.C. § 1983 against Brady and Sanders in their individual capacities (Count V in part). The motion is DENIED AS MOOT as to: (a) Plaintiff Lawrence Alexander Jr.'s disparate discipline claim under 42 U.S.C. § 1981 against Brady and Sanders in their individual capacities (Count II in part); (b) Plaintiff Antuan Hinson's Fourth Amendment claim under 42 U.S.C. § 1983 against Brady and Sanders in their individual capacities (Count V in part); and (c) Plaintiff Antuan Hinson's invasion of privacy claim against Brady and Sanders in their individual capacities (Count VI in part), insofar as the proposed SAC may be filed as to these claims. The motion is GRANTED as to all other claims against Brady and Sanders (Counts II in part, III, IV, V in part, VI in part, VIII (as to Brady), IX (Civil Conspiracy), "IX [sic]" (Injunction)), which are DISMISSED WITH PREJUDICE.

(5) Plaintiffs' Motion for Leave to File Second Amended Complaint (Doc. 32) is GRANTED IN PART AND DENIED IN PART. The motion is GRANTED as to: (a) Plaintiffs' breach of contract claim against the City (Count I); (b) Plaintiffs' hostile work environment claim under 42 U.S.C. § 1981 against Wray, Brady, and Sanders in their individual capacities (Count II in part); (c) Plaintiff Steven A. Evans' disparate treatment claim under 42 U.S.C. § 1981 against Wray, Brady, and Sanders in their individual capacities (Count II in part); (d) Plaintiff Lawrence Alexander Jr.'s disparate discipline claim under 42 U.S.C. § 1981 against Wray, Brady, and Sanders in their individual capacities (Count II in part); (e) Plaintiffs' Equal Protection claim under 42 U.S.C. § 1983 against Wray, Brady, and Sanders in their individual capacities (Count V in part); (f) Plaintiff Antuan Hinson's Fourth Amendment claim under 42 U.S.C. § 1983 against Wray, Brady, and Sanders in their individual capacities (Count V in part); (g) Plaintiff Antuan Hinson's invasion of privacy claim against Wray, Brady, and Sanders in their individual capacities (Count VI in part); and (h) Plaintiffs' claim for tortious interference with prospective economic advantage against Wade in her individual capacity (Count VII in part). Otherwise, the motion is DENIED on grounds of futility.

Plaintiffs shall file their Second Amended Complaint in conformance with this order within twenty (20) days.

/s/     Thomas D. Schroeder
                                        United States District Judge

January 5, 2011