IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

LAWRENCE ALEXANDER, JR., et al., )
                                  )
                    Plaintiffs,  )
                                  )
        v.                        )        1:09-CV-00293
                                  )
THE CITY OF GREENSBORO, et al.,   )
                                  )
                    Defendants.   )
_____  )
LAWRENCE ALEXANDER, JR., et al., )
                                  )
                    Plaintiffs,  )
                                  )
        v.                        )        1:09-CV-00934
                                  )
THE CITY OF GREENSBORO,           )
                                  )
                    Defendant.    )
_____  )

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, District Judge.

These related employment actions, originally involving forty plaintiffs, are before the court on defendants' motions as to the claims of the two remaining plaintiffs: Charles Edward Cherry and Joseph Pryor. Defendants City of Greensboro ("the City"); David Wray, Randall Brady, and Scott Sanders, all officers in the Greensboro (North Carolina) Police Department ("GPD"); and former Greensboro Councilmember Dr. Trudy Wade move for summary judgment pursuant to Federal Rule of Civil Procedure 56 in case 1:09CV293 (Docs. 179, 181, 183); and the City moves

for summary judgment in case 1:09CV934 (Doc. 104). Wray, Brady, and Sanders also move to strike the appendices submitted by the thirty-eight other original plaintiffs in case 1:09CV293, which are relied upon by Cherry and Pryor, on the ground they violate this court's August 5, 2013 briefing order (Doc. 261), and the City moves to strike Cherry and Pryor's *pro se* response brief in case 1:09CV934 on the ground it also violates the court's prior briefing order and this district's local rules (Doc. 191).

For the reasons set forth below, the motions for summary judgment will be granted, the motions to strike will be denied as moot, and the actions will be dismissed.

## I.    BACKGROUND

### A.    Procedural History

These cases arise from the race discrimination claims of forty current and former black officers of the GPD. All claims are based on events that occurred when Wray (white) was Chief of Police (2003-'06),[1] Brady (white) was Assistant Chief (2003-'04) and then Deputy Chief (2004-'05), and Sanders (white) was an investigator in GPD's Special Investigation Division ("SID") (2001-'06). Wray resigned on January 9, 2006; Brady retired on

---

[1] The prior police chief, Robert White, was black. Upon Wray's advancement to chief, then-Deputy City Manager Mitchell Johnson directed Wray to clean up perceived sloppiness and unfair treatment in the GPD during White's tenure. (Doc. 282-3 at 25.)

December 1, 2005; and Sanders was reassigned on January 12, 2006. (See Doc. 192 in case 1:09CV293 at 10.)[2]

In case 1:09CV293 ("Alexander 293" or the "Section 1981 case"), forty current and former GPD officers claimed racial discrimination based on multiple theories. Since that time, all plaintiffs have proceeded with various iterations of their complaint, and the court has trimmed the claims after various motions by defendants. A more complete history, which is unnecessary for purposes of the present motions, is recounted in Alexander v. City of Greensboro, 762 F. Supp. 2d 764 (M.D.N.C. 2011), and Alexander v. City of Greensboro, No. 1:09-CV-293, 2011 WL 3360644 (M.D.N.C. Aug. 3, 2011).

Following over four and one-half years of litigation and discovery and after the briefing was completed on the pending motions, thirty-eight plaintiffs resolved their claims,[3] and what remains before the court in Alexander 293 are the following

_____

[2] All citations to the record in this Memorandum Opinion refer to the ECF page number, not to any internal document page numbering.

[3] Specifically, Lawrence Alexander, Jr., and Steven A. Evans filed a stipulation of voluntary dismissal with prejudice as to their disparate treatment claims in both cases presently before the court. (Doc. 171 in case 1:09CV293; Doc. 96 in case 1:09CV934.) Antuan Hinson's Fourth Amendment and state law invasion of privacy claims had survived defendants' motions to dismiss but were withdrawn at his deposition. (Doc. 195-2 in case 1:09CV293 at 3.) The thirty-eight original plaintiffs other than Cherry and Pryor, including Alexander, Evans, and Hinson then filed notices of voluntary dismissal with prejudice as to all remaining claims on November 7, 2013. (Doc. 304 in case 1:09CV293; Doc. 220 in case 1:09CV934.)

claims by plaintiffs Cherry and Pryor: hostile work environment based on race under 42 U.S.C. § 1981 against Wray, Brady, and Sanders (collectively the "GPD Defendants"); breach of contract against the City (based on a pre-litigation confidentiality agreement); and tortious interference with prospective economic advantage against former councilmember Wade (based on her alleged interference with a settlement offer by the City).

Several months after Alexander 293 was initiated, the same forty plaintiffs sued the City, alleging that the same conduct constituted race discrimination in employment under theories of disparate treatment and hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"). (Doc. 1 in case 1:09CV934 ("Alexander 934" or the "Title VII case").) Again, the court trimmed plaintiffs' claims following various motions by the City. See Alexander v. City of Greensboro, No. 1:09-CV-934, 2011 WL 13857 (M.D.N.C. Jan. 4, 2011); Alexander v. City of Greensboro, 801 F. Supp. 2d 429 (M.D.N.C. 2011). The disparate treatment claims have now all been dismissed,[4] and the thirty-eight other plaintiffs resolved their claims in this Title VII case when they resolved their claims in the companion Section 1981 case. So, what

---

[4] As referenced in note 2, the court allowed the disparate treatment claims of Alexander and Evans to proceed, but those plaintiffs voluntarily dismissed them.

remains of <u>Alexander 934</u> are the same claims of hostile work environment made by Cherry and Pryor in <u>Alexander 293</u> but under the rubric of Title VII.

**B.   Factual Background**

The briefing on the pending summary judgment motions, and thus the development of the factual record, has been complicated by Cherry and Pryor and their counsel.  In order to manage the volume of materials for the then-pending forty plaintiffs, the court originally ordered that all plaintiffs' legal arguments be submitted in a joint brief, and each plaintiff was permitted to file separate appendices to include factual arguments and all record evidence unique to him.  (Doc. 170 in case 1:09CV293; Doc. 97 in case 1:09CV934.)  Coincidentally with the due date for the filing of plaintiffs' briefing, Cherry and Pryor discharged their counsel of record and, without permission of the court, on September 5, 2013, filed their own response brief that ignores the court's briefing order and grossly exceeds the page limitations allowed by the court and this district's local rules.  (<u>See</u> Doc. 131 in case 1:09CV934.)[5]  Also on September 5, counsel for plaintiffs filed their master response briefs and

_____

[5] At a November 7, 2013 hearing, Cherry and Pryor's counsel indicated that Cherry discharged them on September 4, 2013, the day before plaintiffs' response brief was due, and Pryor on September 5, 2013, the day it was due; of course, by this time plaintiffs' extensive briefing was already substantially completed.

record evidence and, out of an abundance of caution because they had not been discharged by this court, noted that they were submitting the materials on behalf of all forty original plaintiffs, including Cherry and Pryor. (<u>See</u> Doc. 282 in case 1:09CV293 at 1-2 n.1; Doc. 132 in case 1:09CV934 at 1-2 n.1.)

During hearings on September 17 and October 13, 2013, the court advised Cherry and Pryor's counsel (in the presence of Cherry and Pryor) that, given the then-impending trial date, they would not be discharged until their clients had an opportunity to retain substitute counsel.[6] Cherry and Pryor eventually engaged substitute counsel who entered an appearance in both cases on November 7, 2013, well after all briefing was completed, the case had been placed on the October trial calendar, and this court had begun review of the pending motions. (Doc. 305 in case 1:09CV293; Doc. 221 in case 1:09CV934.)[7]

Plaintiffs' master response brief for both cases (Doc. 282; Doc. 132 in case 1:09CV934) sets forth several factual bases for

---

[6] One of the court's concerns centered on the thousands of pages of discovery released by the City that were governed by a Protective Order and Supplemental Protective Order entered into between the parties and the claims by the City that Cherry and Pryor may have violated the orders by releasing some of the information publicly. (<u>See</u> Docs. 120 and 121 in case 1:09CV293; Docs. 60 and 61 in case 1:09CV934.)

[7] For simplicity, from this point forward the court will cite to documents in <u>Alexander 293</u> unless otherwise noted.

their claims that the City (in the Title VII case) and the GPD Defendants (in the Section 1981 case) created a racially hostile work environment for all original plaintiffs during Wray's tenure as Chief. Cherry and Pryor proffer a wide range of alleged conduct in their *pro se* brief, which rambles, overlaps the master response, is at times difficult to decipher, and is devoid of record support. If the court were to rely solely on Cherry and Pryor's *pro se* brief, a result they presumably intended by filing it, its gross deficiencies would render its adequacy as a response problematic at best for Cherry and Pryor. For that reason and those noted later in this opinion, therefore, the court will consider all materials filed by or on behalf of Cherry and Pryor that contain admissible evidence and argument. Accordingly, the court sets out the factual record from these materials in the light most favorable to these two remaining plaintiffs as non-moving parties. For an even more thorough discussion of the context in which these claims arose, the reader should consult the court's several prior opinions noted earlier.

### 1. Hostile work environment claims

#### a. The "black book" and other lineups

Throughout this litigation, plaintiffs' central claim has been that the GPD Defendants maintained one or more "black books" containing photographs of black GPD officers that were

used to falsely implicate plaintiffs and other black officers in criminal wrongdoing. Indeed, it was on this basis that the court permitted plaintiffs' claims to survive initial motions to dismiss. See Alexander 293, 762 F. Supp. 2d at 794-95. Although all plaintiffs have consistently claimed that several such books existed and that they were used to conduct illegitimate investigations of black officers, it is now apparent that plaintiffs lack admissible evidence to support this central claim.[9]

The main "black book" discussed by plaintiffs contains photographs of 19 black GPD officers, including Pryor, among 114 photographs.[10] Defendants admit that such a book existed but argue that it was created as a legitimate aid in the investigation of a sexual assault reported to the GPD by an alleged victim who implicated a uniformed black GPD officer. (Doc. 192 at 23–28.) The record evidence regarding this lineup book is found in Sanders' deposition and its attached exhibits. (Docs. 196-3, 196-4, 196-5, and 198-6) Sanders and Sergeant Tom Fox interviewed the alleged victim, who reported that she was assaulted in the middle of August 2004 by a black uniformed

---

[9] For example, Cherry and Pryor's *pro se* brief argues that as many as ten "black books" existed, but, as noted herein, they provide no record evidence for most of them.

[10] In the *pro se* brief, Pryor states that he was pictured in this lineup book. Defendants do not dispute this assertion.

officer she described as dark-skinned, short-haired, and short in stature.[13]   (Doc. 198-6 at 5-6.)   In response, Sanders compiled a lineup book containing photographs of the 19 black officers who were on duty during the timeframe the assault allegedly occurred.  (Doc. 196-4 at 5.)[14]  However, the alleged victim was not able to identify her assailant from the photographs.  (Doc. 196-4 at 10.)[15]  Sanders further testified that he did not show this lineup book to anyone but the alleged victim in the sexual assault investigation.  (Doc. 196-5 at 4.) Plaintiffs have not produced any admissible evidence to contradict this statement, and any suggestion otherwise is only speculation based on inadmissible hearsay.   Moreover, Pryor concedes he was unaware that his photograph was in this line-up book while it was used and did not know about its existence

---

[13] Pryor contends that this is evidence that the book was not used for a legitimate investigatory purpose because he is six feet three inches tall.  (Doc. 131 in case 1:09CV934 at 47.)

[14] The lineup book, attached to the GPD Defendants' brief, consisted of 19 pages, each containing a photograph of one of the 19 officers and five "fillers."  (Doc. 197-3.)

[15] Sanders testified that the alleged victim only recognized original plaintiff Steven Snipes out of the 19 officers but said that he was not the assailant.  (Doc. 196-4 at 10.)  Later, Sanders showed the alleged victim a photograph of original plaintiff Ahmed Blake.   The victim told Sanders that Blake could be the assailant, but she could not be sure.  (Id.)   Based on that inconclusive interview, the investigation remained open with Blake as the primary suspect.  (Id. at 10-11.)   There is no information as to any further activity regarding the investigation, and thus it should not be inferred from this Memorandum Opinion that any assessment of Blake's guilt exists.

until it "went public" as the result of a newspaper report. (Doc. 114-6 at 24; Doc. 282-2 at 9; see also Doc. 114-6 in case 1:09CV934 at 35 (EEOC Intake Questionnaire noting "7/2005" as earliest date of alleged harm).)

Another lineup book, containing the photographs of six black GPD officers (not including Cherry or Pryor), was shown in late 2002 or early 2003 in connection with the investigation of a possible assault at a bachelor party which Sanders understood only black officers attended. (Doc. 196-4 at 2-4; Doc. 196-3 at 9-11.) Two of the three officers pictured in this lineup admitted that they did not learn that their photographs had been used until long after Wray and Brady left the GPD and Sanders had been reassigned. (Doc. 196-8 at 10-11 (Allen Wallace); Doc. 196-7 at 6 (Steven Snipes).) Original plaintiff Norman Rankin knew that his photograph had been shown to a dancer at the party's location; he originally called Sanders to express his objection, but eventually apologized. (Doc. 195-7 at 5.) After Sanders received information that a white officer may have been present at the party, Sanders showed photographs of all GPD employees, white and black, to his informant, but the informant was unable to identify the white officer from the photographs. (Doc. 196-3 at 6-8.) Plaintiffs have not produced any admissible evidence that these lineups were used for any purpose other than to investigate the possible assault reported at the

bachelor party, or that Cherry or Pryor were aware this book existed until after three other officers met with City Manager Mitchell Johnson in August 2005 to raise concerns about Wray, which was well after the lineups were allegedly used.[16] (See Doc. 131 in case 1:09CV934 at 21.)

Sanders also showed individual photographs of black officers on some occasions. For example, he displayed original plaintiff William Graves' photograph to a fireman from High Point who had witnessed an arrest outside a nightclub in order to verify Graves' identity as the arresting officer. (Doc. 196-5 at 4-5.) Sanders also showed photographs of Snipes and GPD officer Julius Fulmore (the lone plaintiff in the related case 1:09CV373) to an undisclosed informant in connection with an investigation of Fulmore following the discovery of drug paraphernalia in a hotel room he had rented on June 2, 2004. (Id. at 9–10.) The informant was asked to verify Snipes' identity because the informant had previously indicated that she knew him. (Id. at 10.) Finally, Sanders testified that photographs of Snipes and Rankin were shown to an informant during a Drug Enforcement Administration investigation. (Id. at

---

[16] Three original plaintiffs – William Graves, Stephen L. Hunter and Allen Wallace - met with Johnson, Wray, the City Attorney, and a local attorney in August 2005 to discuss the treatment of black officers under the Wray administration as well as Wray's management style and practices. (Doc. 282-3 at 43; Doc. 282-8 at 3.)

12.) As with the "black books," there is no evidence that Cherry and Pryor were aware of any of these photographs being shown until the August 2005 meeting with City Manager Johnson.[17] (See, e.g., Doc. 112-1 in case 1:09CV934 at 24-30 (Cherry conceding he cannot say when he became aware of information regarding black books).)

Apart from these incidents, plaintiffs have produced no admissible evidence that any photograph of a black GPD officer was shown to any other person.[18]

### b. Investigations and other alleged disparate treatment of black GPD officers

Cherry and Pryor now rely heavily on various GPD investigations of black officers, including some who were not ever plaintiffs in these cases, to bolster their hostile work environment claims. Ordinarily, the type of investigation within the GPD depended on the type of allegation: investigations of officers for alleged criminal violations were ordinarily conducted by the GPD's Criminal Investigation

---

[17] Assistant Chief Tim Bellamy (black) also testified that he was aware of some photographs of some original plaintiffs having been shown to informants in some situations, but he declined to disclose their identities or the situations, and plaintiffs never moved to compel this information. (Doc 282-16 at 19-22.) Thus, even assuming that such displays occurred, the court is left with no basis on which a jury could reasonably determine they were improperly based on race.

[18] Pryor testified that upon his employment at the GPD there was an "urban legend" that the GPD kept books of photographs of black officers. (Doc. 114-6 in case 1:09CV934 at 23-24.) No other evidence was provided, however.

Division ("CID"), which had a chain of command that provided reporting and oversight; investigations of suspected violations of internal rules and policies were handled as civil matters by Internal Affairs; and the gathering of special intelligence (to be passed on to the appropriate investigative division of the GPD) was ordinarily handled by SID, which GPD directives state has no investigative function and which had less oversight and fewer procedural protections. Cherry and Pryor argue that the practice under Wray's administration of investigating black officers using the GPD's SID rather than its CID violated GPD directives and is evidence of targeting of black officers that contributed to their hostile work environment. (Doc. 282 at 8–11.)

For the sake of clarity, the specific investigations and disparate treatment claims of Cherry and Pryor will be set out first before events relating to other officers are identified.

### i. Cherry

In 2003, while Wray was assistant chief, Cherry had a conflict with Captain Bill Ingold, a white officer who was Cherry's superior. According to Cherry, Ingold entered the doorway of his office and cursed at him. (Doc. 112-1 in case 1:09CV934 at 49.) Cherry responded by going to Ingold's office and requesting an apology. (Id. at 50.) Wray summoned Cherry to his office and threatened an Internal Affairs investigation

if Cherry did not apologize to Ingold. (Id.) Cherry agreed to apologize if Ingold would apologize to him in return; the parties then apologized and went their separate ways. (Id. at 51–52.) Cherry told then-Chief White (who is black) about the incident but, according to Cherry, it was never investigated, and Wray was elevated to chief without ever reporting he had violated GPD directives by not investigating Ingold's behavior. (Id. at 52–53.) Cherry never filed a grievance or complaint about the handling of the incident. (Doc. 112-1 in case 1:09CV934 at 52.)

When Wray became chief, he transferred Cherry to an undesirable position as field lieutenant.[19] (Doc. 282-1 at 18.) Cherry claims he was passed over several times for better assignments and promotions in favor of white officers, implying that Wray's explanation that Cherry needed more field experience was a pretext for discrimination. (Id.)

Either in 2004 or 2005,[20] Cherry's daughter made an allegation of misdemeanor child abuse against him, which her

---

[19] In the pro se brief, Cherry states that this job required him to work 12-hour days and spend time away from his family, including his daughter with whom he was attempting to build a relationship. (Doc. 131 in case 1:09CV934 at 13–14.) This claim does not appear in the record, either in Cherry's deposition or interrogatory responses. (Doc. 282-1 at 19–22.)

[20] Cherry's interrogatory responses indicate that this occurred "[i]n about 2004," (Doc. 281-1 at 20), but his pro se brief places the incident in early 2005 (Doc. 131 in case 1:09CV934 at 15).

mother, another GPD police officer, reported. (Doc 112-1 in case 1:09CV934 at 59.) Cherry testified that CID, in investigating the case, gave the mother a "shell report" to take to the magistrate in order to obtain a warrant for Cherry's arrest.[21] (Id.) Cherry spoke to Wray about the incident, but Wray refused to intervene and, when approached by Cherry in the gym, commented he would "let the chips fall where they may" regarding CID's investigation. (Id. at 60.)[22] Thereafter, Cherry's daughter recanted her allegation of child abuse, and the arrest warrant was recalled. (Doc. 112-1 in case 1:09CV934 at 70.) The status of the CID investigation was subsequently changed to "Inactivated." (Id.) Cherry contends that it should have been changed to "Unfounded" (id. at 61), and in his *pro se*

---

[21] The *pro se* brief further explains Cherry's exception to the "shell report" because he represents that although the general procedure is for magistrates not to issue a warrant in a child abuse case prior to an investigation by the Juvenile Services Division, such procedure was bypassed in his case. (Doc. 131 in case 1:09CV934 at 15.) However, nothing indicates that the procedure used was impermissible.

[22] In his *pro se* brief, Cherry says Wray called his domestic situation a "mess," while claiming generally (without further factual support) that several white officers who had similar disputes were not so insulted. (Doc. 131 in case 1:09CV934 at 15.) Cherry also claims that while the investigation into the child abuse accusation was ongoing, he occasionally used a GPD service (that allowed any member of the public to request police supervision, presumably when a family member was threatened) to ensure that his daughter was picked up or dropped off at the start and end of his visitation time. Then-Assistant Chief Bellamy (black) told him that if he continued to utilize the City resources in this fashion, his job would be in danger. Cherry claims that Bellamy represented that this order came from above him, presumably from Wray or Brady. (Id. at 15-16.)

brief claims the CID investigator told him that it could not be changed even though the daughter's testimony was used to obtain the warrant in the first place (Doc. 131 in case 1:09CV934 at 17). Cherry speculates that Wray chose to label the investigation as "Inactivated" in order to leave the door open for future, arguably unwarranted, investigation. (Id.)[23] A later investigation of the same conduct by Internal Affairs classified the allegation as "Unfounded." (Doc. 112—1 in case 1:09CV934 at 72.) Cherry could not recall if he ever filed any written grievance regarding this incident. (Id. at 61.)

Cherry testified in his deposition that he was involved in Brady's investigation into original plaintiff Steven Hunter for alleged fraudulent reporting of time worked at an off-duty assignment, but Cherry could not recall when this had occurred. (Id. at 47.) Cherry concluded that it was an "easy investigation" and that a memorandum was written that cleared Hunter of any wrongdoing. (Id.) However, Cherry testified, evidence that a white officer had fraudulently reported off-duty time was not investigated. (Id. at 47–48.)[24]

---

[23] In the *pro se* brief, Cherry represents that an Internal Affairs sergeant told him there was "no way" that his criminal investigation should have yielded a finding of "Inactivated." (Id. at 16–17.) There is no record evidence of this.

[24] Cherry also represents in his *pro se* brief that he filed a complaint with the GPD claiming that he was being defrauded (in an unidentified manner) and that the GPD's Professional Standards Division failed to

Finally, Cherry stated in his discovery responses that "[m]inority officers are subjected to being called derogatory terms like 'sorry sack of s***' by white commanders and are not disciplined," that once a white GPD Captain "turned to Cherry in a hallway, blocked his path, and called him a 'jerk,'" and that a white assistant chief would not allow his complaint about the latter incident to be investigated. (Doc. 282-1 at 21-22.) No further evidence as to either of these is presented by Cherry.

### ii. Pryor

Pryor testified in his deposition and stated in his interrogatory responses that soon after he joined the GPD in 2003, he was the only black officer in his squad and heard a fellow squad member say something to the effect of "they can't get rid of our token black man." (Doc. 114-6 in case 1:09CV934 at 7; Doc. 282-2 at 8.) He alerted his sergeant, Patricia Buser (white female), who directed the offending officer to apologize but did not initiate an investigation or force the officer to apologize publicly. (Doc. 114-6 in case 1:09CV934 at 8-9.)

---

conduct a proper administrative investigation into his complaint. (Doc. 131 in case 1:09CV934 at 17-18.) This appears to be a reference to testimony in his deposition in which Cherry mentions a complaint he made regarding his child support action involving the mother of his child (which SID Captain Matt Lojko investigated and the district attorney declined to pursue because it was a civil dispute). (Doc. 112-1 in case 1:09CV934 at 64-67.) He also testified that a summons was not "handled properly" regarding a dispute he had with his child's mother about her alleged improper contacts with him. (Id. at 68.) The second complaint does not appear in any briefing.

Pryor then went to his captain, original plaintiff William Phifer (black). (Id. at 11.) Phifer told Pryor that he would "send it back down to [sic] the chain of command to . . . Lieutenant [Janice] Rogers, to do the investigation." (Id. at 11-12.) Pryor testified that Rogers (white) did not conduct an investigation, but Pryor was not certain whether Phifer ever alerted Rogers to Pryor's complaint. (Id. at 12-14.)

While working off-duty at a Harris Teeter grocery store in late 2005, Pryor arrested a man for public disorder. (Id. at 15-16; Doc. 282-2 at 8.) As Pryor described the incident, the man entered the store and, upon seeing Pryor, "said something to the effect of this is a stick up" and then started smiling. (Doc. 114-6 in case 1:09CV934 at 15.) The man continued shopping and when he came back through the line Pryor told him he should not joke like that. (Id.) The man "said something to [the] effect of I know or something, I don't care." (Id.) Pryor then told him he was under arrest, the man resisted, and Pryor used mace to restrain him. (Id. 15-16.) Pryor brought the man to a magistrate, who found probable cause for the arrest for public disorder. (Id. at 16.) A few days later, however, the GPD determined it would dismiss the charge against the man because there was insufficient probable cause. (Id. at 17.) Sergeant Buser later contacted Pryor and told him that he would be criminally charged for assaulting the suspect. (Id. at 18-

19.) Pryor in turn contacted the police union attorney, Bill Hill, who advised him that he was about to be arrested and should prepare to surrender his badge and gun. (Doc. 282-2 at 8.) No criminal investigation ever occurred, however. (Doc. 114-6 in case 1:09CV934 at 20.)[25] The GPD instead conducted an administrative investigation and issued Pryor a Division Level Reprimand. (Doc. 114-6 in case 1:09CV934 at 22.) Pryor contends that the magistrate's finding of probable cause for the arrest rendered any discipline inappropriate. (Id.) However, Pryor declined to pursue an appeal because, in his words, "he had gone from having to turn in his badge to a Division Level Reprimand, and decided to take his lumps." (Doc. 282-2 at 9.)[26]

### iii. Other officers

Officer James Hinson, who is black but was not a plaintiff in these cases, found a GPS tracker on his GPD vehicle on June 4, 2005. (Doc. 282-8 at 7.) According to Dwight Crotts, former

---

[25] In the *pro se* brief, Pryor claims he went to Phifer to discuss the charges and that this ultimately led to Wray's decision to drop the charges. (Doc. 131 in case 1:09CV934 at 45.) Pryor's deposition testimony, the only admissible evidence on this point, contradicts this claim. (Doc. 114-6 in case 1:09CV934 at 21.)

[26] The *pro se* brief articulates Pryor's contention that white officers who arrested suspects without probable cause were not investigated. (Doc. 131 in 1:09CV934 at 45-46.) The only factual support is found in Hastings' deposition, where he testified that two white GPD officers arrested a suspect without probable cause and that Wray told him to shut down the criminal investigation because the entire case was being transferred to Internal Affairs. (Doc. 282-14 at 6.)

Captain of SID, Hinson had been investigated for alleged involvement in an assault and with a prostitute. (Doc. 282-18 at 15.) The GPD Internal Affairs division had determined in 2004 that there was no basis to go forward with the investigation (Doc. 282-8 at 5-6), but SID reopened it nevertheless. (Doc 282-18 at 29, 32-33.) After the tracker was discovered, Wray and new SID captain Matt Lojko retained two former GPD officers to investigate several allegations against Hinson, most of which had already been considered and dropped in the previous Internal Affairs investigation. (Id. at 34-35; Doc. 282-8 at 5-6.) Crotts advised the former officers that Hinson had already been investigated for the same allegations and cleared. (Doc. 282-18 at 33.) When Crotts questioned Wray regarding the change in procedure in bringing back former officers to conduct a second investigation, Wray responded that he could order parking enforcement to conduct an investigation if he pleased. (Id. at 39.) Apparently, nothing resulted from this second investigation, as plaintiffs have not put forth any evidence regarding it or its outcome. At the time of the Hinson investigation, to the extent he was aware of it, Pryor believed it was "probably for just cause." (Doc. 282-2 at 9.) As noted infra, however, Wray's conduct relating to the investigation of Hinson, once revealed, became the subject of intense scrutiny by

City Manager Johnson and ultimately contributed to Wray's departure from the GPD.

GPD Officer Fulmore also had a GPS tracker placed on his vehicle by the GPD.[27] (Doc. 282-18 at 51-52.) Fulmore claimed he was investigated at least ten times between October 2002 and March 2005 (see Doc. 90-3 in case 1:09CV373), had his photograph shown to several criminals and others in an attempt to link him to criminal activity (see Doc. 89-1 in case 1:09CV373 at 85-100), and was suspended with pay for nine months following an investigation of the hotel incident previously noted (see Doc. 90 in case 1:09CV373 at 4-18; Doc. 89 in case 1:09CV373 at 1-4 (arguments in brief)). Sanders and another officer conducted the investigation of Fulmore's conduct in the hotel incident (Doc. 79-34 in case 1:09CV373) and presented their findings to Assistant District Attorney Howard Newman (id. at 7). Newman determined that there was insufficient evidence to charge Fulmore with a crime. (Id.) Plaintiffs have not provided evidence that the Fulmore investigations were without foundation, but the evidence, viewed in the light most favorable to plaintiffs, does indicate that the GPD continued its investigation of the hotel incident beyond the time the North

---

[27] Cherry concedes that he cannot say he learned about the Fulmore tracker before Wray's resignation on January 9, 2006. (Doc. 112-1 in 1:09CV934 at 46.)

Carolina State Bureau of Investigation ("SBI") determined that the complaining witness, then an inmate, lacked credibility. Fulmore's claims that his photograph was shown to various criminals, however, are supported only by inadmissible hearsay. Cherry and Pryor claim that the treatment of Fulmore contributed to their hostile work environment and that the continuous investigations are evidence that the GPD Defendants impermissibly targeted black officers for unreasonable treatment. (Doc. 282 at 24–25.)

GPD Officer Stacey Morton, an original plaintiff in these cases, was terminated after an August 26, 2003 use-of-force incident during which he helped restrain a suspect who had been handcuffed by a fellow officer.[28] (Doc. 282-2 at 2; Doc. 282-1 at 51.) Morton stated in his interrogatory responses that no GPD officer had been terminated for conduct like his in twenty years. (Doc. 282-2 at 2.) On November 11, 2003, an appeals board voted 5-0 to reverse Morton's termination, but Wray adhered to the decision to terminate him. (Id.) Morton was also tried for criminal assault and acquitted after a bench trial on January 28, 2004. (Id.) After a hearing before then-Deputy City Manager Johnson (who would later become City Manager), Morton was reinstated on February 27, 2004. (Id.)

---

[28] Morton's termination letter was signed by Crotts in his capacity as Captain of SID. (Doc. 282-2 at 2.)

Thereafter, Wray transferred Morton from the more elite "Crime Abatement Team" to patrol in an undesirable part of Greensboro, reduced his rank, and suspended him without pay for 160 hours. (Id.) According to Johnson, he personally believed Wray had "overemphasized the event" as part of Wray's tough stand on officer misconduct (Doc. 282-3 at 20–21), but Morton felt that he had been targeted because of his race (Doc. 282-2 at 3).

Officer Darrin Davis, another original plaintiff, was criminally investigated months after an administrative investigation had closed on a use-of-force incident. (Doc. 282-1 at 26.) Wray's impetus for opening the criminal investigation was allegedly an anonymous letter received by the Guilford County District Attorney's office claiming that an effort to report the incident had gone unheeded. (Id.) In another incident, original plaintiff Jonathan Heard filed a report against his white co-worker for allegedly strip-searching a suspect. (Doc. 282-1 at 33.) After Brady took control of the Internal Affairs investigation, the white officer received no punishment while Heard was transferred to an undesirable district. (Id.) Plaintiffs have provided no evidence of the underlying facts of these incidents to indicate whether the treatment of the black officers was improper.

Original plaintiff Kevin Chandler stated in his interrogatory response that a woman with whom he had been

romantically involved broke into his house in March 2004. (Id. at 18.) Accordingly to Chandler, the woman cut his face with a blade, he fled the scene, and she subsequently called 911 and accused him of jumping on her. (Id.) Chandler was charged with criminal assault and suspended with pay. (Id.) The criminal charges were eventually dropped, but Chandler was given administrative discipline.[29] (Id.)

According to his interrogatory response, original plaintiff Brian James was interrogated by Sanders and Fox on March 28, 2005. (Id. at 39.) James signed a "criminal investigation waiver" and was under the impression that Sanders and Fox were investigating someone else. (Id.) Sanders questioned James about his relationship with a particular individual and played a recording of James talking to that individual, but Sanders assured James there were no recordings of inappropriate conversations on his part. (Id. at 40.) After the interview, James was under the impression that the investigation into his conduct was over. But, in fact, Wray told James, "[d]on't worry, I don't think anything differently about you, they had to

---

[29] Cherry and Pryor included this incident in the pro se brief; however, they rely on inadmissible hearsay evidence that (1) Wray, Brady, and Crotts prevented a black officer from responding to the scene "presumably because he was black," and (2) a special prosecutor brought in to handle the case from Forsyth County remarked that he "had nothing to even argue here," referring to the evidence against Chandler. (Doc. 131 in case 1:09CV934 at 28–29.) Chandler's interrogatory response relies on the same hearsay. (Doc. 282–1 at 18.)

go through this process because of some allegations that were made." (Id. at 40–41.) Later in 2005, James asked Brady if SID thought he was dirty, and Brady responded, "[n]o, you're clean as a whistle." (Id. at 41.) Brady added that there was not a piece of paper in the SID office with James' name and said that "the good thing about this program is that if our investigation is unfounded, it's like it never existed." (Id.) James told Brady that he wanted something in his record to show he had been cleared, but James found out that an Internal Affairs investigation would have to be initiated to accomplish that. (Id.) Yet, no investigation ever occurred. (Id.) Soon after, however, Wray transferred James to CID and commented that James had almost "derailed himself" with his conduct during the investigation. (Id.)

Crotts testified that, based on special intelligence, the GPD set up a sting operation in which a prostitute would proposition an unsworn black GPD employee after he was suspected of engaging in prostitution activity at a Greensboro club. (Doc. 282-18 at 24.) When the operation was discovered, an administrative investigation commenced, and the employee was either terminated or resigned before he could be terminated. (Id. at 25.) Crotts could not recall whether the employee was ever prosecuted for the alleged prostitution activity (id.), and

there is no record evidence that the investigation was without basis.

Officer Gary Hastings (white), former Captain of CID, testified that in 2005 while he was in CID, a bi-racial GPD officer was investigated for allegedly stealing gasoline from the City for his personal use. (Doc. 282-14 at 5; Doc. 282-18 at 62.) When Internal Affairs determined that the allegations should not be sustained, Crotts testified, Wray exhibited "disgust," and Crotts believed he might be transferred out of Internal Affairs for coming to this conclusion. (Doc. 282-18 at 64-65.) There is no evidence that Wray ever took any action against any Internal Affairs investigators in the case, however.

Finally, Hastings testified that when Wray assigned Rankin to be a homicide investigator for SID, Wray said, "I'm hoping Rankin's face over there is going to buy us some window dressing." (Doc. 282-14 at 4.) Plaintiffs have provided no date for this occurrence, and the submitted portion of Hastings' deposition fails to provide any context. Presumably, it occurred while Wray was chief.[31]

---

[31] Additional alleged incidents of disparate treatment are related in the City Attorney's investigatory report, discussed infra, but they are not specifically referred to or relied upon by Cherry or Pryor in any of their filings.

### c.    Chain of command under Wray

The original plaintiffs' master response brief contends that the way Wray configured his chain of command contributed to a hostile work environment.  (Doc. 88 ¶¶ 61, 70, 74, 90, 107.) According to Officer Richard David Ball, who was employed by the GPD from 1976 through 2005 (Doc. 282-12 at 3), Sanders, as investigator for SID, was authorized to report directly to Wray and Brady, thus bypassing the commander of Internal Affairs (id. at 20).  Sanders' supposed supervisor, Officer Craig McMinn, testified that many times he had no idea what Sanders was doing. (Doc. 282-17 at 13.)  According to McMinn, the built-in checks-and-balances system that the chain of command provided was missing when Sanders reported directly to Brady, whom McMinn did not consider to be a seasoned investigator.  (Id. at 14-15.) Additionally, Hastings stated that when he told Wray that GPD policy required all criminal investigations of officers to be conducted by CID, Wray responded, "I am the policy." (Doc. 282-14 at 7.)

Cherry and Pryor contend that the chain of command Wray utilized for his administration, focusing on Sanders' free-wheeling role as SID investigator in particular, allowed the GPD Defendants to target black officers with impunity and thus contributed to the hostile work environment.  (Doc. 282 at 36-38.)

### d. High-ranking black officers excluded from decision-making

Cherry and Pryor also argue that the exclusion of high-ranking black officers, particularly Assistant Chiefs Tim Bellamy and Annie Stevenson, from important meetings contributed to a hostile work environment at the GPD. In particular, Bellamy testified that he was excluded from weekly closed-door meetings that were attended by lower-ranking officers. (Doc. 282-16 at 7–11.) Once he was promoted to assistant chief, he was warned by other high-ranking black officers that there were some meetings he would not be invited to and that "they kind of turned secret meetings into secret police." (Id. at 11.) Bellamy believed that such "secret meetings" undermined his ability to perform his job as assistant chief. (Id. at 12–13.)

Cherry and Pryor argue that Wray maintained an inner circle of white officers to conduct his administration's racially-biased investigations and which contributed to the hostile work environment that existed at the GPD.[33] The record is unclear whether Cherry and Pryor knew about the secret meetings before

---

[33] The City Attorney's internal analysis of the Wray administration, discussed infra, noted that Wray held "informal" meetings of his command staff after hours at a local restaurant, and when Assistant Chief Stevenson questioned whether black commanders were being excluded, Wray extended an invitation to them as well – "but it seems that they never attended such a meeting." (Doc. 282-8 at 25.)

August 2005.[34]

         **e.    City Legal and Risk Management Associates reports**[35]

The original plaintiffs also rely on the findings contained in two reports from investigations into alleged racial and other issues within the GPD that were commissioned by City Manager Johnson following his August 2005 meeting with three of the original plaintiffs.  One report was issued by the City's legal department following the City attorney's investigation (the "City Legal Report"), while the other was issued by Risk Management Associates (the "RMA Report"), an independent consulting firm retained by Johnson.  See Alexander 293, 762 F. Supp. 2d at 778-79, 784.

The City Legal Report (Doc. 282-8) was commissioned first by Johnson.  Following his August 2005 meeting with three GPD officers about their concerns over Wray's conduct, Johnson felt he needed an investigation independent of the GPD that would address the mounting criticisms of Wray's administration and more specifically permit the City to defend itself against outside charges involving Wray and the GPD (Doc. 282-3 at 49-50).  By this time, Wray had already dismissed the increasing

---

[34] Cherry's interrogatory response states only that Bellamy told him "[w]hile Wray was Chief" that white officers had secret meetings and made decisions without his knowledge.  (Doc. 282-1 at 20.)

[35] Cherry and Pryor do not rely on either report in their *pro se* brief.

complaints about his handling of police matters in his weekly meetings with Johnson (Wray was a direct report to Johnson, as city manager), and Johnson had provided written responses to the local NAACP's pointed June 21, 2005 letter (Doc. 282-4) raising concerns about Hinson, the "black books," and other matters. Johnson had also met with local NAACP President Gladys Shipman and told her, based on Wray's representations, "with every ounce of integrity that I have that we didn't have a black book, that we were not targeting black officers." (Doc. 282-3 at 32-34.) Moreover, at around the same time, the SBI requested a meeting with Johnson and independently expressed concerns about the GPD's handling of investigations. (Id. at 46-47.) In light of complaints about Wray's management style from black and white officers alike and the SBI's concerns, Johnson was beginning to have serious doubts about the reliability of the information Wray was giving him. (Id. at 34.)

Although the City Legal Report was commissioned before the RMA Report, it was not actually released until after Wray resigned in January 2006 – that is, after the RMA Report was made public. The City Legal Report discussed the GPD's internal investigations of several of the individual plaintiffs. The report is addressed in more detail in this court's opinion in Alexander 293, 762 F. Supp. 2d at 778, 796-803, where many of the plaintiffs were attempting to proceed on a theory of

disparate treatment. The report provides instances of alleged wrongful conduct directed toward certain GPD officers, yet the vast majority of the plaintiffs are not mentioned in it. It concluded that the "facts gathered suggest the following improprieties" by the GPD Defendants and others during the Wray administration, including: (1) on several occasions, Wray, Brady, or another assistant chief ordered the alteration of original documents pertaining to internal investigations (however, none of the original plaintiffs' investigations is specifically mentioned in the report); (2) improper administrative pressure on subordinates to change their administrative findings, discipline and evaluation, including pressure on Phifer to increase Pryor's disciplinary recommendation in the Harris Teeter incident; (3) disparate treatment of various officers, such as Hinson, James, Rankin, Patterson, Fulmore, Alexander, and Hunter, relating to many of the investigations detailed above (although the report does not charge that the investigations themselves were without legal basis); (4) the appearance of racial targeting and discrimination, such as the re-opening of the Hinson investigation contrary to GPD policy, exclusion of Bellamy from meetings, surveillance of Hinson and Fulmore, and the failure to dispel "black book" rumors; (5) allegations of intimidation by Wray and Brady against several officers, white and black alike;

and (6) improper use of SID and failure to follow procedures. (See Doc. 282-8.)

During the City legal department's investigation in the fall of 2005, Johnson came to believe that the investigation should be broadened to address Wray's management practices and would need to be conducted by an outside party rather than by the City attorney. Thus, Johnson retained Risk Management Associates to conduct a separate investigation. (Doc. 282-8 at 11.) Risk Management Associates employs private consultants with extensive experience in law enforcement services, management, and training. (Id.) Like the City Legal Report, the RMA Report (Doc. 282-7) was intended to provide a response to complaints made to Johnson about Wray's style of leadership, including claims of racial tension in the GPD (Doc. 282-3 at 43). During the investigation, however, it became apparent that the report would have to be more narrowly tailored to address the veracity of Chief Wray's discussions with Johnson about the investigation of GPD officer Hinson and other personnel decisions.

The RMA Report was completed on December 19, 2005. This court summarized the report in Wray's subsequent race discrimination case challenging his allegedly forced resignation from the GPD, Wray v. City of Greensboro, No. 1:09-CV-00095, 2013 WL 4494460 (M.D.N.C Aug. 19, 2013), as follows:

The RMA Report concluded that "there is clear and convincing evidence" to support the conclusion that Wray did not provide truthful and accurate information regarding Hinson's suspension, the discovery of the tracking device, and related matters, that Hinson's suspension was "unnecessary and inappropriate," and that Wray may have violated at least two North Carolina criminal statutes in connection with a June 2005 union meeting. This caused [City Manager] Johnson to believe that Wray may have been misleading regarding the Hinson investigation, failed to properly oversee the police department, and may have violated North Carolina law.

Id. at *3 (citations to the record omitted). At least in part based on the findings of the RMA Report, Johnson decided to place Wray on administrative leave in early January 2006. (Doc. 282-3 at 62–63.) Wray resigned a few days later. (Id.)

Following the City Legal and RMA investigations and immediately following Wray's resignation, Johnson issued a public statement on behalf of the City in which he admitted that (1) Wray had been dishonest with his superiors with respect to the ongoing investigation of James Hinson; (2) a "black book" containing the pictures of 19 black officers had been concealed and Wray's superiors were not informed of its purpose as an investigatory tool for the sexual assault investigation, which led to the proliferation of inaccurate information; and (3) SID's "continued pursuit of unproven, previously investigated, and unsubstantiated charges against certain African[-]American officers created an atmosphere of fear, distrust, and suspicion, which undermined the department's morale and efficiency." (Doc.

33

282-10 at 4-5.) Plaintiffs rely on these statements essentially as admissions that a hostile work environment existed at the GPD.

### 2. Breach of contract and tortious interference clams

Following all of these incidents, many of the plaintiffs, including Cherry and Pryor, filed charges of discrimination with the Equal Opportunity Employment Commission ("EEOC"). Thereafter, on February 13, 2008, the EEOC sent the City a "proposed conciliation agreement" indicating, among other things, that the EEOC was encouraging the parties to engage in conciliation. (Doc. 180-2.) On March 4, some EEOC claimants (including Cherry), representatives of the City, and their counsel met to mediate the charges. (Doc. 180-3 at 3.) On that date, an agreement was entered into (the "Stipulation") that provided, in relevant part:

> In discussing possible settlement, certain personnel matters that are confidential by law may need to be discussed. In an effort to have a meaningful settlement discussion without concern that confidential matters not be discussed outside the context of the settlement meeting, counsel for the parties have agreed to keep all discussions kept [sic] confidential.
>
> IT IS HEREBY STIPULATED AND AGREED by and between the parties to this stipulation, through their undersigned counsel, that:
>
> 1. This stipulation shall govern any statement or information by any party, to any other party in connection with the mediation of this action.

> 2. No person who receives any statement or information during the mediation shall disclose it to any non-party for any purpose.

(Doc. 180-5.)  Although no settlement was reached on that date, on August 19, 2008, the Greensboro City Council (the "City Council") voted to offer plaintiffs a total of $750,000 to settle their claims.[37]  (Doc. 210-2 at 20-21; Doc. 180-18 at 3.)  Wade, as a councilmember, expressed frustration that the City Council was not told the plaintiffs' names before deciding whether to offer the settlement.  (Doc. 210-2 at 23.)  She also felt that the City Council lacked sufficient information about the facts on which the claims were based to make a decision whether to settle and that ultimately whether the plaintiffs should be awarded any money was a determination best left to the courts.  (Id. at 52.)

After the settlement offer, Wade called City Clerk Betsy Richardson to make a public records request for all contracts signed by the City Manager in the previous two years.  (Id. at 5.)  According to Wade and Johnson, the request sought "[a]ll outstanding consulting and service contracts except for construction and demolition contracts; all completed consulting

---

[37] The offer had certain conditions attached to it.  Plaintiffs rejected it with an August 22 counteroffer, which the City rejected September 4, 2008.  (Doc. 210-14 ¶¶ 27-29.)  The City authorized another version of an offer with a $750,000 payment on October 21, which was communicated to plaintiffs November 3.  (Id. ¶¶ 31, 32.)

and service contracts since July 1, 2007; [and] all current RFP's for consulting and service contracts." (<u>Id.</u> at 8.) Johnson became aware of the request on October 31, 2008, after receiving an e-mail from Richardson. (Doc. 210-7 at 3.) Because the documents Wade requested were contracts with the City, Johnson had no concerns that the documents were anything other than public records, available to any citizen. (Doc. 210-3 at 23.)

The City produced the documents for Wade in tranches, with the entire production lasting about a month. (Doc. 210-2 at 6.) Because of the sheer number of documents encompassed by her request, Wade enlisted the help of her political consultant, William Burkley, to sort through them. (Doc. 185 at 15-16.) Within them, Burkley discovered a document entitled "Equitable Sharing Agreement and Certification" (the "Sharing Agreement") (Doc. 210-4), which identifies thirty-nine of the <u>Alexander</u> plaintiffs by name, including Cherry and Pryor, as having filed an EEOC charge of discrimination against the City.

Upon discovering the document, Burkley immediately called John Hammer, publisher of the *Rhinoceros Times* ("*Rhino Times*"), a free local weekly newspaper in circulation in Greensboro that had printed stories about the alleged ongoing GPD racial issues. (Doc. 210-2 at 10.) Wade and Burkley immediately drove to Hammer's residence, where Burkley got out of the car and

excitedly waved the Sharing Agreement at Hammer, saying something to the effect of, "you're not going to believe what I have . . . this is the list here and it's public information, and you're not going to believe this, that's the police officers . . . ." (Id. at 11.) Up to this point, Wade had not seen the document and directed Burkley to get back in the car. (Id. at 12.) Burkley told Hammer that if he wanted the Sharing Agreement, he could make a public records request to the City on his own. (Id. at 12) Wade explained:

> I didn't want to give it to Mr. Hammer. He could ask himself for the same public information I had. I didn't want to influence the story in the *Rhino Times* with Trudy Wade gives public information to John Hammer. If he wants it, he can get it the same way I got the public information or anybody else could.

(Id. at 13.)

Hammer later e-mailed Richardson and requested the same documents that had been delivered to Wade, using language that closely tracked Wade's previous request. (Doc. 210-9 at 2-3.) Hammer forwarded his e-mail to Assistant City Clerk Diana Schreiber. According to Schreiber, Wade requested that she fulfill Hammer's request by simply copying the documents given to Wade. (Doc. 210-6 at 4, 6.) Schreiber met Wade in the City Council's underground parking lot, where Wade gave her a stack of documents to copy for Hammer. (Id. at 6-7.) Schreiber then accompanied Wade to the Mayor's office, where Schreiber worked,

and began making the copies.  (Id. at 8.)  Wade made clear that the copies were for Hammer.  (Id. at 10.)

Schreiber copied the documents in about an hour, went downstairs where Hammer was waiting, gave him his copies, and returned the originals to Wade.  (Id. at 14-15.)  According to Schreiber, Wade appeared upset that she could not initially find something in the stack of documents returned to her but became satisfied when she eventually found it.  (Id. at 15-16.)  Wade asked Schreiber to return to her car to get more documents, but Schreiber refused because she did not have time.[38]

After Johnson learned that the names of the plaintiffs, including Cherry and Pryor, had been produced to Wade and Hammer, he instructed the City Clerk's office to bring him all the documents that had been produced to Hammer.  (Doc. 210-3 at 7.)  In this search, Johnson discovered the Sharing Agreement and its accompanying list of names.  (Id.)  He testified that the "release of that document . . . was a mistake on the part of staff because we had no idea that that information was in the documents."  (Id.)  According to Johnson, the mistake was made because he and the clerk had assumed that any document provided by the City's department heads was a matter of public record.

---

[38] Although Wade disputes this part of this conversation, especially that she expressed disappointment she could not find a specific document (Doc. 210-2 at 59), the court accepts it for purposes of the present motions.

(Id. at 8.)   For her part, Schreiber also admitted that the Sharing Agreement should not have been given to Wade in the first place.  (Doc. 210-6 at 20.)

On November 13, 2008, Hammer published an article in the *Rhino Times* entitled "Names Too Secret for City Council Revealed."  (Doc. 210-11.)   The article includes the names of the thirty-nine plaintiffs subject to the Sharing Agreement, including Cherry and Pryor, and the $750,000 settlement offer. (Id. at 2-4.)   Hammer also expressed his opinion that the members of the City Council who had supported a settlement offer to the plaintiffs before knowing their identities had acted irresponsibly.  (Id. at 2.)   According to Johnson, the article created a public outcry about the settlement at the next City Council meeting.  (Doc. 210-3 at 12.)[39]

Cherry and Pryor contend that the settlement offer was revoked five days later during a closed session of the City Council on November 18, 2008.  (Doc. 210 at 16.)   Wade and Johnson have refused to disclose the results of any vote or discussions at that meeting on the grounds of privilege.[40]  (Doc. 210-2 at 53-55; Doc. 210-3 at 25-27.)   Cherry and Pryor have

---

[39] The City and Wade strongly contest this point, but a reasonable jury could credit Johnson's testimony that there was a public outcry about the settlement.

[40]  The invocation of privilege does not appear to have been challenged by any plaintiff in this action.

both filed affidavits stating that they would have accepted their share of the $750,000 settlement had the offer not been rescinded. (Doc. 210–12 at 15–16, 53–54.)[41]

## II. ANALYSIS

### A.    Motion to Strike Cherry and Pryor's *Pro Se* Brief

As noted above, Cherry and Pryor discharged their counsel on September 4 and 5, 2013, essentially contemporaneously with the due date of their response brief.    Not clear of their obligation insofar as the court had not discharged them and no new counsel had been retained, counsel for Cherry and Pryor timely filed a brief on the clients' behalf; however, Cherry and Pryor also filed their own *pro se* brief detailing their hostile work environment claims against the City and the GPD Defendants. (Doc. 131 in case 1:09CV934.)    The 68-page *pro se* brief is wholly devoid of any citation to the record, with just two citations to any legal authority, and violates a number of the local rules of this district.    See, e.g., L.R. 7.2(a)(2) ("Each statement of fact should be supported by reference to a part of the official record in the case."); L.R. 7.3(d) (limiting response briefs to 20 pages).    It also violates this court's

---

[41] The City notes that original plaintiff Rankin originally testified at his deposition that Cherry and Pryor were not prepared to accept the $750,000 offer at the time.  (Doc. 180 at 6.)  However, Rankin recanted this testimony later in his deposition.  (Doc. 180–18 at 5–6.)

briefing Order.  For these reasons, the City moved to strike it.
(Doc. 191 in case 1:09CV934.)

The *pro se* brief indeed rests on a precarious footing.
Yet, these claims have been pending for almost five years, and
the court has a strong interest in resolving them rather than
delay their resolution further because of the missteps of Cherry
and Pryor.  The court has therefore considered the contents of
all materials filed by or on behalf of Cherry and Pryor.
Because the court finds, for the reasons that follow, that the
*pro se* brief fails to support a claim that a hostile work
environment existed for these two plaintiffs at the GPD during
the relevant time period, the City's motion to strike will be
denied as moot.

### B.  GPD Defendants' Motion to Strike Appendices

The GPD Defendants also move to strike the appendices
submitted on behalf of the other thirty-eight plaintiffs on the
grounds that they violate this court's prior Order on briefing
limits and rely on inadmissible hearsay evidence.  (Doc. 261.)
The appendices regurgitate and are duplicative of those
plaintiffs' interrogatory responses, which are attached to their
motion for summary judgment as Exhibit A.  (Docs. 282-1, 282-2.)

The interrogatory responses are admissible evidence (to the
extent they are based on the personal knowledge of the
declarant), and therefore the court need not determine whether

41

the same material may be considered in the form of appendices to the original plaintiffs' response brief. The motion will therefore be denied as moot. Of course, to the extent any interrogatory response contains inadmissible hearsay, it will simply be disregarded rather than struck.

### C. Motions for Summary Judgment

#### 1. Standard of review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that no genuine dispute of material fact remains. When the non-moving party has the burden of proof, the moving party is entitled to summary judgment if it shows the absence of material disputed facts. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 325 (1986). "As the Supreme Court has made clear, 'courts should [not] treat discrimination differently from other ultimate questions of fact.'" Merritt v. Old Dominion Freight Line, Inc., 601 F.3d 289, 294-95 (4th Cir. 2010) (quoting U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 716 (1983)). In assessing whether a genuine dispute of material fact sufficient to preclude summary judgment exists, the court regards the non-movants' statements as true and accepts all admissible evidence and draws all inferences in the non-movants'

favor.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986).  But a non-moving party must establish more than the "mere existence of a scintilla of evidence" to support his position.  <u>Id.</u> at 252.  If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted."  <u>Id.</u> at 249-50.  Ultimately, summary judgment is appropriate where the non-movant fails to offer "evidence on which the jury could reasonably find for the plaintiff."  <u>Id.</u> at 252.

### 2. Hostile work environment claims

#### a. Elements of hostile work environment claim

In order to survive summary judgment on their hostile work environment claims, Cherry and Pryor must produce evidence sufficient for a reasonable jury to find that defendants' conduct was "(1) unwelcome; (2) based on race; and (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere."  <u>Spriggs v. Diamond Auto Glass</u>, 242 F.3d 179, 183 (4th Cir. 2001).  The elements are the same whether the cause of action arises under Title VII or section 1981.  <u>Id.</u> at 184.

Defendants argue that Cherry and Pryor cannot show that the alleged actions were either based on race or "severe or pervasive."  To show that the alleged hostile work environment was based on their race, Cherry and Pryor must produce evidence

sufficient for a reasonable jury to find that, but for their race, they would not have been the victim of the alleged discrimination. <u>Mosby-Grant v. City of Hagerstown, 630 F.3d 326, 334 (4th Cir. 2010)</u>. Whether the alleged conduct was sufficiently "severe or pervasive" to create a hostile work environment claim depends on several factors, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 23 (1993); <u>see also</u> <u>Williams v. Aluminum Co. of Am.</u>, 457 F. Supp. 2d 596, 608 (M.D.N.C. 2006).

To be actionable, the harassment must be both subjectively and objectively hostile. <u>Harris</u>, 510 U.S. at 21–22. An objectively hostile work environment is one "that a reasonable person would find hostile or abusive." <u>Id.</u> at 21. "Whether the harassment is objectively severe or pervasive is judged from the perspective of a reasonable person in the plaintiff's position." <u>Williams</u>, 457 F. Supp. 2d at 608 (citing <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 81 (1998)). As this court noted in <u>Alexander 293</u>, because this case was not brought as a class action, each plaintiff is required to show that he is entitled to relief. 762 F. Supp. 2d at 791. Thus, Cherry and Pryor each must produce sufficient evidence upon which a

reasonable jury could find all the elements of a hostile work environment as to him.

### b.   Evidentiary deficiencies

Neither Cherry nor Pryor has produced any admissible evidence in their jointly filed *pro se* brief.   None of their arguments contains any citation to the record in either case, and many rely on hearsay as the sole support.   For example, there are several arguments in the brief that rely on alleged statements or actions of Assistant Chief Bellamy.   The court has reviewed the entirety of Bellamy's deposition transcript submitted by the <u>Alexander</u> plaintiffs and, apart from his testimony about being excluded from certain meetings, found no support for them.   Even where Bellamy's testimony appears to be helpful to Cherry and Pryor, it relies on inadmissible hearsay. For example, Bellamy testified that a number of reliable confidential informants stated that some white GPD officers were going around Greensboro and showing photographs of black officers to those informants and to others.   (Doc. 282-16 at 21-22.)   Bellamy viewed these informants as reliable enough to use for seeking a search warrant from a magistrate, yet he refused to divulge their names.   (<u>Id.</u> at 19-20.)   Needless to say, the record contains no statements from them; these declarants have not been deposed, nor has their testimony been made available in any admissible form.   Bellamy's reports of their alleged

statements therefore consist of inadmissible hearsay, see Fed. R. Evid. 801(c), 802, and the court will not consider them when ruling on the motion for summary judgment. See Greensboro Prof'l Firefighters Ass'n, Local 3157 v. City of Greensboro, 64 F.3d 962, 967 (4th Cir. 1995).

### c. Black book allegations

Plaintiffs' reliance on the various line-up books – an original focus of this case - to establish their hostile work environment claim fails.

As an initial matter, the Alexander plaintiffs and the *pro se* brief essentially argue that to the extent the City and GPD Defendants admit to showing photographs of certain black officers to anyone, the line-ups were improperly conducted in a racially-motivated way. In the absence of evidence of bad faith or improper motivation, however, courts should avoid engaging in *post hoc* examination of internal police investigations. See, e.g., Dintino v. Echols, 243 F. Supp. 2d 255, 265–66 (E.D. Pa. 2003) (noting in context of constitutional claim under 42 U.S.C. § 1983, that "[a]bsent evidence of wrongdoing or bad faith, of which the plaintiff presents none, it is not the province of the court to second-guess the investigatory techniques used and decisions made by law enforcement officials"); Smith v. Reddy, 882 F. Supp. 497, 502 (D. Md. 1995) (noting in section 1983 action that the court's role is "not to second-guess police

work"); <u>United States v. Gravina</u>, 906 F. Supp. 50, 54 (D. Mass. 1995) (noting in context of application of exclusionary rule in supervised release revocation hearing, "absent any evidence whatsoever of improper police motivation or conduct, this Court will not second-guess the manner in which the police performed their functions"). Neither Cherry nor Pryor has produced any admissible evidence that any lineup book was used for any reason other than the City's proffered investigatory purposes.[42] Plaintiffs' hostile work environment claims gain no purchase on unsupported assertions that different lineups should have been shown in certain situations, such as the sexual assault investigation.

More importantly, Cherry and Pryor admit, in both their depositions and their *pro se* brief, that they had no contemporaneous knowledge of any photographs in any of the so-called "black books" being shown to anyone. (Doc. 112-1 in case 1:09CV934 (Cherry Dep.) at 23-30; Doc. 114-6 in case 1:09CV934 (Pryor Dep.) at 29-30.) In fact, in their *pro se* brief Cherry and Pryor assert that they became aware of the lineup books after the August 2005 meeting that three other

---

[42] Even evidence of an alleged lineup book discovered by Fulmore is based on inadmissible hearsay. Fulmore testified in his deposition in case 1:09CV373 that Officer Danny Combs told him about the photographs that Sanders was gathering in his office. (<u>See</u> Doc. 89-1 in case 1:09CV373 at 102.) No testimony of Officer Combs has been presented in these cases.

Alexander plaintiffs had with then-Deputy City Manager Johnson, which was well after the investigations were concluded and the City had begun investigating the various discrimination claims. (Doc. 131 in case 1:09CV934 at 21.) Although the Fourth Circuit does not yet appear to have addressed the subject, other circuits have held that because discriminatory conduct must be subjectively (as well as objectively) hostile, "[a] Title VII plaintiff 'may only rely on evidence relating to harassment of which []he was aware during the time that []he was allegedly subject to a hostile work environment.'" Cottrill v. MFA, Inc., 443 F.3d 629, 636 (8th Cir. 2006) (quoting Hirase-Doi v. U.S. West Commc'ns, Inc., 61 F.3d 777, 782 (10th Cir. 1995)); accord Pryor v. Seyfarth, Shaw, Fairweather & Geraldson, 212 F.3d 976, 978 (7th Cir. 2000) (finding that "[i]nsofar as Woodford harassed other employees, and did so without (so far as appears) Pryor's knowledge, it could not have altered *her* conditions of employment, and so she could not complain about that harassment under Title VII"); Burnett v. Tyco Corp., 203 F.3d 980, 981 (6th Cir. 2000) (finding allegations of misconduct insufficient because "there is no evidence that plaintiff was aware of these actions at the time").

Plaintiffs cannot rely solely on rumors and inadmissible hearsay to create a genuine issue of material fact where, at least on this record, those rumors were perpetuated by the

*Alexander* plaintiffs themselves. Neither the *pro se* brief nor the original plaintiffs' response brief cites any authority, and the court can locate none, for the proposition that plaintiffs may create a hostile work environment by propagating rumors amongst themselves. Yet this is precisely what Cherry and Pryor request that the court allow them to do.

For these reasons, the record evidence fails to support a hostile work environment claim regarding the so-called "black books."

### d. Investigations of black officers and other alleged irregularities

Cherry and Pryor also rely on various GPD investigations of themselves, the other *Alexander* plaintiffs, James Hinson, and Fulmore to support their hostile work environment claims. Unlike the black book claims, record, non-hearsay evidence does exist regarding investigations of black GPD officers.

To be sure, the court has previously found that the amended complaint's allegations of investigations as to Cherry and Pryor failed to state a separate claim for disparate treatment as to them. Pryor himself complains of just two incidents. One of these (the Harris Teeter arrest incident) was already considered by the court in <u>Alexander 293</u> as a disparate treatment and/or disparate discipline claim and dismissed for legal insufficiency. <u>See</u> 762 F. Supp. 2d at 800-01. The other

incident involved Pryor being called a "token black" by a squad member and his immediate superior failing to investigate the comment. On their own, these incidents would not be sufficiently severe or pervasive to sustain a hostile work environment claim. See, e.g., Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 226 (1st Cir. 2012) ("stray remarks," even if they may be offensive, cannot constitute a hostile work environment claim).

Cherry's incidents, which are admittedly more numerous than Pryor's, still amount to nothing more than isolated disparate treatment claims and technical complaints about the adequacy of GPD internal investigations. For instance, Cherry's claims regarding the child abuse investigation invite this court to parse the technicalities of a plainly legitimate investigation into a serious allegation made by Cherry's daughter, which her mother reported. The claim arising out of the confrontation between Cherry and Ingold does not appear to amount to any sort of claim, as Cherry's only argument is that Wray failed to follow GPD directives after an incident in which both parties apologized. Such an incident could not form the basis of any claim under Title VII or section 1981, because these statutes do not create a general workplace civility code, and not every insult or slight is actionable under the discrimination laws. See Jennings v. Univ. of N.C., 482 F.3d 686, 696 (4th Cir. 2007)

(citing Oncale, 523 U.S. at 80).  Like Pryor's, Cherry's complaints about individual disparate treatment are insufficient to support a claim of hostile work environment.  Moreover, there is no evidence that Cherry and Pryor were aware of each other's incidents.

Both Cherry and Pryor state that certain epithets were uttered against them or other officers.  However, only one epithet was used in Pryor's presence over the span of years.  Pryor acknowledged that the GPD addressed the incident by requiring the offending officer to apologize, although the response was not to Pryor's satisfaction.  Cherry was once called a "jerk" by a white captain, and Cherry states that white commanders called minority officers "terms like 'sorry sack of s***'."  Neither plaintiff charges a steady stream of racial slurs, making it nearly impossible to perform one's job.  See, e.g., EEOC v. Central Wholesalers, Inc., 573 F.3d 167, 176–77 (4th Cir. 2009) (black plaintiff produced sufficient evidence for hostile work environment claim where co-workers used the epithet "n****r" on a daily basis and displayed mop-head dolls hanging by nooses in the office); EEOC v. Sunbelt Rentals, Inc., 521 F.3d 306, 315–19 (4th Cir. 2008) (sufficient evidence for hostile work environment claim where the plaintiff was subjected to constant comments disparaging the Muslim faith, questioning his allegiance to the United States, and insinuating that he was

a terrorist); <u>Spriggs</u>, 242 F.3d at 184–85 (epithets such as "n****r" and "monkey," even though not directed at the plaintiff, were sufficient to support a hostile work environment claim when said in his presence); <u>cf.</u> <u>Greene v. Swain Cnty. P'ship for Health</u>, 342 F. Supp. 2d 442, 455 (W.D.N.C. 2004) (defendant granted summary judgment on hostile work environment claim where plaintiff's evidence consisted of being called the "Token Indian" and subjected to a few derogatory comments about her black hair and high cheekbones). The record is also devoid of the use of any threats of violence or physical intimidation. <u>See, e.g.</u>, <u>White v. BFI Waste Servs., LLC</u>, 375 F.3d 288, 298–99 n.6 (4th Cir. 2004) ("The presence of race-based physical threats undeniably strengthens a hostile work environment claim. The absence of such, however, is in no way dispositive, when there is sufficient evidence from which a reasonable jury could conclude that allegedly harassing conduct was otherwise humiliating." (internal quotation marks omitted)); <u>Dowd v. United Steelworkers of Am., Local No. 286</u>, 253 F.3d 1093, 1101–02 (8th Cir. 2001) (plaintiffs could establish hostile work environment claim against union where union members subjected them to threats of violence each time they drove into the steel plant, including throwing tacks in the path of the plaintiffs' cars and spitting on their car windows); <u>EEOC v. T-N-T Carports, Inc.</u>, No. 1:09-CV-27, 2011 WL 1769352, at *4-5 (M.D.N.C. May 9,

2011) (plaintiff could establish a hostile work environment where, among several incidents that could have humiliated her, one involved a threat of physical violence and caused her and a co-worker to cry).

In an attempt to overcome these deficiencies, plaintiffs seek to aggregate the various investigations of GPD officers to support a hostile work environment claim for themselves. This effort to fashion a hostile work environment claim out of a collection of alleged disparate treatment claims will not pass muster unless the facts support the separate criteria for a hostile work environment claim. See Rattigan v. Gonzales, 503 F. Supp. 2d 56, 82 (D.D.C. 2007) ("[C]obbling together a number of distinct, disparate acts will not create a hostile work environment. For example, if an employee is discriminatorily denied ten promotions over a period of time, that pattern of conduct may give rise to ten separate claims under Title VII, but it would not create a hostile work environment claim based on pervasive intimidation, insult and ridicule."); see also Bailey v. Int'l Paper, Civ. A. No. 2:11-03013, 2012 WL 405713, at *3 (D.S.C. Feb. 8, 2012) (finding that "Plaintiff cannot transform her separate and distinct claim for disparate treatment based on gender into a hostile work environment claim, unless the facts alleged meet the separate criteria for a hostile work environment claim"); Parker v. State of Del., Dep't

of Pub. Safety, 11 F. Supp. 2d 467, 475 (D. Del. 1998) ("[T]he dangers of allowing standard disparate treatment claims to be converted into a contemporaneous hostile work environment claim are apparent. Such an action would significantly blur the distinctions between both the elements that underpin each cause of action and the kinds of harm each cause of action was designed to address.").

Cherry and Pryor also seek to boost their claims by arguing that the investigations into the conduct of other officers created an atmosphere of fear for black officers at the GPD. Under the totality of the circumstances, the court can consider conduct targeted toward others. Hayes v. Lowe's Food Stores, Inc., No. 1:04CV00178, 2005 WL 1258932, at *6 (M.D.N.C. May 26, 2005) (citing Brown v. Hous. Auth. of Calvert Cnty., 150 F. Supp. 2d 856, 863 (D. Md. 2001)). But admittedly, such second-hand harassment claims carry less weight than harassment directed at the plaintiffs personally and must have actually contributed to the hostile work environment *plaintiffs* claim they suffered. Id. Ultimately, the question remains whether Cherry and Pryor have stated sufficient facts to support the elements of a hostile work environment claim for themselves, as noted earlier.

After a careful review of the record, the court concludes that Cherry and Pryor have failed to produce admissible evidence

from which a reasonable jury could find that the conduct of the City and the GPD Defendants was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere *for them.* There are several reasons for this conclusion.

Principally, Cherry and Pryor have failed to demonstrate that, with the exception of Hinson's investigation, they were aware of the various investigations of other officers before they were exposed by the City's independent investigations. As noted earlier, it is a fundamental precept of a hostile work environment claim that the complainant be aware of the conduct alleged to have caused the severe or pervasive racial hostility. See, e.g., Cottrill, 443 F.3d at 636. In the case of Hinson's investigation, even Pryor initially believed it was "probably for just cause," thus failing the subjective element of the standard. (Doc. 282-2 at 9.)

In addition, the various incidents of alleged disparate treatment, considered individually and in their totality, simply fail to rise to the level of severe or pervasive conduct based on race. In most, if not all, cases, plaintiffs have failed to provide evidence to support the inference that such investigations themselves were without any legitimate police purpose. The fact that an investigation terminated in favor of

an officer is insufficient evidence it was instituted without basis.

The investigation that comes closest to evidencing an abusive purpose is Hinson's, because Wray reopened it in 2005 after it had been resolved in August 2004.  Yet, the claim at issue is for a hostile work environment, and even Hinson was unaware that he was under renewed investigation until June 4, 2005, when he discovered the tracking device on his vehicle. From all appearances, the GPD tried to keep the investigation secret, and only because Hinson went to the newspapers did it become public.  After the incident became publicly known, Wray issued a public statement on June 17, 2005, that implicated Hinson in a broader investigation that, in the light most favorable to plaintiffs, was later revealed to be trumped up and lacked any reasonable basis.  As improper as Wray's conduct as to Hinson appears to have been,[47] this incident does not provide evidence of a hostile work environment for Cherry and Pryor.

Further, plaintiffs' contentions that Sanders operated outside the chain of command and that SID acted improperly when it, as opposed to another division, investigated black officers invite this court to involve itself in the inner workings of the

---

[47]  For example, Wray allegedly linked Hinson to a federal drug investigation that involved "bodies in refrigerators."  (Doc. 282-7 at 8.)

GPD. The court declines to do so absent evidence that the investigations were without any legal basis, which, with the exception of the *continued* investigations of Hinson and Fulmore, does not appear on this record.[48] The inherent nature of police work gives rise to internal investigations in appropriate cases. Indeed, even Cherry and James Bowman, a North Carolina SBI agent upon whom plaintiffs rely, acknowledge that while in many cases such allegations are unfounded, it is incumbent upon police investigators in certain cases to consider and, in appropriate cases, pursue reports of impropriety involving their officers made by suspects, family members, and others. (Doc. 112-1 in case 1:09CV934 at 44; Doc. 282-21 ¶ 6 (noting that "in most cases an investigation of such allegations is necessary").) The court cannot say that in the environment of police work generally, and on this record in particular, the admissible evidence would permit a reasonable jury to find that the investigations cited were abusive based on race so as to constitute severe or pervasive harassment for Cherry and Pryor.[49]

---

[48] In any event, it does not appear that either Cherry or Pryor was investigated by SID, as Cherry's child abuse investigation was conducted by CID.

[49] The investigation of Fulmore, cited by plaintiffs as one of the more egregious, demonstrates this point. The inculpatory evidence - drug paraphernalia and a used condom - found in a hotel room registered in Fulmore's name was discovered during a routine hotel interdiction. The room next door was rented to a known prostitute and drug user, who implicated Fulmore in criminal conduct. Fulmore admitted to use of

57

Similarly, plaintiffs' evidence that high-ranking black officers such as Bellamy were excluded from secret meetings with Wray fails to show any altering of Cherry's or Pryor's working conditions. See Allen v. Napolitano, 774 F. Supp. 2d 186, 206 (D.D.C. 2011) (finding claims of exclusion from meetings not sufficiently severe or pervasive to rise to the level necessary to support hostile work environment claim); Pletz v. Hayden, Civ. A. No. 08-0539, 2009 WL 274505, at *6 (E.D. Va. Feb. 4, 2009) (finding belittling plaintiff's job performance, removing her overtime, moving her to various positions over several years while male counterparts were allowed to "homestead" in their positions, making snide remarks, excluding her from correspondence and meetings, supervisor's distancing himself from plaintiff, and supervisor's stating mis-truths and contradictions regarding plaintiff's performance insufficient to make out hostile work environment claim). Similarly, assuming all of plaintiffs' evidence to be true, the technicalities of the chain of command and the existence of Wray's "inner circle"

the condom. Once the prostitute was located, the GPD disagreed with the SBI on her credibility. Ultimately, Fulmore was cleared of any criminal charges, but only after DNA was sent off for examination, yet he was found to have violated GPD policy in connection with the whole incident. The real criticism of the GPD investigation relates not to the merits but mostly to the fact it took over six months to be resolved. The need for obtaining DNA test results appears to have contributed to this delay. (Doc. 282-8 at 9-11.) Even the SBI acknowledged that the initial Fulmore investigation was necessary. (Doc. 282-21 ¶ 6.)

have not been shown to have had any effect on *Cherry and Pryor's* work environment.

In sum, the record, viewed in its totality and in the light most favorable to plaintiffs, paints a sordid picture of Wray's use of intimidation and a heavy hand to administer the GPD. Undoubtedly, as the RMA Report and City Legal Report detail, there is evidence that some of his tactics and the appearances created by them were, at least, racially insensitive. In some cases, there is evidence that he may have been racially motivated as to the nature and extent of an investigation (e.g., Hinson). However, while the plaintiffs rely on the onslaught of evidence of the various misdeeds of Wray's administration as a general indictment, the limited issue before the court is whether the City and GPD Defendants created a racially hostile work environment for Cherry and Pryor. As the Fourth Circuit has cautioned, "plaintiffs must clear a high bar in order to satisfy the severe or pervasive test." Central Wholesalers, 573 F.3d at 176 (quoting Sunbelt, 521 F.3d at 315). The court concludes that the proffered evidence of inadmissible hearsay and rumors spread amongst the plaintiffs and aggregated investigations of other officers, disparate treatment claims, and internal investigation tactics fails as a matter of law to create a hostile work environment claim *as to Cherry and Pryor*.

Consequently, the City and the GPD Defendants' motions for summary judgment on these claims will be granted.

### 3. Tortious interference claims against Wade

In order to maintain an action for tortious interference with prospective economic advantage, Cherry and Pryor must show that Wade induced the City to refrain from entering into a contract with them without justification. <u>DaimlerChrysler Corp. v. Kirkhart</u>, 148 N.C. App. 572, 585, 561 S.E.2d 276, 286 (2002). In <u>Alexander 293</u>, this court declined to dismiss plaintiffs' tortious interference claim for the following reason:

> Construing all allegations and reasonable inferences derived therefrom in the light most favorable to Plaintiffs, the Amended Complaint alleges that the City submitted a written settlement offer to Plaintiffs, that Wade's disclosures and the subsequent publication of the information she provided led directly to protests by Greensboro citizens against the prospective settlement, that these protests led directly to the City Council's decision to withdraw the offer, that Plaintiffs were considering the City's offer when it was withdrawn, and that Plaintiffs would have accepted the offer had it not been withdrawn.

<u>Alexander 293</u>, 762 F. Supp. 2d at 819 (citations to the record omitted). In addition, the court held that although the plaintiffs had alleged sufficient facts to make it plausible that Wade acted "without justification," she was an "insider" with the power to vote for or against any settlement and therefore may be entitled to a qualified privilege unless the

plaintiffs demonstrated genuinely disputed facts that could, if believed, overcome it.  See id. at 819-20.

With a fully developed factual record, the court now revisits whether Wade is entitled to a qualified privilege, even assuming that a disclosure can be attributed to her.  Earlier in the litigation, plaintiffs contended that Wade disclosed both the names of the EEOC claimants as well as the $750,000 settlement amount, which allegedly contributed to a public outcry that caused the City to abandon settlement.  See Alexander, 762 F. Supp. 2d at 778.  However, plaintiffs have not raised any argument or provided any evidence in the current briefing that Wade disclosed the settlement amount (probably because the Sharing Agreement is silent as to it).  The court will therefore treat that aspect of the claim as having been abandoned.[50]

Cherry and Pryor do not attempt to argue at this stage that Wade was not an "insider"; rather, they assert that she lacked justification because her methods of disclosure were improper. (Doc. 210 at 20.)  Indeed, "[one] approach to pleading lack of justification against an 'insider' is to allege that Wade's methods were improper."  Alexander 293, 762 F. Supp. 2d at 821

---

[50] Even if this aspect of the claim were not abandoned, it would fail because the premise of the claim – that the amount had not been publicly disclosed – has been demonstrated to be patently false, as set forth in the discussion of the parallel claim against the City based on the same premise.  See infra Part II.C.4.

(citing Embree Const. Grp., Inc. v. Rafcor, Inc., 330 N.C. 487, 498, 411 S.E.2d 916, 924 (1992)).

In North Carolina, insiders to contract negotiations may still be held liable for tortious interference with contract if they acted with "legal malice." See, e.g., Varner v. Bryan, 113 N.C. App. 697, 701-02, 440 S.E.2d 295, 298 (1994). Although the parties have not directed the court to, nor can it locate, any North Carolina case applying the "legal malice" standard to a claim of tortious interference with prospective economic advantage, the elements of these torts are similar, and there is no reason to believe that insider status would not provide similar protection in such cases.[51] Therefore, Cherry and Pryor must produce sufficient evidence for a reasonable jury to conclude that Wade acted with "legal malice," assuming that she caused the disclosure of the Sharing Agreement to Hammer.

A person acts with legal malice "if [s]he does a wrongful act or exceeds [her] legal right or authority in order to

---

[51] The elements of tortious interference with contract are: "(1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to the plaintiff." Embree, 330 N.C. at 498, 411 S.E.2d at 924. The main difference between the torts is that tortious interference with prospective economic advantage allows a plaintiff to recover against a third party for preventing the formation of a contract, while tortious interference with contract allows recovery for interfering with the rights of a plaintiff under a valid, executed contract.

prevent the [formation] of the contract between the parties."
Varner, 113 N.C. App. at 702, 440 S.E.2d at 298. Legal malice
is distinct from "actual malice," and North Carolina cases have
established that a plaintiff must prove legal malice, not actual
malice, in a tortious interference with contract case. See
Reichhold Chem., Inc. v. Goel, 146 N.C. App. 137, 149, 555
S.E.2d 281, 288-89 (2001) (citing Childress v. Abeles, 240 N.C.
667, 675, 84 S.E.2d 176, 182 (1954)). Thus, the evidence must
show that Wade "acted without any *legal* justification" for her
actions. Varner, 113 N.C. App. at 702, 440 S.E.2d at 298
(citing Childress, 240 N.C. at 675, 84 S.E.2d at 182 (emphasis
added)).

Cherry and Pryor argue that because the names of the
plaintiffs who filed charges of discrimination with the EEOC
were confidential under N.C. Gen. Stat. § 160A-168(a), there is
evidence that Wade knew the names were confidential and thus
acted with the requisite intent. They appear to assume that
Wade knew at the time that disclosing the Sharing Agreement
would violate the confidentiality statute. Even assuming that
the names of the plaintiffs were confidential under the statute,
however, the undisputed evidence shows that Wade did not act
with legal malice.

Cherry and Pryor do not dispute that the City produced the
Sharing Agreement to Wade pursuant to a valid public records

63

request. Plaintiffs argue that Wade nevertheless should have concluded that the Sharing Agreement was a confidential document that was wrongfully produced by the City. Under these circumstances, however, Wade was entitled to assume that the Sharing Agreement produced to her as a result of her request for contracts the City entered into was a public document that she could disclose. But she did not disclose the document to Hammer; rather, she told him he would have to seek his own public records request, which he did. By directing him to do so, Wade did not act wrongfully or exceed her authority. It is of no moment that Hammer's copies of the putative public records were obtained by copying Wade's collection rather than requiring the City to gather all the records from all City agencies yet again. The documents the City had produced to Wade were represented to be public records in any event, and thus she had a legal justification for making her copies available to the City for copying.[52]

Consequently, Wade's acts, viewed in the light most favorable to Cherry and Pryor, do not subject her to liability for tortious interference with prospective economic advantage.

---

[52] Furthermore, Cherry and Pryor's reliance on § 160A-168 is misplaced. It is a criminal statute that confers no private right of action on aggrieved persons. Houpe v. City of Statesville, 128 N.C. App. 334, 350-51, 497 S.E.2d 82, 93 (1998).

####     4.    Breach of contract claims against the City

Cherry and Pryor's remaining breach of contract claims against the City are premised on their contention that the City breached the Stipulation by disclosing the names of the plaintiffs who filed EEOC charges and the proposed settlement amount.  The Stipulation provided:

> 1. This stipulation shall govern any statement or information by any party, to any other party in connection with the mediation of this action.
>
> 2. No person who *receives* any statement or information *during the mediation* shall disclose it to any non-party for any purpose.

(Doc. 180-5 (emphasis added).)  By the plain language of the Stipulation, it governs only information received by the parties during the EEOC's mediation.

With respect to the identities of the plaintiffs, including Cherry and Pryor, the City is correct that the undisputed evidence shows that the City received the names before the EEOC mediation.  As plaintiff Brian James admitted in his deposition, City Legal, which represented the City at the mediation, was already aware of the names of the plaintiffs before the mediation.  (Doc. 180-3 at 4-5.)  Thus, the City did not "receive" the names as part of the mediation process and could not have breached the Stipulation by disclosing them.  Whether the names were confidential under § 160A-168 is irrelevant in

this determination; the cause of action is for breach of contract, and the contract at issue is the Stipulation.

As to the disclosure of the $750,000 settlement amount, this court stated in its denial of the City's motion for judgment on the pleadings that "[t]he City has the better argument as to the settlement offer amount, because the [second amended complaint] explicitly alleges that this amount originated with the City, which conveyed it to Plaintiffs." Alexander v. City of Greensboro, No. 1:09-CV-293, 2011 WL 3360644, at *10 (M.D.N.C. Aug. 3, 2011). This allegation was unchanged in the third amended complaint, which is the current operative complaint (Doc. 88 ¶ 125), and remains undisputed. Consequently, the settlement amount cannot be information that the City "received" in the mediation.

Plaintiffs now appear to have abandoned this claim, as they no longer contend that Wade or the City released the amount. But plaintiffs should not be let off so easily. The allegations as to the disclosure of the settlement amount are problematic. Throughout this litigation, the plaintiffs have kept this claim alive with the representation that the $750,000 settlement offer was first disclosed by Hammer's November 13, 2008, article that sourced the figure from a document released by Wade. (Doc. 88 (Third Amended Complaint) ¶ 134, Doc. 50 (Second Amended

Complaint) ¶ 134.)[53]  Plaintiffs alleged that a public outcry over the amount, once it was revealed, caused the City to withdraw the offer.  Alexander 293, 762 F. Supp. 2d at 810.  The court permitted the claim to survive based on plaintiffs' allegations and representations.

Now that discovery has been completed, however, the undisputed evidence shows that a $750,000 settlement offer had been outstanding since August 19, 2008 – months before Hammer's November article.  (Doc. 132-14 ¶ 29.)  More importantly, the *Rhino Times* had published the amount not once, but twice in separate articles, on September 11, 2008 (Doc. 180-28 at 3), and October 23, 2008 (Doc. 180-29 at 6), well before the City's and Wade's alleged disclosure of the Sharing Agreement.  The premise of the plaintiffs' claim – that the settlement offer was withdrawn as a result of Wade's alleged release of the settlement amount to the *Rhino Times*, which made it public presumably for the first time – is belied by the record and exposes the plaintiffs' claim as built on a patent falsehood from the beginning.

In sum, the undisputed evidence shows that the City already knew that Cherry and Pryor had filed EEOC charges and knew the

---

[53] Both complaints state, in relevant part: "[a]t the time of the November 13, 2008 publication of the article, no public document existed which contained the specific monetary amount the Defendant Greensboro agreed to pay the Plaintiffs to resolve the matters."

settlement amount before the negotiations; the City did not "receive" those facts from the <u>Alexander</u> plaintiffs during the EEOC-sponsored negotiations. Therefore, Cherry and Pryor cannot survive summary judgment on their breach of contract claims.

## III. CONCLUSION

For the reasons stated, the court concludes that Cherry and Pryor have failed to produce sufficient evidence for a reasonable jury to find in their favor on the hostile work environment, tortious interference, and breach of contract claims.

IT IS THEREFORE ORDERED that the motions for summary judgment by the City (Doc. 179; Doc. 104 in case 1:09CV934), Wade (Doc. 183), and the GPD Defendants (Doc. 181) are GRANTED, and that the case be DISMISSED.

IT IS FURTHER ORDERED that the motions to strike (Doc. 261; Doc. 191 in case 1:09CV934) are DENIED AS MOOT.

                                    /s/   Thomas D. Schroeder
                                    United States District Judge

December 18, 2013